```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   DOMINGO CASTILLO MARCELINO,

 4                  Plaintiff,

 5            v.                            16 CV 6287 (KPF) (AJP)

 6   374 FOOD INC, et al.,

 7                  Defendants.

 8   ------------------------------x
                                           New York, N.Y.
 9                                         July 19, 2017
                                           9:00 a.m.
10
     Before:
11
                      HON. KATHERINE POLK FAILLA,
12
                                               District Judge
13
                             APPEARANCES
14
     MICHAEL FAILLACE & ASSOCIATES, P.C.
15        Attorneys for Plaintiff
     BY:  SHAWN RAYMOND CLARK
16        COLIN JAMES MULHOLLAND

17   LEHMAN LG LLC
          Attorneys for Defendants
18   BY:  BRIAN EARL LEHMAN
          JULIE ROSENBLUM SOLARZ
19
     ALSO PRESENT:  JAMES HONTORIA and MATILDE De FERRARI,
20   INTERPRETERS (SPANISH)

21

22

23

24

25
```

```
 1                 (Case called)

 2                 THE DEPUTY CLERK:  Counsel, please identify yourselves

 3     for the record.

 4                 MR. MULHOLLAND:  Yes.  Colin Mulholland.  Good

 5     morning.

 6                 MR. CLARK:  Shawn Clark also for the plaintiff, who is

 7     seated with me at counsel table.

 8                 THE COURT:  Good morning, Mr. Castillo Marcelino.

 9                 MR. CLARK:  Also with me is one of the translators.

10                 THE COURT:  Mr. Hontoria.

11                 THE INTERPRETER:  Yes.

12                 THE COURT:  And there is also another translator.

13     Good morning to you as well.

14                 Mr. Castillo Marcelino, let me understand one thing,

15     sir.  At this time you are receiving assistance from a

16     Spanish-language interpreter.  If at any time you cannot hear

17     or understand what the interpreter is saying, please let me

18     know.

19                 MR. MARCELINO:  Yes.

20                 THE COURT:  Thank you very much.

21                 MR. MARCELINO:  Thank you.

22                 THE COURT:  Mr. Lehman.

23                 MR. LEHMAN:  Brian Lehman for the defendants.

24                 MS. SOLARZ:  Julie Solarz for the defendants.

25                 THE COURT:  Good morning.
```

 1          Also at the table with you?

 2          MR. TIRAN TSADOK:  Tiran Tsadok.

 3          THE COURT:  Good morning to you as well.

 4          Mr. Lehman, there are some folks at the back.  Are

 5     they for impeachment purposes?

 6          MR. LEHMAN:  Yes, your Honor.

 7          THE COURT:  Are these the individuals who were

 8     referred to in the pretrial order or actually in the electronic

 9     devices order that I signed the other day?

10          MR. LEHMAN:  Yes, your Honor, and this morning.

11          THE COURT:  That's fine.  I thought I understood what

12     the marshals needed, and now I do completely.

13          May I just ask this:  Have the parties had discussions

14     about whether these witnesses can remain in the courtroom for

15     the first part of the trial when Mr. Castillo Marcelino will be

16     testifying?

17          MR. LEHMAN:  We haven't.  I'll defer to them.  I'll do

18     whatever they want.

19          THE COURT:  All right.

20          MR. CLARK:  My understanding is that typically, if

21     they are witnesses, that they would be excluded from the party

22     testimony.  Nevertheless, this is a little murky because

23     they're being introduced for purposes of impeachment.

24          My preference would be to have them excluded, the

25     typical rule for witnesses.  To be honest, I'm not 100 percent

1  sure what the proper rule is as to impeachment witnesses.  I'm

2  not sure if they would be required to be disclosed.

3         THE COURT:  I think they should be excluded.  I don't

4  think there is a problem excluding them.

5         Let me just ask.  There are two Tsadoks.  Mr. Tsadok,

6  are you the son, and is there a father as well?

7         MR. TIRAN TSADOK:  Yes.

8         THE COURT:  Is the father here, sir?

9         MR. LEHMAN:  He is.  He's down in the cafe.  He's just

10  waiting there.

11         THE COURT:  That's fine.  I would think he would be

12  permitted to stay because he is actually a party to the

13  litigation.

14         He is named as a defendant in the litigation; is that

15  correct?

16         MR. LEHMAN:  Yes.  He's named.  I think he's more

17  comfortable downstairs.

18         THE COURT:  He can absent himself from the trial

19  proceedings.  My thought was I don't think he would need to be

20  excluded in the way these witnesses would need to be excluded.

21         MR. LEHMAN:  Yes, your Honor, although he is going to

22  give testimony.

23         THE COURT:  Even that I understand.  We're on the same

24  page.  That is fine.  I'm going to ask the five folks to step

25  outside, please.

 1          MR. LEHMAN:  Can we use the interpreter to explain

 2     what's happening?

 3          THE COURT:  Sure.

 4          MR. LEHMAN:  Or I can explain out loud.

 5          MR. CLARK:  We are splitting the costs of the

 6     translators.  So that's fine.

 7          THE COURT:  That's fine.  So let's do that.

 8          (Pause)

 9          THE COURT:  Counsel, my thought would be that if I

10     could have brief opening statements, and then we'd proceed to

11     Mr. Castillo Marcelino's adoption of his declaration and then

12     cross-examination and then go from there.

13          If either side prefers not to make an opening

14     statement, that is understandable.  I'd be happy to hear from

15     you.

16          Is one of you going to talk this morning?

17          MR. MULHOLLAND:  We'd be happy to waive opening

18     statements in this trial.

19          THE COURT:  Thank you.

20          Mr. Lehman?

21          MR. LEHMAN:  I think we'd feel comfortable waiving.

22          THE COURT:  That's fine.  Then let us proceed.

23          Will the plaintiff call their first witness.

24          MR. MULHOLLAND:  Yes.  The plaintiff would call

25     plaintiff Mr. Domingo Castillo Marcelino to the stand.

1      THE COURT:  Mr. Mulholland, since there is a

2 declaration, I assume what we're going to do is just show it to

3 him and have him adopt that declaration as his direct testimony

4 today; is that correct?

5      MR. MULHOLLAND:  Yes.  That is correct.

6      THE COURT:  Do you have a copy of the declaration?

7 Mine is annotated.

8      MR. MULHOLLAND:  I have the original.

9      THE COURT:  That is great.  You may approach.

10      Mr. Lehman and Ms. Solarz, you have a copy of this

11 declaration as well; correct?

12      MS. SOLARZ:  Yes, your Honor.

13  DOMINGO CASTILLO MARCELINO,

14     called as a witness by the Plaintiff,

15     having been duly sworn, testified as follows:

16 DIRECT EXAMINATION

17 BY MR. MULHOLLAND:

18 Q.  Mr. Marcelino, if you could take a moment to examine the

19 document I just handed you.  It should be four pages.

20      Do you recognize the document?

21 A.  Yes.

22 Q.  Could you tell the Court what that document is.  Tell the

23 Court what the document is to your understanding.

24 A.  Yes.

25 Q.  If you could tell the Court what your understanding of that

1    document is.

2    A.  This is my testimony.

3    Q.  If you could take a look at the fourth page of that

4    document.

5             Do you see a signature?

6    A.  Yes.

7    Q.  Is that your signature?

8    A.  Yes.  It is my signature.

9    Q.  Do you recall signing this document?

10   A.  Yes.

11   Q.  Did you sign it under oath?

12   A.  Yes.

13   Q.  Did you understand the contents of the document?

14   A.  Yes.

15   Q.  Do you maintain that they're true to this day?

16   A.  Yes.

17            MR. MULHOLLAND:  Your Honor, plaintiff would like to

18   move to have Plaintiff's Exhibit 1, the original declaration of

19   Mr. Domingo Marcelino, moved into evidence.

20            THE COURT:  All right.

21            Any objection from the defense?

22            MR. LEHMAN:  No, your Honor.

23            THE COURT:  Plaintiff's Exhibit 1 is admitted.

24            (Plaintiff's Exhibit 1 received in evidence)

25            MR. MULHOLLAND:  Plaintiff would also the Court to

 1  move into evidence what's been marked as Plaintiff's Exhibit 2,

 2  which is the original certified affidavit of translation, the

 3  English translation of the declaration of Mr. Marcelino.

 4          THE COURT:  Thank you.

 5          Mr. Lehman?

 6          MR. LEHMAN:  No objection, your Honor.

 7          THE COURT:  Then that is also admitted.  Thank you

 8  very much.

 9          (Plaintiff's Exhibit 2 received in evidence)

10          MR. MULHOLLAND:  May I approach?

11          THE COURT:  You may.  Thank you.

12          MR. MULHOLLAND:  Plaintiff has one more exhibit that

13  we're asking to move into evidence.  It's a copy of

14  defendants -- sorry.  That's all we need from the plaintiff

15  right now.

16          THE COURT:  Thank you very much.

17          Cross-examination.  I'm pointing to Mr. Lehman.  I

18  don't know which of Mr. Lehman or Ms. Solarz will be doing

19  that.

20          MR. LEHMAN:  I'm going to do cross-examination, and

21  she's going to handle the witnesses, your Honor.

22          THE COURT:  Please.  We'll let you take your turn

23  then.

24  CROSS-EXAMINATION

25  BY MR. LEHMAN:

1   Q.  Good morning.

2   A.  Good morning.

3   Q.  I'm Brian Lehman.  I'm the lawyer for the defendants.

4           Do you understand that when I'm asking questions that

5   you're still under oath?

6   A.  Yes.

7   Q.  You stated in your declaration in paragraph 3 that you were

8   employed at Tribeca Bagels by the defendants from September 2,

9   2015, until April 20, 2016.

10          Did you have any other jobs during that time period?

11  A.  Yes.

12  Q.  Could you please tell me those jobs.

13  A.  I didn't understand.

14  Q.  Could you please tell me those jobs.

15  A.  At Tribeca Bagels?

16  Q.  Did you have any other jobs other than being employed by

17  Tribeca Bagels?

18  A.  No.

19          THE COURT:  If I may just ask a clarifying question.

20          During the entire time period from September of 2015

21  through April of 2016, the only entity for which you worked was

22  Tribeca Bagels?

23          THE WITNESS:  Yes.

24          THE COURT:  Thank you.

25  BY MR. LEHMAN:

1   Q.  Did you know Tribeca Bagels as 374 Food Inc. during your

2   employment?

3   A.  Yes.

4   Q.  How did you find that out?

5   A.  Through the owners.

6   Q.  Who do you believe the owners are?

7   A.  The owners.  May I point to them?

8   Q.  Sure.

9   A.  The gentleman seated on the second table.

10  Q.  Is that the only owner?  Or are there other owners?

11  A.  He was here as a witness, but he was asked to leave the

12  room.

13  Q.  Could you describe what he looks like.

14  A.  It's an Asian gentleman.

15          THE COURT:  Mr. Lehman, I'm sorry.  I would have had

16  you keep the folks so that we could do the identification.

17  Perhaps later.

18          You'll excuse me again.

19          Do you recall the color of the shirt that he was

20  wearing or what he was dressed in?

21          THE WITNESS:  He had a striped blue T-shirt.

22          THE COURT:  I'll look for that when they come back.

23  Thank you.

24  BY MR. LEHMAN:

25  Q.  Was he wearing glasses?

1   A.  Yes.

2   Q.  Was he wearing a yarmulke?

3   A.  A "multa."

4   Q.  A "multa?"  I don't know what that word means.

5          THE COURT:  I think he doesn't understand the question

6   you're asking.

7   BY MR. LEHMAN:

8   Q.  Do you know what a yarmulke is?

9   A.  No.

10  Q.  Have you ever seen Jewish people wear something on their

11  head?

12  A.  Yes.

13  Q.  Was the person that you say was the owner -- was he wearing

14  something on his head in the courtroom?

15  A.  I didn't notice it.

16  Q.  When I ask these questions, you understand that I mean

17  during the period of your employment, which, according to you,

18  was from September 2 to April 20, the question being:  Do you

19  understand that time period is what we're talking about here

20  today?

21          MR. MULHOLLAND:  Objection.

22          THE COURT:  I'd like a little bit of clarification.

23  The question regarding what the gentleman was wearing -- that

24  was limited to today.  Correct?

25          MR. LEHMAN:  Yes.

 1          THE COURT:  So the questions you're now going to be

 2   asking him relate to this period of time September through

 3   April?

 4          MR. LEHMAN:  Yes, your Honor.

 5          THE COURT:  Mr. Mulholland, is that the clarification

 6   you were seeking?

 7          MR. MULHOLLAND:  Yes.

 8          THE COURT:  Thank you.

 9          If you could explain that to the witness, please.

10          THE WITNESS:  Yes.

11          MR. LEHMAN:  Your Honor, as a sidenote, it doesn't

12   step on my toes at all when you ask questions.

13          THE COURT:  Thank you.  Not yet at least.

14   BY MR. LEHMAN:

15   Q.  Which days did you work during the week?

16   A.  Monday through Saturday.

17   Q.  Did you have any holidays off?

18   A.  No.

19   Q.  Did they give you Christmas off?

20   A.  No.

21   Q.  Do you understand that Thanksgiving always falls on a

22   Thursday?

23   A.  Yes.

24   Q.  Did they give you Thanksgiving off?

25   A.  No.

1   Q.  Did they give you any Jewish holidays off?  In particular

2   Rosh Hashana or Yom Kippur?

3   A.  No.

4   Q.  Do you know what Yom Kippur is?

5   A.  No.

6   Q.  Do you know what Rosh Hashana is?

7   A.  No.

8   Q.  Did they give you any days off in September 2015?

9          THE COURT:  Other than the Sundays he wasn't working,

10  sir?

11         MR. LEHMAN:  Correct, your Honor.

12         THE COURT:  Thank you.

13         THE WITNESS:  No.

14  BY MR. LEHMAN:

15  Q.  How long does it take you to get to work from where you

16  live?

17  A.  One hour.

18  Q.  Did you ever see anyone that you worked with at Tribeca

19  Bagels on the same subway with you?

20  A.  No.

21  Q.  Could you please look at paragraph 5 of your declaration.

22         I'm going to go back for one second.

23         Do you remember anyone named Ben Hayim who worked at

24  Tribeca Bagels?

25         THE COURT:  May I have the name again, please, sir.

1        MR. LEHMAN:  Ben Hayim.

2            THE WITNESS:  By that name?

3    BY MR. LEHMAN:

4    Q.  Or Ben.

5    A.  I called him Ben Hayim.

6            THE COURT:  Do you do you spell the last name?

7            THE INTERPRETER:  Ben H-a-m-i-n.

8    BY MR. LEHMAN:

9    Q.  So the answer is yes.

10            Would it surprise you if he said he remembers taking

11    the subway with you?

12    A.  No.

13    Q.  It would not surprise you?

14    A.  I never saw him.

15    Q.  Could you please look at paragraph 5 of your declaration.

16    It says" I knew Tiran as Tito.  He was introduced to me as the

17    owner of Tribeca Bagels on several occasions."

18            Who introduced Tiran to you?

19    A.  Alberto, the manager.

20    Q.  So, on multiple occasions, on several occasions, Alberto

21    said, I would like you to meet Tito or something similar?

22    A.  On two occasions I was introduced to him.

23    Q.  Did it strike you as strange that he was introducing you

24    twice?

25    A.  No.

1    Q.  When you signed this document, did you understand the word

2    "several" to mean two?

3          THE INTERPRETER:  Could you repeat for the

4    interpreter, please.

5    BY MR. LEHMAN:

6    Q.  When you signed this document, did you understand that the

7    word "several" meant two?

8    A.  Yes.

9    Q.  Do you remember when you heard Tiran discuss the payroll

10   and general finances of Tribeca Bagels with Alberto?

11         THE INTERPRETER:  The interpreter would like to

12   correct his previous interpretation.

13         THE COURT:  Yes, please.

14         THE INTERPRETER:  The interpretation was that I didn't

15   catch that "various" means two.  So I would like to qualify and

16   tell him exactly what counsel said.

17         THE COURT:  Excuse me.  I didn't think it was

18   "various."  I thought it was "several."  I thought that was the

19   word that was to be interpreted.

20         Am I correct, Mr. Lehman?

21         MR. LEHMAN:  Yes.

22         THE COURT:  Did he understand when he affirmed or

23   signed a declaration and said "several occasions," that

24   "several" meant two.  That's the question.

25         THE WITNESS:  That was my understanding.

H7JYCAST           Marcelino - Cross

```
 1                THE COURT:  Thank you.
 2   BY MR. LEHMAN:
 3   Q.  Sitting here today, do you know why you didn't just put
 4   "two" instead of "several"?
 5   A.  That was my understanding.
 6   Q.  Do you remember seeing Tiran discuss the payroll and
 7   general finances of Tribeca Bagels with the acting manager?
 8   A.  Yes.
 9   Q.  So when was the first time you saw them meet?
10   A.  The my first day at work.
11   Q.  What day was your first day at work?  Meaning Sunday?
12   Monday?  Tuesday?  Wednesday?
13   A.  Monday.
14   Q.  Could you describe the layout of Tribeca Bagels for me.
15   A.  Yes, I can.
16   Q.  Please do.
17   A.  Okay.  At the entrance to the left is the cash register,
18   and then a little bit forward is the place where the sandwiches
19   are prepared and where the pizza is made.  To the right is the
20   hot food counter, buffet, together with cold salads.
21   Q.  Is that the entire layout of Tribeca Bagels?
22   A.  No.  There are other things.  Just to the right they have
23   soda and beer, yogurt, juices.
24   Q.  So that you know what I'm going to ask you, I'm going to
25   ask you where did they have the discussion.  Before asking
```

1    that, the judge has never seen this place.  So that's why I'm

2    asking you to describe the entire layout of Tribeca Bagels.

3    A.  Okay.  I'll repeat it again.  To the right is where you

4    have the juices, the soda.  And then to the right is where the

5    hot food is located.  At the end to the right is the bathroom,

6    and about three steps to the left is the entranceway to the

7    kitchen, and then there is a staircase that goes upstairs to

8    the office.  Outside of the office is where the hot drinks, hot

9    soda, hot beer are stored.

10   Q.  So, just briefly, I'm going to show you visually where

11   things are at for the judge's sake because it's hard to

12   understand words into a visual picture.

13         If I do something wrong, will you correct me.  The

14   cashier is to your left, hot food to your right.  You walk

15   approximately to the wall.  That's where the kitchen begins?

16   A.  Yes.

17   Q.  Back there in the kitchen there's a stairwell.

18         MR. MULHOLLAND:  Objection, your Honor.  This format

19   of questioning is very confusing.  I'm not sure what my client

20   is agreeing to when he responds and what the question is.

21         THE COURT:  I thought Mr. Lehman gave a prefatory

22   comment saying what he was trying to do is to aid me in

23   understanding the layout of the store, since there is no visual

24   depiction of the store, that he was offering his understanding

25   of the layout based on the plaintiff's testimony and that the

 1   plaintiff was either going to agree or disagree with respect to

 2   whether Mr. Lehman was accurately stating the layout of the

 3   store.

 4            I need to understand what this place looks like.

 5   That's the point.

 6            Let me do this:  Mr. Castillo Marcelino, what I'm

 7   trying to understand in my mind is what this place looks like.

 8   What Mr. Lehman has been doing is trying to aid me in picturing

 9   in my mind the layout of Tribeca Bagels.

10            Do you understand that, sir?

11            THE WITNESS:  Yes.

12            THE COURT:  If what Mr. Lehman is saying conflicts

13   with your recollection of what Tribeca Bagels looked like on

14   the inside, would you please let him know.

15            THE WITNESS:  That's fine.

16            THE COURT:  Thank you.

17            Mr. Lehman, could I ask you, please, to start again.

18            MR. LEHMAN:  Sure.

19   Q.  You walk into the store.  The cashier is on the left.

20   A.  Yes.

21   Q.  The hot food bar is on the right.

22   A.  Yes.

23   Q.  From here to approximately the wall is the store.

24   A.  Yes.

25   Q.  Behind that wall there would be a kitchen.

 1   A.  Uh-huh.

 2   Q.  Could you please say yes or no.

 3   A.  Yes.

 4   Q.  In the kitchen there's a stairwell.

 5   A.  Yes.

 6   Q.  Does that stairwell go up, down, or both?

 7   A.  Up.

 8   Q.  So it goes up to the second floor?

 9   A.  Yes.

10   Q.  On the second floor are beverages being stored which are

11   hot because they are not air conditioned?

12   A.  Yes.

13   Q.  And then behind that storage room, there is an office?

14   A.  Yes.

15   Q.  Is the ceiling approximately 10 feet tall?

16          THE COURT:  Which ceiling?

17          MR. LEHMAN:  On the second floor.

18          THE WITNESS:  Yes.

19   BY MR. LEHMAN:

20   Q.  How tall are you?

21   A.  170.

22   Q.  Centimeters or inches?  I assume centimeters.  170?

23   A.  Meters.

24          THE COURT:  1.7 meters.  Got it.

25   BY MR. LEHMAN:

 1   Q.   What is in that office?

 2   A.   There is a computer.   There were cameras where you can see

 3   everything that is going on in Tribeca Bagels.

 4          MR. LEHMAN:   Your Honor, do you have any questions

 5   about the layout?

 6          THE COURT:   Just one question, please.

 7          Is there a door to the kitchen such that you cannot

 8   see into the kitchen from the store area?

 9          THE WITNESS:   Yes.   There is a door.

10          THE COURT:   Okay.   Thank you.

11          Please continue.

12   BY MR. LEHMAN:

13   Q.   So, if we turn to paragraph 5, it states, "I observed and

14   heard" on this part I'm going to say "Tito" -- "discuss the

15   payroll and general finances of Tribeca Bagels with the acting

16   manager Alberto."

17          Earlier you testified that this happened on the very

18   first day.   Is that correct?

19   A.   Yes.

20          MR. LEHMAN:   Just to the interpreter, if you need me

21   to put it in more bite-size sentences for you, I'm happy to.   I

22   realize it interrupts the cadence, but I would be happy to.

23          THE INTERPRETER:   Thank you.

24   BY MR. LEHMAN:

25   Q.   Where did you see this first conversation?

1    A.  In the office.

2    Q.  In the office with the computer?

3    A.  Yes.

4            THE COURT:  The one on the second floor?

5            THE WITNESS:  Yes.

6            THE COURT:  Where were you when this meeting was

7    taking place?

8            THE WITNESS:  I was organizing the new arrivals of

9    sodas and drinks.

10           THE COURT:  Also on the second floor?

11           THE WITNESS:  Yes.

12           THE COURT:  Thank you.

13   BY MR. LEHMAN:

14   Q.  Is there a door between the storage room and the office?

15   A.  There is no door.

16   Q.  I'm confused.  Could you restate the date on which you were

17   hired.  Meaning Sunday, Monday, Tuesday, Wednesday, Thursday,

18   Friday.

19   A.  It was a Monday.

20           THE COURT:  May I ask, sir:  Did you begin work on the

21   very day that you were hired?

22           THE WITNESS:  Yes.

23           THE COURT:  Thank you.

24   BY MR. LEHMAN:

25   Q.  Would it surprise you if I told you that the day you were

1   hired was a Thursday?

2   A.  No.

3   Q.  It would not surprise you?

4   A.  No.

5           MR. LEHMAN:  We're just checking the complaint.

6   Q.  I'll ask one more time.  September 2, 2015, was a

7   Wednesday.

8           Does that surprise you?

9   A.  No, because I remember it was Monday.

10          THE COURT:  Yet you've sworn in the declaration that's

11  in your hands that you began work on September 2 of 2015.  Is

12  that correct, sir?

13          THE WITNESS:  Yes.

14          THE COURT:  Fine.

15  BY MR. LEHMAN:

16  Q.  Do you remember the conversation that you say you heard

17  between Alberto and Tiran?

18  A.  I heard when the owner comes and asked, how's the business?

19  How's everything?

20  Q.  Anything else?

21  A.  That's what I heard.

22  Q.  How long did the conversation last?

23  A.  Around five minutes.

24  Q.  How many other times during the course of your employment

25  did you hear Alberto and Tito talk?

1   A.   The times that he goes to the Tribeca Bagels.

2              THE COURT:  The times that who goes to Tribeca Bagels?

3              THE WITNESS:  The owner.

4              THE COURT:  Excuse me, Mr. Lehman.

5         Are you saying that when Mr. Tsadok, Tito, visited

6   Tribeca Bagels, that is when you saw him speak with Alberto?

7              THE WITNESS:  Yes.  The times I heard them.

8              THE COURT:  How many times did Tito visit Tribeca

9   Bagels during the time that you were employed there?  If you

10  can recall.

11             THE WITNESS:  He would go three times a week.

12             THE COURT:  Just one more question with respect to the

13  first conversation that you heard, the one that you heard in

14  the office on your first day of work.

15        You said that that conversation lasted about five

16  minutes.

17        Is that what you're recalling, sir?

18             THE WITNESS:  Yes.

19             THE COURT:  Were you present in the storage area for

20  the entire length of that conversation.

21             THE WITNESS:  In the kitchen also.

22             THE COURT:  How do you know that it lasted five

23  minutes if you weren't there?

24             THE WITNESS:  Because he only goes and very fast.

25  BY MR. LEHMAN:

H7JYCAST          Marcelino - Cross

1   Q.   Could you hear them talking from the kitchen?

2   A.   Yeah, because they would talk in the kitchen, in the

3   office.

4   Q.   In your declaration, you state that it was a regular

5   meeting.

6        What do you mean by "regular"?

7   A.   It's like a meeting; right?

8   Q.   Do you know what the word "regular" means?

9   A.   No, I don't.  In English I don't know.

10        THE COURT:  Excuse me, please.  I want to make sure I

11   understood the answer he just gave.  He may not know what the

12   word "regular" means, but does he know what the word *habitual*

13   in Spanish means?

14        THE WITNESS:  *Habitual* -- I haven't heard that word in

15   Spanish.

16        THE COURT:  One moment, please.

17        Mr. Lehman, is the word *habitual* in the Spanish

18   version of the declaration?

19        MR. LEHMAN:  I don't have the Spanish declaration in

20   front of me, but I believe it is.

21        MR. MULHOLLAND:  It's a different word.  They use the

22   word *regulare*, regular with an E on the end.

23        THE COURT:  Thank you for the clarification.

24        Does Mr. Castillo Marcelino know what the word

25   *regulare* means?

1    THE WITNESS:  *Regulare*, yes.

2    THE COURT:  What does it mean?

3    THE WITNESS:  *Regulare* in Spanish is something normal.

4    THE COURT:  What does that mean?

5    THE WITNESS:  It means not more, not less.  It's

6 regular.

7    THE COURT:  Okay.

8    Counsel, let's move on.

9 BY MR. LEHMAN:

10 Q.  So how many times over the course of your employment total

11 did you observe Tito and Alberto meet?

12 A.  Three times a week.

13 Q.  So approximately 90 to 100 times?  Is that correct?

14 A.  Do you mean throughout the month?

15    THE COURT:  Meaning during the entire time period that

16 Mr. Castillo Marcelino was employed at Tribeca Bagels, does he

17 recall 90 to 100 meetings, approximately, between Mr. Tsadok

18 and the manager.

19    THE WITNESS:  Yes.

20 BY MR. LEHMAN:

21 Q.  One last question on this.

22    What days were the three days a week?

23 A.  Monday, Wednesday, and Friday.

24 Q.  What time?

25 A.  Between 3:00 and 3:30 p.m.

1  Q.  What time of day were you introduced to Tito by Alberto the

2  first time?

3  A.  Around 3:00 p.m.

4  Q.  In paragraph 6, you say, "I received my schedule from

5  Alberto, who I understand to have received direction from

6  Tito."

7           Is that correct?

8  A.  Yes.

9  Q.  Can you please tell me the information on which you based

10  that understanding.

11  A.  Because Alberto asked Tito how much I was going to be paid.

12  Q.  Anything else?

13  A.  No.

14  Q.  So your understanding of Alberto taking direction from Tito

15  is based on only one thing, which is you heard Alberto ask Tito

16  how much money will this guy receive?

17  A.  Yes.

18           THE COURT:  Just for my clarification, when you say

19  that Alberto asked Tito how much you would be paid, was that a

20  question that he asked once at the time that you were hired?

21  Or is that a question he asked every week?

22           THE WITNESS:  Only once.

23           THE COURT:  Thank you.

24  BY MR. LEHMAN:

25  Q.  What time did you come into work that first day?

1    A.  At 5:00 a.m.

2    Q.  Could you please look at paragraph 8 of your declaration.

3    It states:  "During my employ with Tribeca Bagels, I was

4    introduced to an older man who was held out as the owner of

5    Tribeca Bagels and whom I was asked to call Imo."

6            Who asked you to call him Imo?

7    A.  Imo.

8    Q.  Does Imo have any other names according to your knowledge?

9    A.  He has another name.

10   Q.  Could you please tell me that name.

11   A.  His other name is Hayim.

12   Q.  Did he ever tell you his name was --

13           THE COURT:  Sir, did you get an answer to your

14   original question, which is who asked the plaintiff to call

15   this gentleman Imo?

16           MR. LEHMAN:  My understanding was that Imo asked him

17   to call him Imo.

18           THE COURT:  Thank you.

19   Q.  Is that correct?

20           MR. MULHOLLAND:  That was my understanding.

21           THE INTERPRETER:  I need a question.

22   BY MR. LEHMAN:

23   Q.  Did—me ask you to call him Imo?

24   A.  Yes.  His nickname.

25           THE COURT:  Thank you.

1    BY MR. LEHMAN:

2    Q.   When was the first time you heard the name Hayim?

3    A.   My first day of work I asked him, what is your actual name?

4    Q.   How did he respond?

5    A.   Yes.  He told me, my name is Hayim, but I'm known by Imo.

6    Q.   What time of day did he say, my name is Hayim, but call

7    me Imo?

8    A.   At what time?

9    Q.   Yes.

10   A.   At 11:00 a.m.

11   Q.   What were you doing at 11:00 a.m. on that day?

12   A.   I was cooking.

13   Q.   How long did you talk with Hayim?

14   A.   We would talk practically every day.  He works with me.

15   Q.   On that first day, how long did you talk with Hayim?

16   A.   Around half an hour.

17   Q.   Did anyone else ever call Imo Hayim?

18   A.   No.

19   Q.   Did you ever see the word "Hayim" anywhere in Tribeca

20   Bagels on any certificate, piece of paper, anywhere within that

21   business?

22   A.   No.  I didn't see it.

23   Q.   In one day how many hours is Tribeca Bagels open?

24   A.   It's open 24 hours.

25   Q.   Did you have someone replace you when you left work?

 1   A.  No.

 2   Q.  So, to your knowledge, there was no cook after you left?

 3            MR. MULHOLLAND:  Objection, your Honor.

 4            THE COURT:  Let me understand the objection, please.

 5            MR. MULHOLLAND:  There is no foundation.  He didn't

 6   say anything about being the only cook.  The word "replaced" he

 7   used earlier was ambiguous.

 8            THE COURT:  Now you're testifying.

 9            The question was did someone replace him when he left,

10   and he said no one did.

11            MR. MULHOLLAND:  Then he asked --

12            THE COURT:  I will allow the question.  Let's please

13   repeat the question.

14   BY MR. LEHMAN:

15   Q.  So your understanding is that after you left, there was no

16   cook?

17   A.  Not in the kitchen.

18   Q.  Was there a cook somewhere else?

19   A.  Please repeat the question.

20   Q.  Was there a cook somewhere else?

21   A.  No.

22   Q.  When I "say you" left in the context of these recent

23   questions, do you understand that to mean while you were

24   employed, not when you finally left in the entire employment?

25            I can repeat that, your Honor.

H7JYCAST                    Marcelino - Cross

1      THE COURT:  Let's try that again.  Go ahead.

2  BY MR. LEHMAN:

3  Q.  There are two types of leaving work.  One is leaving for

4  the day, and the other is leaving the employment for good.

5      THE COURT:  Do you understand that, sir?

6      THE WITNESS:  Yes.

7      THE COURT:  So, when you were testifying about no one

8  replacing you when you left, were you talking about when your

9  shift ended on a particular day?

10      THE WITNESS:  Yes, I did.

11      THE COURT:  Thank you.

12  BY MR. LEHMAN:

13  Q.  Did you ever see a poster at Tribeca Bagels stating minimum

14  wage?

15  A.  No.  I didn't see it.

16  Q.  Did you ever see a poster or a piece of paper on a wall

17  that stated your legal rights of any sort?

18  A.  No, I didn't see it.

19  Q.  Could you please look at paragraph 19.  It states:  "I

20  never received a meal break or rest during my work hours."

21      Did you receive free food while working at Tribeca

22  Bagels?

23  A.  Yes.  I would eat, but while I was working.

24      THE COURT:  I don't think that was his question.  The

25  question was:  Was the food free?

 1              THE WITNESS:  Yes.  Free.

 2    BY MR. LEHMAN:

 3    Q.  How many times a day did you eat a free meal?

 4    A.  Only once.

 5    Q.  From 5:00 a.m. till 5:00 p.m.?

 6    A.  I would eat at 5:00 p.m.

 7              THE COURT:  Just so I'm clear, from 5:00 a.m. through

 8    4:00 p.m., he consumed nothing?

 9              THE WITNESS:  Only coffee.

10    BY MR. LEHMAN:

11    Q.  Was the coffee for free?

12    A.  Yes.

13    Q.  Did you eat while cooking?

14    A.  Yes.

15    Q.  Does that violate health codes?

16    A.  Yes, but I didn't have time.

17    Q.  Did you know that you were violating health codes?

18    A.  No.

19    Q.  When did you first learn that that would violate a health

20    code?

21    A.  I knew about it one month ago.

22    Q.  What was your first job after working at Tribeca Bagels?

23    A.  Are you talking about which was my first job before Tribeca

24    Bagels?

25    Q.  No.  What was your first job after April 20?

 1   A.  Prepare.

 2   Q.  Where?

 3   A.  In 691 10th Avenue.

 4   Q.  What is the name of that business?

 5   A.  Nano restaurant.

 6   Q.  Could you please spell that.

 7   A.  Nano restaurant, N-a-n-o.

 8   Q.  Where do you work now?

 9   A.  Right there.

10   Q.  Have you had any other job other than working there since

11   you left Tribeca Bagels?

12   A.  No.

13   Q.  What kind of food do they serve at this restaurant?

14   A.  Ecuadorian food, Ecuador.

15   Q.  Did you ever work at a restaurant called Rain House?

16   A.  Rain House?  No.

17   Q.  Have you ever worked at a Brazilian restaurant?

18   A.  No.

19   Q.  Have you ever worked at a restaurant where women wear

20   feathers on their head?

21   A.  No.

22   Q.  Have you ever been to a restaurant where women wear

23   feathers on their head?

24   A.  No.

25   Q.  Have you ever been to a restaurant where the women who work

 1    there wear anything on their heads?  Feathers or something

 2    else.

 3    A.  No.

 4    Q.  Have you ever been to a restaurant where women wear

 5    bikinis?

 6              THE COURT:  Has he ever been to or worked at?

 7              MR. LEHMAN:  Been to.

 8              THE WITNESS:  No.

 9    Q.  If I show you a picture of your Facebook feed right now of

10    you in a cook's outfit with a woman in a bikini with something

11    on her head, does that refresh your recollection that you have

12    been to a restaurant?

13              THE INTERPRETER:  I'm sorry.  With a bikini you say?

14              THE COURT:  You may approach.

15    BY MR. LEHMAN:

16    Q.  Does this picture refresh your recollection that you have

17    been to a restaurant with a woman with something on her head

18    who was wearing a bikini?

19    A.  I worked there one day, not every time.

20              THE COURT:  I heard his answer.

21              One day and one day only you worked at that

22    restaurant?

23              THE WITNESS:  I only went to help one day on an event.

24              THE COURT:  But then you did work there that one day.

25              THE WITNESS:  One day only.

1              THE COURT:  He asked you whether you had ever been to

2     a restaurant where women wear bikinis.  You said no.

3              THE WITNESS:  But what I understood it was bikini like

4     table dance.  That's what I understood.

5              THE COURT:  That's not what he asked.  That's not what

6     he asked.

7              THE WITNESS:  It's not the same.

8              THE COURT:  Counsel, I understand your point.

9     BY MR. LEHMAN:

10    Q.  Are you understanding all of my questions?

11    A.  Some of them.

12    Q.  Do you agree --

13             THE COURT:  Wait.

14             What questions are you not understanding?

15             THE WITNESS:  Because he asked me whether I worked in

16    a place where they have naked women with a bikini.

17             THE COURT:  But that's not in fact what he asked.

18             Other than that question, was there any other question

19    that Mr. Lehman asked you or that I asked you that you did not

20    understand at the time that you answered it?

21             THE WITNESS:  Only that one.

22             THE COURT:  One other question, please.

23             You mentioned that you worked at that restaurant for

24    one day.  You helped with one event.

25             Is that correct?  Do I understand your testimony

 1  correctly?

 2          THE WITNESS:  Yes.

 3          THE COURT:  Were there any other restaurants where you

 4  worked for one event or for one day after you left the

 5  employment of Tribeca Bagels?

 6          THE WITNESS:  Not till now.

 7          THE COURT:  By "not till now," do you mean the one day

 8  that you worked for the job that's depicted in the photograph?

 9          THE WITNESS:  There was only once.

10          THE COURT:  Okay.  Thank you.

11  BY MR. LEHMAN:

12  Q.  Do you remember which day you worked there?

13  A.  No.  I don't remember.

14  Q.  If I show you the picture and it states March 27, 2016,

15  does that help you remember the date on which you worked?

16  A.  No.

17  Q.  Do you remember posting this picture on your Facebook page?

18  A.  Yes.

19  Q.  How long after the picture was taken did you post it?

20  A.  I don't remember.

21  Q.  You don't remember at all?  Let me put it this way:

22  Sometimes people confuse precision with accuracy.

23          If I were to ask you how tall the Empire State

24  building is, you might say, I don't know.  But you also might

25  say, around 100 stories.

```
1              Do you understand what I just said?

2              MR. MULHOLLAND:  Objection.

3              THE WITNESS:  A little.

4              THE COURT:  May I try something, counsel.

5              Sir, you saw the photograph that defense counsel

6    showed you.  Yes?  Do you remember the photograph that he

7    showed you?

8              THE WITNESS:  Yes.

9              THE COURT:  Is that a photograph that you put, you

10   posted, to your Facebook account?

11             THE WITNESS:  Yes.

12             THE COURT:  You put it on the Facebook account after

13   the picture was taken.  Of course.  You had to have the picture

14   in order to post it; correct?

15             THE WITNESS:  Yes.

16             THE COURT:  Did somebody take that photograph and

17   email it to you and that's how you were able to put it on your

18   Facebook page.

19             THE WITNESS:  I didn't put it on.

20             THE COURT:  Who took the photograph, sir?

21             THE WITNESS:  A guy who was with me.

22             THE COURT:  Did he take it using your phone?  Or did

23   he take it using some other device?

24             THE WITNESS:  He used my telephone.

25             THE COURT:  I see.  So you were able to post it from
```

 1   your telephone.

 2           THE WITNESS:  Yes.

 3           THE COURT:  How long after the photograph was taken

 4   did you post it on your Facebook page?

 5           THE WITNESS:  I don't remember.

 6           THE COURT:  I understand that you don't remember

 7   precisely.

 8           Do you think it was one week later or one month later

 9   or one year later?  If you know.

10           THE WITNESS:  Maybe one year.

11           THE COURT:  One year after it was taken?

12           THE WITNESS:  Yes.

13           THE COURT:  Counsel, if there are other questions you

14   wish to ask, you may.

15           MR. LEHMAN:  No, because he's admitted that the

16   picture is his, we do have a copy of it that we would like to

17   introduce as an exhibit.  I originally just used it to refresh

18   his recollection, but he's now admitted that it's on his

19   Facebook page.

20           THE COURT:  Yes.  I'll accept it for now with the

21   possibility that later on I'm going to reject it.  I have seen

22   it.  I'm not sure it does anything to address the issues in

23   this case.

24           MR. MULHOLLAND:  If I could just make an objection for

25   the record.

 1            THE COURT:  It is noted.  Thank you.

 2            MR. LEHMAN:  We don't have copies of this one.

 3            THE COURT:  You'll get me one very promptly.

 4            MR. LEHMAN:  Yes, your Honor.  Your Honor, I could

 5   give you that one.  I'm comfortable with that, since it's on

 6   his Facebook page as we speak.  It was more for opposing

 7   counsel.

 8            THE COURT:  You can give it to me at your earliest

 9   convenience.  Thank you.

10   BY MR. LEHMAN:

11   Q.  Who asked you to work there?

12            MR. MULHOLLAND:  Objection.

13            THE COURT:  By "there"?

14   BY MR. LEHMAN:

15   Q.  Who asked you to work at Rain House?

16            THE COURT:  I believe the objection is he doesn't know

17   where it is.

18            Can we try it with the place in the picture.

19   BY MR. LEHMAN:

20   Q.  Who asked you to work at the place in the picture?

21   A.  A gentleman by the name of Jose.

22            THE COURT:  Does Jose have a last name?

23            THE WITNESS:  I don't know it.

24   BY MR. LEHMAN:

25   Q.  Who paid you at the place in the picture?

```
 1              MR. MULHOLLAND:  Objection, your Honor.

 2              THE COURT:  I'll allow it.

 3              THE WITNESS:  Jose paid me.

 4    BY MR. LEHMAN:

 5    Q.  How many hours did you work that day?

 6    A.  I worked for ten hours.

 7    Q.  What did you do during those ten hours?

 8    A.  Chopping fruit.  That's all.

 9    Q.  Just to be clear, for ten hours, you chopped fruit?

10    A.  Yes.  It was a large event.

11    Q.  How did you find out about the one-day job?

12    A.  I went by and asked.

13              THE COURT:  You went where, sir?  To the restaurant?

14              THE WITNESS:  Yes.  I passed by, and I entered and

15    asked at the restaurant.

16    BY MR. LEHMAN:

17    Q.  So where is the restaurant?

18    A.  I don't recall precisely because it was for a single day,

19    but it was around 115 Northern Boulevard, something like that.

20    Q.  How far from where you live is that place in terms of

21    minutes?

22    A.  About half an hour walking.

23              THE COURT:  Counsel, if you'll excuse me.

24              Sir, was there a sign on the restaurant that indicated

25    that they were hiring people?
```

 1              THE WITNESS:  No.

 2              THE COURT:  Why then did you walk a half an hour and

 3    walk into the restaurant to ask for work?

 4              THE WITNESS:  I walked for half an hour.  I asked if

 5    they had work.  They told me yes but only for one day.

 6              THE COURT:  How did you know to walk into that

 7    restaurant and ask for work?  Did anyone tell you that they

 8    were looking to hire people?

 9              THE WITNESS:  No.  I was asking at every restaurant I

10    went by.

11              THE COURT:  I see.  Thank you.

12              After passing by several restaurants, you found this

13    place?

14              THE WITNESS:  Yes.

15              THE COURT:  Thank you for the clarification.

16              MR. LEHMAN:  Your Honor, can we take a break?

17              THE COURT:  Yes.  Let me understand.  I want to

18    understand how much more cross you have, sir, if you can

19    estimate.  I don't know whether we're talking ten minutes, two

20    hours.

21              MR. LEHMAN:  I would think an hour is what I was

22    thinking is the limit on it.  The reason I asked for a break is

23    because of my spine.

24              THE COURT:  I understand.  Of course.  Is five minutes

25    enough for everybody?  Ten minutes.  Let's do a ten-minute

 1    break and come back.

 2              MR. LEHMAN:  I would just ask that the witness not

 3    talk with his lawyers.

 4              THE COURT:  To not discuss this case.  They can talk

 5    about the weather.  They just can't talk about this case.

 6              Sir, you are instructed not to discuss your testimony

 7    with your attorneys during this break.

 8              Do you understand that?

 9              THE WITNESS:  Yes.

10              THE COURT:  Thank you.  All right.  See you in

11    ten minutes.  Thank you.

12              (Recess)

13              THE COURT:  Thank you very much.  Please be seated.

14              Mr. Lehman, you may resume your cross-examination.

15    BY MR. LEHMAN:

16    Q.  Do you know that you're still under oath?

17    A.  Yes.

18    Q.  Do you agree that if you are confused on any question, you

19    will let us know?

20    A.  Yes.

21    Q.  Do you see Hayim in this courtroom?

22    A.  Who?

23    Q.  Hayim.  Imo.

24    A.  I don't see him.  I don't see him.

25    Q.  You don't see anyone that you know as Imo, and you don't

 1   see anyone that you know as Hayim?

 2   A.  I don't see him.

 3           MR. LEHMAN:  Your Honor, the person at the table is

 4   the other defendant.  That's Hayim.

 5           THE COURT:  This is Hayim Tsadok.

 6           Good morning to you, sir.  Sir, good morning to you.

 7   Welcome.

 8           MR. HAYIM TSADOK:  Good morning.

 9           THE COURT:  Thank you.  You may be seated.

10   BY MR. LEHMAN:

11   Q.  Do you know that man?

12   A.  No.

13   Q.  Would it surprise you if I told you that man lives in

14   Florida?

15   A.  No.

16   Q.  Do you know the relationship between Hayim and Tito?

17   A.  Between that gentleman and Tito, no.

18   Q.  Do you know the relationship between a person named Hayim

19   and a person named Tito in relationship to this case?

20           THE COURT:  Stop looking at him, sir.

21           The question is:  You testified earlier about a person

22   named Tito.

23           Do you recall that testimony?

24           THE WITNESS:  Yes.

25           THE COURT:  You testified also about a person

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    named Imo.  That's how this gentleman introduced himself to

2    you.

3            Is that not correct?

4            THE WITNESS:  Yes.

5            THE COURT:  Imo and Tito are two people; correct?

6            THE WITNESS:  Yes.

7            THE COURT:  Are they related in any way?  Are they

8    friends?  Are they coworkers?  Are they family?  Do you know?

9    If you don't know, that's fine.

10           THE WITNESS:  Imo and Tito are partners.

11   BY MR. LEHMAN:

12   Q.  Do you know if Hayim is Tito's father?  Do you know that?

13   If you don't, that's okay.  But do you know whether that's his

14   father?

15   A.  I didn't know.

16   Q.  On what information do you base the conclusion that Hayim

17   was an owner, the person that you know as Hayim, was an owner

18   of Tribeca Bagels?

19   A.  Because-me told me.

20   Q.  He said, I am an owner or something similar?  Is that true?

21   Is it true that Imo said to you, I am an owner or something

22   similar?

23   A.  Yes, he did.

24   Q.  Do you remember your last day of work?

25   A.  I don't remember the day, but it was on April 20.

HJJYCAST                    Marcelino - Cross

1    Q.  What time did you work till?

2    A.  The manager did not allow me to get in.

3    Q.  What time did you work until?  4:00 p.m.?  5:00 p.m.?

4    11:00 a.m.?  Any time.

5    A.  I arrived at 5:00 a.m. on the 20th, on the day I was

6    supposed to work, and the manager did not allow me to get in.

7    Q.  So what time did you leave Tribeca Bagels?

8    A.  At 6:00.

9    Q.  In the morning or at night?

10   A.  In the morning.

11   Q.  What did you then do?

12   A.  I went home.

13          THE COURT:  Sir, did the manager give you a reason for

14   not letting you in?

15          Excuse me, Mr. Lehman.

16          THE WITNESS:  He told me that I had arrived 30 minutes

17   late and, therefore, I didn't have to work any longer.

18   BY MR. LEHMAN:

19   Q.  Were you in fact late?

20   A.  Yes.

21   Q.  Were you often late?

22   A.  No.

23   Q.  Was that the first time that you were late?

24   A.  It was the second.

25   Q.  When was the first time?

1    A.  The first took place on my second week at work.

2            THE COURT:  If I could just ask a question for

3    clarification.

4            Mr. Castillo Marcelino, you testified that you arrived

5    on April 20 at 5:00 a.m.  Is that correct?

6            THE WITNESS:  5:30.

7            THE COURT:  That's not actually what you testified to.

8    It's now 5:30.  That's when you arrived that day.

9            THE WITNESS:  5:30, yes.

10           THE COURT:  Thank you.

11           Mr. Lehman, you may continue.

12   BY MR. LEHMAN:

13   Q.  Is it true that Alberto fired you for being 30 minutes

14   late?

15   A.  Yes.

16   Q.  And then you went home which you testified earlier was an

17   hour away?  Is that accurate?

18   A.  Yes.

19   Q.  Did you tell anyone that you had been fired?

20   A.  No.

21   Q.  What did you do for the rest of the day?

22   A.  I went home to rest.

23   Q.  And you stayed at home for that entire day?

24   A.  Yes.

25           MR. LEHMAN:  Your Honor, I'd like to introduce the

1  complaint as Defendant's Exhibit Number 1.

2            THE COURT:  A couple of things:  Number one, I think

3  that you think that Defendant's Exhibit A is the photograph.

4  So I believe this is the second exhibit.

5            Mr. Mulholland, is there an objection to the

6  introduction of the complaint?

7            MR. MULHOLLAND:  Yes.  It's an unverified document.

8  It's not relevant.

9            THE COURT:  It's your client's statements, is it not?

10           MR. MULHOLLAND:  Yes.  It's not a prior inconsistent

11  statement.

12           THE COURT:  I'm getting this from both of you.

13           MR. CLARK:  If I can speak to this particular

14  objection.

15           THE COURT:  Yes.

16           MR. CLARK:  A complaint is a collection of allegations

17  by the attorney.  It's not a prior statement of a witness.  It

18  isn't properly used as impeachment for purposes of a lawsuit.

19           THE COURT:  I'm not entirely sure you're correct.  I'm

20  going to allow the questioning on it, but you're going to be

21  showing me in your findings of fact and conclusions of law why

22  I may not consider it.

23           MR. CLARK:  Absolutely, your Honor.

24           THE COURT:  Right now it's provisionally introduced as

25  Defendant's B.

```
 1              MR. LEHMAN:  Your Honor, did you say B as in boy?

 2              THE COURT:  Yes, sir.

 3              Is there only an English version of this document,

 4    sir?

 5              MR. LEHMAN:  There is only an English version that

 6    they filed.

 7              THE COURT:  That's what I thought.  You may approach.

 8              This is the complaint of August 9 of 2016?

 9              MR. LEHMAN:  Yes, your Honor.  In this case.

10              THE COURT:  I do have it.  Thank you.

11    BY MR. LEHMAN:

12    Q.  Could you go to the last page, please.

13              Is that your signature on the page?

14    A.  Yes.

15    Q.  What is the date below your signature?

16    A.  April 20, 2016.

17    Q.  The very day you were fired.  Is that accurate?

18    A.  Yes.

19    Q.  How did you sign this on April 20 if you did nothing but go

20    home that day?

21    A.  Because later I went to see the lawyer.

22    Q.  Later when?

23    A.  At 2:00 or 3:00 in the afternoon.  I'm not sure.

24    Q.  You testified that you did nothing but stay at home.

25              Do you remember that?
```

```
 1    A.   Yes.  I remember.

 2    Q.   And now you are saying that you went to the lawyers' office

 3    around 2:00 p.m. or 3:00 p.m. that very day.

 4              Is that accurate?

 5    A.   Yes.

 6    Q.   Do you believe those two statements are inconsistent?

 7    A.   Yes.

 8    Q.   Do you remember how you found this lawyer?

 9    A.   Through an advertisement.

10    Q.   When did you see this advertisement?

11    A.   I had seen it in newspapers, and I have not seen this for

12    about two years.

13              THE COURT:  "I have not seen" what for about two

14    years?

15              THE WITNESS:  The advertisement about the lawyers.

16    They were asking me about this.

17              THE COURT:  I was trying to obtain clarity as to the

18    sequence of events here.

19              Counsel, I'm going to ask you to ask your questions

20    again.

21    BY MR. LEHMAN:

22    Q.   How did you find out about this law firm?

23    A.   I found out through a newspaper.

24    Q.   When?

25    A.   Two years ago.
```

```
 1              THE COURT:  Two years ago today or two years before he

 2    signed this piece of paper?

 3              THE WITNESS:  From today.

 4              THE COURT:  Thank you.

 5    BY MR. LEHMAN:

 6    Q.  Did you see that advertisement more than once?

 7    A.  Only once.

 8    Q.  Do you remember which newspaper you saw it in?

 9    A.  No, I don't.

10    Q.  Did you write down the name of the law firm when you saw

11    that advertisement?

12    A.  No.

13    Q.  Did you write down the number of the law firm when you saw

14    the advertisement?

15    A.  The address, no.

16    Q.  Did you write down the phone number of the law firm when

17    you --

18    A.  Yes.

19    Q.  Where did you write it down?

20    A.  In a notebook.

21    Q.  Where did you keep that notebook?

22    A.  It may be at home.

23    Q.  It may be, or it is at home?

24    A.  It may be at home.

25    Q.  Could you tell me again what you did that day after Alberto
```

1    fired you.

2    A.   Went home, rested, and later I went to see the lawyer.

3    Q.   Did you call them ahead of time?

4    A.   No.

5    Q.   How long did it take you from your house to get to the law

6    firm?

7    A.   About 30 minutes.

8    Q.   Do you remember the address of the law firm?

9    A.   Yes.

10   Q.   What was the address of the law firm?

11   A.   It's 60 East 42nd Street.

12   Q.   Have you ever seen this exhibit before today?

13            THE COURT:  At any time before today, have you seen

14   the document that is attached to your notice page?

15            THE WITNESS:  Yes.

16   BY MR. LEHMAN:

17   Q.   When did you first see it?

18            MR. MULHOLLAND:  Objection.

19            THE COURT:  I'll allow it.

20            THE WITNESS:  When I went to the law firm for the

21   first time.

22            THE COURT:  I want to be very careful here, counsel,

23   Mr. Lehman.  I'm not interested in intruding on the

24   attorney-client privilege.  I don't believe it's been opened

25   up, and I'm not going to.  So let's just tailor your questions

```
 1   with that in mind.

 2             MR. LEHMAN:  Agreed, your Honor.

 3   Q.  Do you know what time this complaint was filed at?

 4   A.  I don't have any idea.

 5   Q.  Would it have had to have been after 3:00 p.m. on April 20?

 6   A.  Yes.

 7   Q.  Did you read this complaint in English?

 8   A.  No.

 9   Q.  Did you read this complaint in Spanish?

10   A.  No.

11             THE COURT:  Did someone read this document to you and

12   translate it for you from English into Spanish?

13             THE WITNESS:  Not that I remember.

14             THE COURT:  How do you know that you've seen this

15   document before today?

16             THE WITNESS:  Because my signature is here.

17             THE COURT:  Before you signed that page at the back,

18   did you read a document?

19             THE WITNESS:  This one, not in English.

20   BY MR. LEHMAN:

21   Q.  Did you read it in any language?

22   A.  Not this document.

23             THE COURT:  Counsel, let's move on.

24   BY MR. LEHMAN:

25   Q.  When this was filed --
```

1          A preface here.  This line of questioning will only be

2    three or four questions.

3          THE COURT:  All right.

4          MR. LEHMAN:  Obviously, I'll pause.

5    Q.  When you filed this, did you understand that you were

6    filing it on behalf of other people and also you?

7          MR. CLARK:  Objection.

8          THE COURT:  I'll allow it.

9          I think there's a preliminary question, sir.  That is

10   this:  Mr. Castillo Marcelino, let me ask you a question first.

11         Do you know that the document in your hand was filed

12   in this court and that is how this lawsuit began?  Did you know

13   that, sir?

14         THE WITNESS:  Yes.

15         THE COURT:  Did you read or have translated for you

16   this document before it was filed?

17         THE WITNESS:  Not this document.

18         THE COURT:  Thank you.

19         Do you understand, sir, that in this document you are

20   making a claim for yourself and on behalf of other people?  Do

21   you know that?

22         THE WITNESS:  Yes.

23         THE COURT:  Okay.

24   BY MR. LEHMAN:

25   Q.  Do you believe that you are still representing those people

1    today?

2            THE COURT:  I'll allow it.

3            If you know.

4            THE WITNESS:  Yes.  I know.

5            THE COURT:  Yes, you know.

6            Are you in fact representing people other than

7    yourself in this lawsuit today?

8            THE WITNESS:  Yes.

9            THE COURT:  Counsel, I think you ought to move on.

10   BY MR. LEHMAN:

11   Q.  Were you ever required to purchase or maintain equipment at

12   the job at Tribeca Bagels?

13           MR. MULHOLLAND:  Objection, your Honor.

14           THE COURT:  Because that's no longer being pursued?

15           MR. MULHOLLAND:  Yes.

16           THE COURT:  You know that's no longer being pursued?

17           MR. LEHMAN:  I know that's no longer being pursued.

18   However --

19           THE COURT:  One question.  You may repeat it if it's

20   easier, sir.

21           MR. LEHMAN:  Can I have that read back, please.

22           (Record read)

23           THE WITNESS:  I bought it, yes.

24   BY MR. LEHMAN:

25   Q.  What did you buy?

1   A.  Trousers, hat, and an apron.

2   Q.  Do you know if other people were required to buy things at

3   Tribeca Bagels?

4           MR. MULHOLLAND:  Objection, your Honor.

5           THE COURT:  Move on, counsel.

6   BY MR. LEHMAN:

7   Q.  Have you ever said to another employee that you left your

8   previous job because you sued them?

9           THE COURT:  May I just have a timeframe.  Are we

10  talking --

11  BY MR. LEHMAN:

12  Q.  Have you ever said to another employee at Tribeca Bagels

13  that you left your previous job because you sued them?

14          MR. MULHOLLAND:  Objection.

15          THE COURT:  I will allow it.

16          THE WITNESS:  No.

17  BY MR. LEHMAN:

18  Q.  Have you ever said to an employee that you sue people

19  because that is how you make a living?

20          MR. MULHOLLAND:  Objection, your Honor.

21          THE COURT:  I will allow it.  I want to hear the

22  question again.

23  BY MR. LEHMAN:

24  Q.  Have you ever said something similar to another employee at

25  Tribeca Bagels that you sue people to make a living or

1   something similar?

2   A.  No.

3           MR. LEHMAN:  We may be close, your Honor.

4           THE COURT:  That's fine.

5           MR. LEHMAN:  I think we're done, your Honor.

6           THE COURT:  I have a couple of questions, as long as

7   the parties won't object.

8           Sir, earlier in your testimony today you indicated

9   that you worked Monday through Saturday of every week.

10          Do you recall that testimony, sir?

11          THE WITNESS:  Yes.

12          THE COURT:  You took no holidays; is that correct?

13  They gave you no holidays?

14          THE WITNESS:  No.

15          THE COURT:  I'll ask a better question.

16          Did anyone at Tribeca Bagels ever give you the day off

17  because of a holiday such as Christmas or Thanksgiving or

18  something like that?

19          THE WITNESS:  No.  None.

20          THE COURT:  Did you ever take a sick day?  Did you

21  ever take a day off because you were sick during the period

22  that you worked at Tribeca Bagels?

23          THE WITNESS:  No.

24          THE COURT:  Did you ever take a day off because you

25  had an emergency, a family emergency or something else that

1    prevented you from getting to work on that day?

2              THE WITNESS:  One emergency.

3              THE COURT:  Was it one day that you took off, sir?

4              THE WITNESS:  It was over three days.

5              THE COURT:  More than three days.

6              Just very generally speaking, was it because of a

7    family emergency?

8              THE WITNESS:  No.  I had an emergency with my living

9    quarters.

10             THE COURT:  So it took more than three days to

11   resolve?

12             THE WITNESS:  Yes.

13             THE COURT:  Sir, I'd like to understand better the

14   circumstances of your hiring.

15             You showed up on a Monday morning.  You just showed up

16   to work; correct?  You began work on a Monday morning?

17             THE WITNESS:  Yes.

18             THE COURT:  Were you interviewed by anyone?  Did

19   someone interview you before giving you the job?

20             THE WITNESS:  Yes.  Alberto, the manager.

21             THE COURT:  Did that take place on that Monday

22   morning?

23             THE WITNESS:  Yes.

24             THE COURT:  At 5:00 in the morning?

25             THE WITNESS:  No.  I started around 8:00 or 9:00 in

 1   the morning.

 2          THE COURT:  On your first day of work, you came in at

 3   approximately 8:00 or 9:00 in the morning?

 4          THE WITNESS:  Yes.

 5          THE COURT:  And at that time were you interviewed by

 6   Alberto?

 7          THE WITNESS:  Yes.

 8          THE COURT:  And how did you know to go to Tribeca

 9   Bagels?  Did someone tell you that that company was hiring, or

10   was there a sign that said that they were looking for people or

11   something else?

12          THE WITNESS:  No.  I just walked in and asked.

13          THE COURT:  I see.  So on that Monday, you showed up,

14   you said you were looking for work, they said okay, and they

15   hired you that day?

16          THE WITNESS:  Yes.  That's what happened.

17          THE COURT:  When you were hired, sir, did they tell

18   you that there was a specific period of time each day that you

19   would be working?  Did they give you a shift for each day?

20          THE WITNESS:  No.

21          THE COURT:  On that first day, they told you how much

22   money you would receive per day; is that correct?

23          THE WITNESS:  They offered $9 per hour, but they never

24   paid me by the hour.  They paid me $100 per shift.

25          THE COURT:  I'm not sure you're understanding my

1      question.  My question was:  On the day that you were hired,

2      did they tell you what hours each day you were expected to

3      work?

4                  THE WITNESS:  They told me twelve hours.

5                  THE COURT:  I see.

6                  Sir, I understand from your declaration that your job

7      often required you to be in the kitchen.  Is that correct?

8                  THE WITNESS:  They asked me to practically work all

9      the time at the kitchen.

10                  THE COURT:  And what you were doing was preparing the

11      food that would be on the hot food table in the store; is that

12      correct?

13                  THE WITNESS:  Yes.

14                  THE COURT:  So, to do that, were you in the kitchen

15      putting that food together?

16                  THE WITNESS:  Yes.

17                  THE COURT:  Could you give me a sense, because I have

18      not been in the store.

19                  What type of food did you prepare?

20                  THE WITNESS:  Spaghetti, chicken, meatballs,

21      vegetables, rice, beans, and rice and potatoes.

22                  THE COURT:  So, after you prepared it, sir, would you

23      bring it out into the store area and put it onto that hot

24      table?

25                  THE WITNESS:  Yes.

1          THE COURT:  Did you prepare the pizzas that were being

2    sold?

3          THE WITNESS:  Yes.

4          THE COURT:  Were those pizzas prepared in the kitchen

5    or in the store area?

6          THE WITNESS:  In the kitchen.

7          THE COURT:  Were you making the bagel sandwiches?

8          THE WITNESS:  No.  That was not my job.

9          THE COURT:  Any sandwich on a bagel, a hot sandwich or

10   a cold sandwich was made by someone else?

11         THE WITNESS:  Yes.

12         THE COURT:  Did you ever work the cash register at the

13   front of the store?

14         THE WITNESS:  No.

15         THE COURT:  Thank you very much.  Let me just make

16   sure of my questions.

17         I'm fine.  Thank you very much.

18         Mr. Mulholland, your redirect, if there is any.  I'm

19   not saying you have to have it.

20         MR. MULHOLLAND:  Your Honor, we have no redirect of

21   Mr. Marcelino.

22         THE COURT:  Sir, you're welcome to step down.  Thank

23   you very much.

24         (Witness excused)

25         MR. CLARK:  The plaintiff has one more exhibit to

H7JYCAST         Marcellino - Cross

1    offer to the Court before we close.  It's a copy of defendant's

2    responses to plaintiff's first set of interrogatories, a

3    document request, on the basis that it's an admission of a

4    third-party deponent.

5              THE COURT:  Mr. Lehman?

6              MR. LEHMAN:  Yes, your Honor.  No objection on that.

7    We would also like to offer a document.

8              THE COURT:  So this is Plaintiff's 3, is it not, sir?

9              MR. MULHOLLAND:  Yes.

10             THE COURT:  I believe I have a copy of it.  Thank you.

11             May we let the plaintiff step down and go back to the

12   plaintiff's table.

13             Plaintiff's Exhibit 3 is admitted without objection.

14             (Plaintiff's Exhibit 3 received in evidence)

15             THE COURT:  Mr. Lehman, I don't know what's left of

16   the plaintiff's case.  I'm not sure what you're introducing.

17   Perhaps I'm being unnecessarily persnickety, but I don't know

18   if that's something you're going to be introducing after the

19   plaintiff rests or not.

20             What is it that is in your hand, sir?

21             MR. LEHMAN:  Plaintiff's initial disclosures.

22             THE COURT:  You're offering this as Defendant's C?

23             MR. LEHMAN:  Yes, your Honor.

24             THE COURT:  Folks at the front table?

25             MR. CLARK:  The plaintiffs object.  It's not a prior

 1    statement.  It's not verified by the plaintiff.  It's

 2    litigation documents prepared by counsel.

 3              THE COURT:  This is distressing to me.  Is your client

 4    not reviewing them, sir?

 5              MR. CLARK:  Certainly, yes.  Yes, your Honor.  This is

 6    an area of law where litigants attempt to admit complaints,

 7    answers, initial disclosures.  A document request is generally

 8    a verification by the individual party that allows it to be

 9    used as evidence later in the proceeding.

10              THE COURT:  Then shall we recall Mr. Castillo

11    Marcelino and see whether he discussed these answers with you

12    before you submitted them on his behalf?

13              MR. CLARK:  I think that would speak to privileged

14    information.  I would prefer not doing that certainly.  I'm not

15    entirely sure what portion of the initial disclosures

16    defendants think is useful as evidence in the trial.

17              My general understanding of the import of initial

18    disclosures is that they cannot be admitted as evidence under

19    any Federal Rule of Evidence that I'm aware of.  Certainly I'd

20    be willing, similarly to my submission concerning the

21    complaint, to write further in our findings of fact.  So on

22    conditional --

23              THE COURT:  I'm conditionally admitting it because I

24    want to hear from both sides.  I know there was an objection to

25    the complaint being introduced, but for me the part of the

H7JYCAST                  Marcelino - Cross

1    complaint that I cared about was his actual statement which I

2    don't think you have an objection to.

3              MR. CLARK:  I have no objection to introducing the

4    consent form.  That's perfectly fine with me.  It's just the

5    body of the complaint.

6              THE COURT:  I do understand that.  If perhaps you and

7    your adversary were to work out something you agree on

8    admitting, that would save us briefing later on.  But if not,

9    that is fine.

10             Mr. Lehman, that is being conditionally admitted

11   pursuant to the same understanding I had with plaintiff's

12   counsel about their ability to write on it further.

13             Is there something else that you wish to admit?

14             MR. LEHMAN:  Do you need a copy of it?

15             THE COURT:  I will take it at some point.  I think I

16   have it in the materials that were given to me.  Thank you very

17   much.

18             I'm staring at it right now, initial disclosures.  It

19   is here.

20             Anything else from plaintiff's side?

21             MR. MULHOLLAND:  No.  The plaintiff would rest.

22             THE COURT:  The plaintiff is resting.

23             Is there an application from the defense?

24             MR. LEHMAN:  Your Honor, no, there is not because I

25   think that you could credit his testimony if you decided to.

 1   Therefore, he could prove his case.  I don't think it's

 2   credible.  Therefore, I have no application.

 3         THE COURT:  Let me just ask this.  You'll excuse me if

 4   I'm going to say something that I will regret later.

 5         I want to make sure that you are not waiving your

 6   right to make some motion later on by not making one now.

 7   Because what I'm inclined to do, because I think it's the most

 8   efficient thing to do, is to have you make whatever motion you

 9   could make on whatever bases you can make, and I'm going to

10   reserve on it because I want to hear the rest of this case.

11         Is that what you wish to do?  You can do nothing.  I

12   don't care.

13         MR. LEHMAN:  Your Honor, I feel comfortable with us

14   hearing the rest of the case.  If I miss out on something

15   because I decided to waive it, then that's my fault.

16         THE COURT:  Then that is what I will do.  We'll do it

17   that way.  Let's proceed then with the defense case.

18         Are we ready to go forward?  Does anyone need a break

19   now?  I'm ready to go forward, but I don't want to compromise

20   anyone if they want to take a restroom break.

21         All right.  Ten minutes.  During that time period,

22   we'll get defense witnesses together.

23         MR. CLARK:  Thank you.

24         THE COURT:  Thank you very much.

25         One thing, Mr. Lehman and Ms. Solarz.  It is my

1    understanding again these witnesses are here for impeachment.

2    So I'm expecting short directs.  By "short" I mean surgical.

3              MR. LEHMAN:  Yes, your Honor.

4              THE COURT:  Thank you.

5              (Recess)

6              THE COURT:  Please be seated.

7              May I have the first defense witness.

8              Will there be a defense witness?

9              MS. SOLARZ:  Yes, your Honor.

10             THE COURT:  Thank you.

11             MS. SOLARZ:  The defense would like to call Bartello

12   Ochoa Rebolledo.

13    BARTELLO OCHOA REBOLLEDO,

14        called as a witness by the Defense,

15        having been duly sworn, testified as follows:

16             THE DEPUTY CLERK:  If you could please state your name

17   for the record.

18             THE WITNESS:  Bartello Ochoa Rebolledo.

19             THE DEPUTY CLERK:  If you could please spell your

20   name, sir.

21             THE WITNESS:  Bartello Ochoa.

22             MR. LEHMAN:  Your Honor, he has ID.

23             THE WITNESS:  Rebolledo.

24             THE COURT:  Thank you, sir.  You may be seated.

25             Counsel, you may begin.  Thank you.

1   DIRECT EXAMINATION

2   BY MS. SOLARZ:

3   Q.  Good morning, Bartello.

4         Can you tell me what your job is at Tribeca Bagels and

5   how long you've been working at Tribeca Bagels.

6   A.  Me?

7         THE COURT:  He's asking are you asking him.

8   BY MS. SOLARZ:

9   Q.  Yes.  I am asking you the question.

10   A.  It's going to be three years.

11   Q.  What is your job at Tribeca Bagels?

12   A.  I do deliveries, and I wash the pots, and I organize the

13   sodas.

14   Q.  Can you tell me the hours that you work.

15   A.  From 5:00 to 5:00.

16   Q.  Is that 5:00 p.m. to 5:00 a.m.?

17   A.  Yes.

18   Q.  Can you tell me if you normally come to work at 5:00 p.m.

19   and if you normally leave at 5:00 a.m., or do you come in

20   earlier and leave later?

21   A.  I've been leaving at 5:30 or 5:40 till the person who will

22   relieve me comes.

23   Q.  Just to make it clear, we're talking 5:30/5:40 a.m.; is

24   that correct?

25   A.  Yes.

1   Q.  Do you know the plaintiff, Domingo?

2   A.  Yes.  I saw him when he started working there.

3   Q.  So let me just understand.

4            You saw him at what time?  Since you begin work at

5   5:00 p.m. and leave work at 5:00 a.m., at what point in time

6   would you have seen the plaintiff?

7   A.  He would always be late, and that's when I saw him, about

8   5:30.

9   Q.  Can you tell me:  Have you had any conversations with the

10  plaintiff that stuck out in your mind to you?

11  A.  On one occasion I was punching because I was leaving, and

12  then I go to wash my hands, and I asked him -- I asked him

13  where he had been working before and that he had worked in

14  someplace before where he had sued them and in what way they

15  were going to earn a living.  That's the only way to do it.

16           MR. CLARK:  Your Honor, just for the record, I move to

17  strike that.  I don't see how that impeaches the plaintiff's

18  testimony.

19           THE COURT:  I disagree.  Your objection is noted.

20  BY MS. SOLARZ:

21  Q.  What did that mean to you, what way were you going to make

22  a living, that's the only way to do it?

23  A.  Well, I understood that that's what he was planning on

24  doing there or that's what he did before.

25  Q.  Very good.  Thank you.

H7JYCAST                     Rebolledo - Direct

1              Let me ask you a little bit about the timing you think

2      that he was working there because we have a little bit of a

3      conflict on that.

4              THE COURT:  Counsel, don't testify.  Thank you.

5      BY MS. SOLARZ:

6      Q.  How long do you think that Domingo was working at Tribeca

7      Bagels in your estimation?

8      A.  Well, he started on March 15 -- no.  February 15, and I

9      stopped seeing him on March 16.

10     Q.  That was over a year ago.  So I'm interested in how those

11     dates seem familiar to you with regard to his employment.

12     A.  I realized that because we, people who work there, know how

13     long we've been there.  Somebody is there for a year; somebody

14     is there for two years.

15             THE COURT:  So your testimony, sir, is that

16     Mr. Castillo Marcelino was there for approximately one month?

17             THE WITNESS:  Marcelino?

18             THE COURT:  Domingo.

19             THE WITNESS:  Yes.

20     BY MS. SOLARZ:

21     Q.  Very good.

22             One last question for you.  I know you've been working

23     the night shift today.  So I will let you go soon.

24             Do you get any days off from work for a holiday?

25     A.  The holidays?  Yes.

 1   Q.  I understand Tribeca Bagels is open 24 hours a day.

 2             What holiday do you get off or what month?

 3   A.  September.  In September it's closed.

 4             THE COURT:  The store is closed for the whole month of

 5   September?

 6             THE WITNESS:  Yes.

 7   BY MS. SOLARZ:

 8   Q.  Let me make it clear.

 9             The restaurant, Tribeca Bagels --

10   A.  No.  Not every day.  Only the holidays in September.

11   Q.  Thank you.  I just want to make it clear for the record.

12             So you're saying that it's closed on how many days in

13   September?  Approximately.

14   A.  Three days it's closed in September.

15   Q.  Thank you very much, Bartello.  We appreciate that.

16             No more questions, your Honor.

17             MR. CLARK:  Can I just have one moment.

18             THE COURT:  Of course.

19             (Pause)

20   CROSS-EXAMINATION

21   BY MR. CLARK:

22   Q.  Good morning.

23             You testified that you and the plaintiff in this case

24   worked different shifts at Tribeca Bagels; isn't that correct?

25   A.  Yes.

1   Q.  So you were very rarely spending much time with the

2   plaintiff at Tribeca Bagels.  Am I right?

3   A.  Well, actually, I start at 5:00 p.m., but I can be there at

4   maybe 3:00, 3:30, 4:00.  That's when he was there.  No.  He

5   wasn't there.

6   Q.  So you generally didn't spend much more than a half hour or

7   an hour working with this plaintiff while you were at Tribeca

8   Bagels in a typical day?

9   A.  I'm sorry.  I don't understand.

10  Q.  Well, just by your testimony, you wouldn't typically spend

11  more than a half hour or, at max, an hour with this plaintiff

12  when you were working at Tribeca Bagels.

13  A.  I would see him always in the morning because I would wait

14  for my replacement that would come at 5:30.

15          THE COURT:  And he was your replacement, sir?

16          THE WITNESS:  No.  It was the other guy.  That's when

17  I saw him that he was coming in.

18  BY MR. CLARK:

19  Q.  Thank you.  I think that you're answering a different

20  question than what I'm asking.

21          Specifically I asked on a typical day, you wouldn't

22  see this plaintiff more than the half hour or 45 minutes or the

23  hour it took for your replacement to come, whoever that may be.

24  A.  That I was?

25          THE COURT:  Mr. Ochoa, you worked from 5:00 p.m. to

 1   5:00 a.m.  Is that correct, sir?

 2             THE WITNESS:  Yes.

 3             THE COURT:  Sometimes you arrived earlier.  You

 4   arrived at 3:00 or 3:30 or 4:00 before your shift began; is

 5   that correct?

 6             THE WITNESS:  Yes.  I would get there, and I would

 7   take a coffee and wait for my shift because sometimes the

 8   trains are late.

 9             THE COURT:  Also sometimes you would be at Tribeca

10   Bagels after 5:00 a.m.  You might be there till 5:30 or 5:40

11   because you were waiting for someone to replace you.  Is that

12   also correct?

13             THE WITNESS:  Yes.

14             THE COURT:  When Domingo was working at Tribeca

15   Bagels, on a given day, how many minutes or hours were both you

16   and he in the store at the same time?

17             THE WITNESS:  No.  We never worked there at the same

18   time.  I saw him when he was coming.

19             THE COURT:  Yes.  Of course.  I'm not asking when you

20   worked together.  I'm asking:  For what period or how many

21   minutes in a day were you both in the store at the same time?

22   Not necessarily working.

23             THE WITNESS:  No.  Not every day my replacement would

24   come late.  Only now and then.

25   BY MR. CLARK:

1  Q.  There were in fact many times where you would work and you

2  would understand the plaintiff to work, but you didn't see each

3  other.

4  A.  No, because I would leave at 5:00, and then I would just

5  punch in, and I left.

6  Q.  Now, you are not close friends with the plaintiff, are you?

7  A.  Well, there we all talked to each other like good morning,

8  and we all do our jobs.

9  Q.  It's your testimony that you worked with this plaintiff for

10  approximately a month; is that correct?

11  A.  With him myself one month?

12  Q.  You also testified earlier --

13         THE COURT:  I think this witness does not believe he

14  ever worked --

15         MR. CLARK:  You mean actually worked the same shift.

16         THE COURT:  Yes.  So let's ask a different question.

17  BY MR. CLARK:

18  Q.  You testified earlier that this plaintiff worked at Tribeca

19  Bagels for only a month; is that correct?

20  A.  Yes.

21  Q.  And you never worked with this plaintiff at any point

22  during his employment or your own?

23  A.  No, because he worked in the kitchen, and my job was

24  different.

25  Q.  Despite the fact that you didn't work together at Tribeca

 1   Bagels, you testified earlier that he volunteered that he sues

 2   people to make a living?

 3           MR. LEHMAN:  Your Honor, I object.  That's not what he

 4   testified.

 5           THE COURT:  The record will reflect what was said.

 6           Do you want to ask a different question?

 7   BY MR. CLARK:

 8   Q.  I believe you testified earlier that the plaintiff

 9   volunteered something to you about a prior lawsuit.

10   A.  Yes.  He told me that once.

11   Q.  You can certainly help explain this for me.

12           Does it make any sense that someone who you didn't

13   work with at Tribeca Bagels and that you barely saw would tell

14   you about prior lawsuits against restaurants?

15           THE COURT:  I'll allow the question.

16           THE WITNESS:  That was the only -- that's the only

17   time that I arrived and went up to punch, and that's the time

18   that he -- and it occurred to me to ask him, and he told me

19   that.

20   BY MR. CLARK:

21   Q.  Now, you presently work at Tribeca Bagels; correct?

22   A.  Yes.

23   Q.  You like your job at Tribeca Bagels?

24           THE INTERPRETER:  I'm sorry?

25   BY MR. CLARK:

1    Q.  You like your job at Tribeca Bagels.

2    A.  Yes.

3    Q.  You've been there for three years.

4    A.  I am going to be working there for three years.

5    Q.  It would certainly hurt you if Tribeca Bagels closed down;

6    correct?

7    A.  Of course.

8    Q.  And you understand that Tribeca Bagels is being sued in

9    this lawsuit for a significant amount of money; correct?

10             THE COURT:  It's the "significant amount of money" I'm

11   not so sure he knows.

12   BY MR. CLARK:

13   Q.  Do you understand that Tribeca Bagels is being sued for

14   money damages in this lawsuit?

15   A.  Yes, but the problem is that it's not true what the

16   gentleman is saying.

17             MR. CLARK:  I think I have no further questions for

18   this witness.

19             THE COURT:  Redirect?

20             Counsel, are we switching horses midstream?

21             MR. LEHMAN:  Just for the redirect.  Is that okay?

22             THE COURT:  I prefer the same counsel.  Thank you.

23   REDIRECT EXAMINATION

24   BY MS. SOLARZ:

25   Q.  Bartello, you've been working since at least 5:00 p.m.

 1    today.

 2            How tired are you?  How are you feeling?

 3    A.  Yes, of course, because I have to rest.

 4    Q.  Bartello, you do realize you're under oath and you

 5    absolutely must tell the truth in this courtroom?

 6    A.  Of course I'm telling the truth.

 7    Q.  Bartello, I just want to confirm that the conversation you

 8    discussed with us today is the truth and what you heard from

 9    the plaintiff.

10    A.  Of course.  Yes.  It is the truth I'm telling you.

11    Q.  Thank you, Bartello.

12            No further questions.

13            THE COURT:  Thank you.  You may step down, sir.

14            (Witness excused)

15            THE COURT:  Next witness, please.

16            MS. SOLARZ:  Your Honor, we'd like to call Hayim

17    Tsadok.  He will not be needing an interpreter.

18            MR. LEHMAN:  Your Honor, for religious reasons, he

19    cannot swear, but he can solemnly affirm.

20            THE COURT:  That's fine.

21     HAYIM TSADOK,

22        called as a witness by the Defense,

23        having solemnly affirmed, testified as follows:

24            THE DEPUTY CLERK:  Thank you.

25            If you could just please state and spell your name

H7JYCAST          Hayim Tsadok - Direct

 1    slowly for the record.

 2              THE WITNESS:  My name is Hayim, last name, Tsadok.

 3              THE COURT:  Thank you, sir.  You may be seated.

 4    DIRECT EXAMINATION

 5    BY MS. SOLARZ:

 6    Q.  Mr. Tsadok, were you in the courtroom before this trial

 7    started?

 8    A.  No.

 9    Q.  Were you wearing a T-shirt before?

10    A.  No.

11    Q.  Were you wearing glasses?

12    A.  Reading glasses sometimes.

13              THE COURT:  This morning, sir.

14              THE WITNESS:  This morning, no.

15    BY MS. SOLARZ:

16    Q.  Where do you live?

17    A.  I live in Florida.

18    Q.  How often do you come to New York?

19    A.  I come from time to time to visit my grandchildren, my

20    kids, visit the family, and I go back.

21    Q.  Why are you in New York City today?

22    A.  I've been told I've been sued.  My name was on a piece of

23    paper that I've been sued.  I don't know anything about it.

24    Q.  So are you here today because you are also visiting family?

25    Did you fly up for that purpose as well?

1   A.  Excuse me?

2   Q.  Did you fly to New York City --

3   A.  Yes, I did.

4   Q.  -- to visit family as well?

5            THE COURT:  I'm sorry.  I want to make sure you

6   understand the question that's being asked.  Though I recognize

7   it's not normal speaking, I'm just going to ask you to wait

8   until she finishes, and then I'll ask you to answer.

9            THE WITNESS:  No problem.

10           THE COURT:  Thank you.

11           Could you please re-ask your question.

12  BY MS. SOLARZ:

13  Q.  You said sometimes you come from Florida to visit with your

14  family.

15           This trip you're on today -- is that why you came to

16  New York?

17  A.  Yes.

18  Q.  To visit your family.  Very nice.

19           You live in Florida.  Can you tell me how often you go

20  to Tribeca Bagels.

21  A.  When I have a chance to do that.  I don't come to the city.

22  When I'm in the city, I come to say hello to my son.

23  Q.  You say you go to see your son.

24           Why do you go to Tribeca Bagels?

25  A.  Just to see my son.

 1  Q.  Do you have a relationship with Tribeca Bagels other than

 2  talking to your son?

 3  A.  No.

 4  Q.  When did you first meet the plaintiff?

 5  A.  Today.

 6  Q.  You have not seen the plaintiff before today?

 7  A.  Yes.

 8  Q.  Do you have a nickname?

 9  A.  Howie.

10  Q.  Does anybody call you by any other nickname?

11  A.  No.

12  Q.  Does anybody ever call you Imo?

13  A.  No.

14  Q.  So you say you never saw the plaintiff until today.

15          I just want to confirm that you never taught him how

16  to prepare pizza.

17          THE COURT:  One at a time, please.  Let's not be

18  compound.

19          Did you ever teach him how to prepare pizza?

20          THE WITNESS:  I don't know how to prepare pizza

21  myself.

22          THE COURT:  Then I'll take that as a no.

23  BY MS. SOLARZ:

24  Q.  Did you ever tell him how to cut vegetables?

25  A.  No.

 1   Q.  Did you ever change the oil fryer?

 2   A.  No.

 3   Q.  How long do you stay when you come to the store?

 4   A.  Maybe a half hour, 15 minutes, and then I leave.

 5   Q.  Do you hold yourself out as the owner when you come to the

 6   store?

 7   A.  No.

 8   Q.  Did you ever talk to the plaintiff about his wages or his

 9   salary?

10   A.  I never saw him.  I never saw him.

11            THE COURT:  I need you to wait until she finishes

12   asking the question.

13            THE WITNESS:  Sorry.

14            THE COURT:  Counsel, if you could ask that question

15   again so we have the totality of the question on the record.

16   BY MS. SOLARZ:

17   Q.  Did you ever speak to the plaintiff about wages, salary, or

18   scheduling or anything regarding his working conditions?

19   A.  No.

20            MS. SOLARZ:  Thank you, Mr. Tsadok.  That will be all.

21            MR. CLARK:  No cross, your Honor.

22            THE COURT:  Sir, you may step down.  Thank you.

23            THE WITNESS:  Thank you.

24            (Witness excused)

25            MS. SOLARZ:  Your Honor, we would like to call Luis

 1    Quiroz to the stand.  We will need the Spanish interpreter.

 2     LUIS QUIROZ,

 3         called as a witness by the Defense,

 4         having been duly sworn, testified as follows:

 5              THE DEPUTY CLERK:  Please state your name for the

 6    record.

 7              THE WITNESS:  Luis Quiroz.

 8              THE DEPUTY CLERK:  You may be seated.  Thank you.

 9              THE COURT:  Counsel, you may proceed.

10              MS. SOLARZ:  Your Honor, I'm going to be talking to

11    the witness about some dates.

12              Will I be able to give him a blank calendar so he can

13    refer to some dates?

14              THE COURT:  To refresh his recollection about some

15    dates?

16              MS. SOLARZ:  Just to refresh his recollection.

17              THE COURT:  Do you have a copy for your adversary?

18    What months are you going to be showing?

19              MS. SOLARZ:  It would be February and March.  I do

20    have other copies.

21              THE COURT:  February and March of what year, please?

22              MS. SOLARZ:  2016.

23              THE COURT:  Thank you.

24    DIRECT EXAMINATION

25    BY MS. SOLARZ:

1    Q.  Luis, this is just a blank calendar to use for your

2    recollection when I ask you questions.

3    A.  Yes.

4    Q.  Luis, what is your job at Tribeca Bagels?

5    A.  The kitchen.  I cook.

6    Q.  How long have you been working at Tribeca Bagels?

7    A.  Four years.

8    Q.  Can you tell me:  Did you have to take off any time for a

9    health issue?

10   A.  Yes.

11   Q.  Do you know what dates you took off for your health issue?

12   Can you explain your health issue.

13   A.  I stopped working on February 13.

14   Q.  Why did you stop working on February 13?

15   A.  Because I had to have surgery, surgery on my elbow.

16   Q.  I just want to make it clear what year.

17          What year are we talking about?

18   A.  2016.

19   Q.  That was over a year ago.

20          How do you remember that particular date?

21   A.  Because I have records from the hospital.

22   Q.  Can you tell me:  Did you know the plaintiff before that

23   date?

24   A.  I repeat.  I left on the 13th, and he came to replace me.

25          THE COURT:  "He" who?

1            THE WITNESS:  Yes.  The plaintiff.

2            THE COURT:  The question that you were just asked is:

3    Did you know the plaintiff before he came to work at Tribeca

4    Bagels?

5            THE WITNESS:  No.

6            THE COURT:  Okay.  Thank you.

7    BY MS. SOLARZ:

8    Q.  Can you tell me when you returned to Tribeca Bagels.

9    A.  I returned on March 18 for good.

10   Q.  How do you know what date you returned?

11   A.  Because the plaintiff stopped working.

12   Q.  How do you remember that particular date?

13   A.  Because I had an appointment on March 8, and I went to it.

14   Q.  So please remind me again the first day you returned to

15   work after being away for your illness.

16   A.  March 18.

17   Q.  So you did not work at Tribeca Bagels before March 18 --

18   A.  I worked a few days, but -- I worked a few days, a few

19   hours, March 9 and 10.

20   Q.  What did you do for those few days?

21   A.  Those days, 15th, 16th, I only worked -- I worked for a few

22   hours just to do deliveries.

23           THE COURT:  Which days?  What days in March?

24           THE WITNESS:  9, 10, and 11.

25           THE COURT:  On those three days, you worked several

                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

 1    hours just doing deliveries?

 2              THE WITNESS:  Yes.

 3              THE COURT:  Your elbow had healed by then?

 4              THE WITNESS:  Because they told me in the hospital

 5    that I was not in danger any longer.

 6              THE COURT:  Counsel, you may continue.

 7    BY MS. SOLARZ:

 8    Q.  At any point in time, did you know the plaintiff?  Was he

 9    working any of the days that you were there?

10    A.  Yeah.  I would see him for a little while, not much time

11    actually.

12    Q.  Did you see him after you started working on the 18th?

13    A.  No.

14    Q.  So let me just confirm that after March 18, you did not see

15    the plaintiff, either working at Tribeca Bagels or otherwise,

16    until today in the courtroom.

17    A.  I didn't see him again till today.

18    Q.  Thank you.

19              Just some quick questions about Hayim Tsadok.  Do you

20    know Hayim Tsadok?

21    A.  Yes.

22    Q.  How often do you see Hayim Tsadok and where?

23    A.  At the store once a year.

24    Q.  What does Hayim do when he comes to the store?

25    A.  To visit.

```
 1   Q.  Do you have a nickname for Hayim?

 2   A.  No.

 3   Q.  You never called him Imo?

 4   A.  No.

 5   Q.  Do you know Tiran?

 6   A.  Tiran?

 7   Q.  Tiran Tsadok, yes.

 8   A.  Yes.

 9   Q.  Can you tell me how often Tiran comes to the store.

10   A.  Once a month.

11   Q.  Can you tell me what he does when he comes to the store.

12   A.  So he will be at the office for maybe five minutes.

13            MS. SOLARZ:  That will be all, your Honor.  Thank you.

14            THE COURT:  Cross-examination.

15            MR. CLARK:  Thank you, your Honor.

16            THE COURT:  One moment, counsel.

17       This is the attorney for the plaintiff, and he is

18   permitted to ask you questions now.  Let him ask his question

19   and then please answer it.  If you don't understand his

20   question, please let him know or please let me know.

21            THE WITNESS:  Okay.

22            THE COURT:  Do you understand?

23            THE WITNESS:  Yes.

24            THE COURT:  Counsel, you may proceed.  Thank you very

25   much.
```

H7JYCAST                    Quinez - Cross

1              MR. CLARK:  Thank you.

2    CROSS-EXAMINATION

3    BY MR. CLARK:

4    Q.  Just one preliminary matter.  I saw when you were walking

5    towards the witness stand, you took a document out of a black

6    plastic bag and were carrying it towards the witness stand.

7              Did you in fact do that?

8    A.  Today?

9    Q.  Yes.  Right now.

10   A.  Yes.  Yes.  I can show it to you.

11   Q.  Please do.

12   A.  That's my records when I left the hospital and all the

13   appointments that I had at the hospital.

14             THE COURT:  So that I'm clear, these are records

15   regarding your elbow surgery and the appointments that you had

16   with the doctors?

17             THE WITNESS:  Yes.

18             THE COURT:  Thank you.

19             Go ahead, counsel.

20   BY MR. CLARK:

21   Q.  Did you use those records in order to determine the dates

22   that you testified to earlier of February 13, 2016, and

23   March 18, 2016?

24             THE COURT:  I'll allow the question.

25             Yes, counsel.

H7JYCAST                          Quinez - Cross

 1              MR. LEHMAN:  It's fine, your Honor.

 2              THE COURT:  Do you understand the question, sir?

 3              THE WITNESS:  Yes.

 4    BY MR. CLARK:

 5    Q.  Without these documents, you wouldn't independently recall

 6    the exact times that you left and came back from work?

 7              MR. LEHMAN:  Objection.  That calls for speculation.

 8    He has to pretend what the world would be like if he didn't

 9    have the documents.

10              THE COURT:  I'll allow the question.  I understand the

11    concern that you have.

12              Let me ask the question a little bit differently.

13              Do you recall those dates without those documents?

14              THE WITNESS:  Yes.

15              THE COURT:  Thank you.

16    BY MR. CLARK:

17    Q.  You don't have any documents from Tribeca Bagels that would

18    indicate when you first left working there on February 13?

19    A.  No.

20              MR. LEHMAN:  Your Honor, I do have an objection.  With

21    the way he's phrasing it, it becomes a double negative, you

22    don't have any documents, etc., and he says no.  It would be

23    clearer if he said, do you have any documents, and then the

24    person could answer yes or no.

25              THE COURT:  I understood the question that was being

1    asked and the answer.  I'm fine with that question.

2          Go on.  Did you understand that question?

3          THE WITNESS:  No.

4          THE COURT:  Let me ask the question a little bit

5    differently.

6          Do you have documents from Tribeca Bagels that

7    indicate when you left to address your medical issues?

8          THE WITNESS:  That's all I have as records go.

9          THE COURT:  Thank you.

10   BY MR. CLARK:

11   Q.  Indeed, you don't have any documents from Tribeca Bagels

12   indicating that you worked at any time between September 2015

13   and April 2016; is that correct?

14   A.  Because on March 22, I had another appointment that was

15   canceled, and that's why I started working on the 18th, and the

16   appointment was not necessary.

17         THE COURT:  Let me ask this question.

18         Sir, I want you to focus on the time period from

19   September of 2015 through April of 2016.

20         Do you understand that time period?

21         THE WITNESS:  Yes.

22         THE COURT:  During that time period, did you receive

23   any documents or papers from Tribeca Bagels concerning your

24   work there, your employment or your wages?

25         THE WITNESS:  For the wages.

 1                THE COURT:  What documents did you receive?

 2                THE WITNESS:  The hours that you work.

 3                THE COURT:  Understood.  Thank you.

 4                Go ahead, counsel.

 5     BY MR. CLARK:

 6     Q.  Are you testifying that you received a schedule, a written

 7     schedule, from Tribeca Bagels concerning your hours worked?

 8     A.  Yes.

 9     Q.  Was that true for every week that you worked at Tribeca

10     Bagels between September 2015 and April 2016?

11                THE COURT:  One moment.

12                Yes, sir.

13                MR. LEHMAN:  Your Honor, I do object on relevancy.  I

14     will stipulate that the plaintiff did not receive any

15     paperwork.  So I don't know why we're asking this line of

16     questions about what he received.  We'll stipulate to that.

17                THE COURT:  I understand, sir.

18                MR. CLARK:  The question would be whether or not this

19     witness received any documents.

20                THE COURT:  I'm allowing this one question.  But, sir,

21     the purpose of the witness was for impeaching your client.  I

22     don't want you to have a cross that goes broader than the

23     direct because you could have called him for your direct case.

24                MR. CLARK:  Absolutely, your Honor.  I am trying my

25     best to constrain myself to that.

                        SOUTHERN DISTRICT REPORTERS, P.C.
                                (212) 805-0300

1           THE COURT:  Try harder, and this question ends it.

2           Sir, have you received schedules from Tribeca Bagels?

3           THE WITNESS:  I worked by the week.

4           THE COURT:  Did you receive a schedule for the next

5  week?

6           THE WITNESS:  What week?

7           THE COURT:  Let's move on.

8           MR. CLARK:  We can move on, your Honor.  Thank you.

9  Q.  You presently work at Tribeca Bagels; is that correct?

10 A.  Yes, I do.

11 Q.  You've worked there for four years; is that correct?

12 A.  Yes.

13 Q.  And you enjoy your job at Tribeca Bagels?

14 A.  Yes, because I've been working with them, and they know me

15 for a long time.

16 Q.  Were you approached by your employers at Tribeca Bagels in

17 order to testify at this trial here today?

18          MR. LEHMAN:  Your Honor, I object.  He's saying the

19 word "employers," but that's a fact for you to decide right

20 now.

21          THE COURT:  I understand.

22          Why don't you ask him did someone ask you to testify,

23 and if so, who.

24 BY MR. CLARK:

25 Q.  Did someone ask you to testify at this trial here today?

1   A.  Yes.

2   Q.  Who asked you to testify at this trial here today?

3   A.  The manager.

4   Q.  Who is that?

5   A.  Alberto.

6   Q.  Is Alberto the one that pays you?

7   A.  Yes.

8   Q.  And you understand that Tribeca Bagels will be hurt if the

9   plaintiff was victorious in this case here today?

10           MR. LEHMAN:  Your Honor, I object to the

11  characterization of "hurt."  It doesn't hurt my client to

12  follow the law.

13           THE COURT:  Thank you for testifying.  I'll allow the

14  question to go in as asked.

15           Do you understand the question, sir?

16           THE WITNESS:  Yes.

17           THE COURT:  Do you have an answer to the question?

18           THE WITNESS:  Well, I have to make clear that I came

19  to give testimony for the time that I was not working.

20  BY MR. CLARK:

21  Q.  Were you promised anything in exchange for your testimony?

22  A.  No.

23           MR. CLARK:  No further questions for this witness.

24  Thank you.

25           THE COURT:  The briefest of redirects.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

 1              MS. SOLARZ:  Yes.  Just one quick question, please.

 2    REDIRECT EXAMINATION

 3    BY MS. SOLARZ:

 4    Q.  Luis, would you be willing to lie in court today in order

 5    to be saying positive things about Tribeca Bagels?

 6    A.  No, not to lie.

 7              MS. SOLARZ:  Thank you, your Honor.

 8              THE COURT:  You may leave.

 9              THE WITNESS:  Thank you.

10              (Witness excused)

11              THE COURT:  Ms. Solarz, the next witness, please.

12              MS. SOLARZ:  Yes.  It will be a rather more lengthy

13    conversation with the next witness.  Can we take a quick

14    bathroom break.  Would that be okay?

15              THE COURT:  Yes.  It was my thought we would be able

16    to get this done before there was a need for a lunch break.

17              Am I correct?

18              MS. SOLARZ:  We'll proceed.  That's fine.  I can't be

19    sure how long it will take.

20              THE COURT:  This witness is who, please?

21              THE CLERK:  Please come forward and remain standing by

22    the witness box and please raise your right hand.

23     Felix Nieto,

24         called as a witness by the Defense,

25         having been duly sworn, testified as follows:

H7JYCAST          Nieto - Direct

1      THE DEPUTY CLERK:  If you could please state and spell

2   your name slowly for the record.

3      THE WITNESS:  Felix Nieto, N-i-e-t-o.

4      MS. SOLARZ:  Your Honor, I'm just looking for the

5   calendar.

6      THE COURT:  It's still there.

7      Proceed.

8   DIRECT EXAMINATION

9   BY MS. SOLARZ:

10  Q.  Felix, can you tell me what your job is at Tribeca Bagels

11  and how long you've been working there.

12  A.  I'm the manager at Tribeca Bagels.  I have been there for

13  four years.  I'm in charge of everything there from purchase

14  orders, inventory, etc.

15  Q.  Can you tell me generally what hours you work and what days

16  you work there.

17  A.  Monday through Saturday, 4:30 to 3:30.

18  Q.  Can you tell us how you first met the plaintiff.

19  A.  I met him on February 11, 2016.

20  Q.  How do you know you met him on February 11?

21  A.  I have in my telephone records a text message from him.

22  I'm almost sure it's a text message.

23  Q.  What time did you receive that text message?

24  A.  Somewhere between 6:20 or 6:30 in the morning.

25  Q.  Why would the plaintiff text message you on February 11 at

1   that time?

2   A.  I had placed an ad on Craigslist asking for a person on

3   January 31.  I got the message, and I responded giving him the

4   address of the deli because normally the address is not

5   included in our advertisement, and I told him that there was a

6   job open.

7           THE COURT:  Do you recall the particular advertisement

8   that you placed on or about January 31?

9           THE WITNESS:  Yes.  We were asking for a delivery boy.

10          THE COURT:  Was there a period of time that you were

11  specifying you wanted this person?  Was it a full-time or

12  part-time position?  Was it temporary or permanent?

13          THE WITNESS:  We provided information of 5:00 in the

14  morning till 4:00 in the afternoon, 5:00 a.m. to 4:00 p.m.

15  BY MS. SOLARZ:

16  Q.  After you received the text message, what happened?

17  A.  He came to the deli.  I don't remember the time, but I

18  interviewed him.  So he came in the morning to the deli, and I

19  told him that we needed a cook/helper because Mr. Luis Quiroz

20  had to go to the hospital.  He had some problem and had to go

21  to the hospital.

22          So I told him which were going to be the hours and how

23  much we were going to pay him.  I told him to come on Monday,

24  February 15.

25  Q.  Can you tell me what were the hours you told him he would

H7JYCAST                    Nieto - Direct

1    be working.

2    A.  Okay.  The hours he was supposed to work was from 5:00 a.m.

3    to 5:00 p.m., but that was never -- that never happened because

4    he would normally arrive at 5:30/5:40.

5    Q.  I want to talk to you a little bit about Domingo's working

6    at Tribeca Bagels.

7            Did he often come in timely?

8            THE INTERPRETER:  The interpreter will need --

9            THE COURT:  Did he arrive at work on time?  Generally

10   speaking.

11           THE WITNESS:  No.  No.  He was always late.

12   BY MS. SOLARZ:

13   Q.  How late would he be approximately?

14   A.  5:30/5:40.  I call that late.

15   Q.  And he was supposed to leave at 4:00 p.m. as you said.

16           Was that the time he would leave Tribeca Bagels?

17   A.  Normally I leave around 3:30 or 3:45, but the work in the

18   kitchen is finished around 3:00 p.m., at the most at 3:30

19   because we only fill the steam table once per day.

20   Q.  Thank you.

21           Did he ever take a break for lunch?

22   A.  Yes, he did go for breakfast and lunch.

23   Q.  When he was taking those breaks to eat his breakfast and

24   his lunch, was he working while he was doing that, or was he

25   not working?

1    A.   Like every other worker, he stopped to eat.

2    Q.   Thank you.

3              Can you tell me:  Did you require him to buy any

4    clothing to perform this job?

5              MR. CLARK:  Objection, your Honor.

6              THE COURT:  They're not pursuing it.

7              MS. SOLARZ:  It's not going towards whether he wore

8    the clothing.  It's going towards his credibility saying that

9    was a requirement.

10             THE COURT:  Go ahead.

11             THE WITNESS:  No.

12   BY MS. SOLARZ:

13   Q.   I want to talk to you a little bit about his last days at

14   work.

15   A.   Yes.

16   Q.   What was his last day at work at Tribeca Bagels?

17             THE INTERPRETER:  Can you repeat the question for the

18   interpreter.

19   BY MS. SOLARZ:

20   Q.   Can you please let us know the last day the plaintiff

21   worked at Tribeca Bagels.

22   A.   That was on March 15, 2016.

23   Q.   That was over a year ago.

24             How are you remembering that particular date?

25   A.   I know because in my telephone record, I have two calls

1   that I made on the 16th and 17th that he never answered.

2   Actually, I called him on the 17th.  I didn't call him.

3        I was expecting to see him on the 16th.  He didn't

4   show up, and I called him on the 17th.  This was because

5   previously he didn't show up for one day, and then he showed up

6   the following day, and I let him come in.

7        What happened is that two or three weeks before that,

8   he missed work one day, and he explained.  I asked him, and he

9   explained that he had problems with his living quarters because

10  they were kicking him out.

11  Q.  So tell us what happened on March 18, please, March 18,

12  2016.

13  A.  Well, he came on March 18, arrived between 5:30 and 6:00,

14  and I told him, listen.  Luis Quiroz is back.  He's the person

15  that is in charge of the cook, and we cannot continue with you

16  here.  This is a business, and we cannot have you here.

17       He said the answer saying, that's fine, sir.  I

18  understand.

19  Q.  So did he work with Luis at all after that date of

20  March 18?

21  A.  No.

22  Q.  Now I'm going to ask you a couple questions about Tiran and

23  Hayim.

24       Can you please tell me how often Tiran comes to

25  Tribeca Bagels.

1  A.  Tiran comes one day per week, and it's always on

2  Wednesdays.

3  Q.  Are there weeks that he comes two or three times a week?

4  A.  No.  On occasions, there are one or two weeks that he

5  doesn't show up, but he never comes two or three times per

6  week.

7  Q.  Can you tell me what Tiran does when he comes to the store.

8  A.  He comes, he says hello to the workers that he knows that

9  have been there longer, then he goes to the office, and he

10  writes checks normally for the utilities, the rent, and the

11  insurance because that's an area that I'm not familiar with.

12  Q.  When he goes to that office, does he shut the door?

13  A.  Never.

14  Q.  Can you tell me when he comes in those days, do you discuss

15  with him anything about work schedules, conditions of

16  employment, method of payment of any of the employees?

17          MR. CLARK:  Objection.

18          THE COURT:  I'll allow it.

19          THE WITNESS:  He never discusses with me any issue

20  about the workers.  I am the one who takes care of the

21  schedules, salaries, etc.

22  BY MS. SOLARZ:

23  Q.  You testified that you hired the plaintiff on February 11.

24          Was Tiran with you when you hired him?

25  A.  No.

1   Q.  At any point did you speak to Tiran about what you should

2   be paying the plaintiff?

3   A.  No.  Tiran never asked me how much we pay the workers or

4   what their hours of work are.  I am responsible on the issues

5   related to the daily operation.

6   Q.  What about Hayim Tsadok?  Does he come to the store?

7   A.  I have seen Howie in the last five years a maximum of two

8   times, and I don't remember when.  I don't remember when.  And

9   today I saw him.

10  Q.  By "Howie," you mean Hayim Tsadok; is that correct?

11  A.  Hayim Tsadok, yes.

12  Q.  Do you ever call him Imo?

13  A.  No.

14          THE COURT:  Or Emow?

15          THE WITNESS:  No.  Howie.

16  BY MS. SOLARZ:

17  Q.  Can you tell me what Hayim does when he comes to the store.

18  A.  Well, he says hello to everyone.  I have known him for 30

19  years.  When I came to this country, I went to his store, to

20  his place of business.

21  Q.  In that time that Domingo was working there, did you see

22  Hayim teach him how to prepare pizza?

23  A.  No.

24  Q.  Did you see him teach him how to cut vegetables?

25  A.  No.

 1   Q.  Or did you see him teach him how to change the oil?

 2   A.  No.

 3   Q.  Thank you.

 4           Who has the power to hire and fire at Tribeca Bagels?

 5           THE INTERPRETER:  Can you repeat for the interpreter,

 6   please.

 7   BY MS. SOLARZ:

 8   Q.  Can you please tell me who has the responsibility to hire

 9   and fire the employees at Tribeca Bagels.

10   A.  For the last four years, I have been doing that.

11   Q.  Who has the responsibility to supervise and control their

12   schedule and working conditions?

13   A.  I am.

14   Q.  Who determines their rate and how they will be paid and who

15   pays them?

16   A.  I am the one.

17   Q.  Who maintains the employment records?

18   A.  I pay every Monday, and I have all the records.

19   Q.  Are you saying that you are the only one that does that

20   with regard the employees' wages and schedules?  Or does

21   somebody else assist you?

22   A.  There is nobody else.  I am the only one.

23   Q.  Do you like your job at Tribeca Bagels?

24   A.  I'm very happy there.  I have been working with this family

25   for 30 years.

1   Q.  So can I understand that you have a very nice relationship

2   with the Tsadok family?

3   A.  They are the ones who opened the doors for me in this

4   country.

5   Q.  Can you please tell me who asked you to testify today in

6   court.

7   A.  I am the person responsible for the deli, and I have to

8   answer for the deli.

9   Q.  Do you understand that this is a lawsuit that could have

10  serious financial consequences to Tribeca Bagels?

11          THE COURT:  I already remonstrated with plaintiff's

12  counsel about calling something "significant" or "large."  So I

13  want to be careful.  Let's not add the adjectives.

14  BY MS. SOLARZ:

15  Q.  Do you understand that this lawsuit would create a problem

16  for Tribeca Bagels?

17  A.  Yes, of course.  There is a large number of families that

18  depend on this place.

19  Q.  Would you be willing to lie today on the stand in order to

20  say something positive about Tribeca Bagels?

21  A.  Lie, no.  I'm telling the truth.

22  Q.  Tribeca Bagels is open 24 hours a day.

23          Do they ever get a day off for a holiday?

24  A.  Normally we close on the Jewish holidays.  That happens,

25  most of them in September.  So we close for Rosh Hashana and

1  Yom Kippur, and we close at night, and we close the following

2  day.

3  Q.  Can you tell me:  Did you ever give Domingo any documents

4  reflecting his rate of pay?

5  A.  No.

6  Q.  Did you ever give him any documents that reflect the hours

7  of work, hourly rate of pay, or overtime?

8  A.  There is nothing in writing.  Everything was oral

9  communication.

10 Q.  Is there anything posted at the store regarding these

11 items?

12 A.  There is a poster for the labor department saying how much

13 should be paid, the rate of pay, how much for overtime, etc.

14       MS. SOLARZ:  Very good.  That will be all, your Honor.

15 Thank you.

16       Thank you, Felix.

17       THE COURT:  Let me talk to the parties.

18       Again, I am prepared to go forward until the end

19 because I don't have a sense of how far we are from the end.  I

20 have a sentencing at 3:00.  I would like to be there and

21 available for that sentencing.

22       Mr. Clark, I don't know how long your

23 cross-examination is.

24       MR. CLARK:  I'm going to try to make it very short.

25 Certainly, as we discussed before this, I think a lot of the

 1   questioning will be what weight, given the fact that this is

 2   entirely impeachment evidence, what the facts the Court can

 3   find versus credibility issues and the like.  So I will try to

 4   be very brief with my cross-examination.

 5              THE COURT:  Are there additional defense witnesses

 6   that you intend to call this afternoon?

 7              MS. SOLARZ:  Yes, there are, your Honor.

 8              THE COURT:  How many are there?

 9              MS. SOLARZ:  I need to refresh, but I believe I have

10   two witnesses and one defendant.

11              THE COURT:  Yes, Mr. Lehman.

12              MR. LEHMAN:  If I were to guess, I would think our

13   questions would be no more than 30 minutes total for those

14   three.  Mr. Nieto is the longest one by far.

15              THE COURT:  I'm happy to go forward.

16              Are the parties capable of doing that?

17              MR. CLARK:  It is 1:11, your Honor.  If it's going to

18   be another half hour of additional testimony, I think I can try

19   to commit to not having over 20 minutes of cross-examination.

20   It's hard to --

21              THE COURT:  Can we keep going?

22              MR. CLARK:  Yes.  Let's keep going.

23              THE COURT:  Let's go forward with cross.

24              MR. CLARK:  May I inquire, your Honor?

25              THE COURT:  You may.  Thank you.

1    CROSS-EXAMINATION

2    BY MR. CLARK:

3    Q.  Good afternoon.

4    A.  Good afternoon.

5    Q.  Now, you testified concerning text messages from the

6    plaintiff earlier today.

7            Do you recall that testimony?

8    A.  I remember he would text me, I am Domingo Castillo.  I'm

9    looking for a job.

10           THE COURT:  I think there was an easier question than

11   that.

12           Earlier today you testified about receiving text

13   messages or messages from the plaintiff.

14           THE WITNESS:  Yes.

15           THE COURT:  So my question is:  Do you remember that

16   testimony?  Do you remember testifying about that?

17           THE WITNESS:  Yes.

18           THE COURT:  Okay.  Thank you.

19           Go ahead, counsel.

20   BY MR. CLARK:

21   Q.  You don't have custody of those text messages anymore, do

22   you?

23   A.  No.  Unfortunately, I don't.

24           MS. SOLARZ:  Excuse me, your Honor.  The word

25   "custody" -- I'd like to know how that's being translated.

```
 1              THE COURT:  I think she's asking whether he has the
 2   documents in his possession.
 3              MS. SOLARZ:  Is that how it was asked?
 4              THE INTERPRETER:  Yes.
 5              THE COURT:  Thank you.
 6   BY MR. CLARK:
 7   Q.  So, when you say the specific dates that those text
 8   messages were sent, you're relying entirely on your memory;
 9   correct?
10   A.  Well, no, because if you check on the records of the phone,
11   there are no calls till February 11, the first call I have from
12   Mr. Domingo.
13   Q.  So is it your testimony that you are in possession of phone
14   records concerning this case?
15   A.  I don't have the texts, but in the received calls on my
16   phone, I have the calls.
17   Q.  You have the phone calls, not text messages, actual phone
18   calls?
19   A.  I don't have the texts themselves, but I have the phone
20   number from that call.
21   Q.  You also testified that you put an ad for this position on
22   Craigslist.
23   A.  No.  That one was for a delivery boy, but that I had
24   solved.  But now I had the new problem in the kitchen.
25   Q.  So are you saying then that there was never a Craigslist ad
```

1   concerning plaintiff's position ever posted?

2   A.  No, not on that day there weren't.  The thing is that

3   Craigslist leaves two or three weeks the ads online so people

4   can look at it.  So people can call us and ask about the jobs.

5              THE COURT:  So am I correct that you heard from the

6   plaintiff in response to that Craigslist ad even though the

7   position had been filled?

8              THE WITNESS:  And I explained to him that what was

9   needed at the time was a kitchen helper.

10  BY MR. CLARK:

11  Q.  You don't have the physical ad in your physical possession

12  anymore; correct?

13  A.  No.  The ad, no.  But I can get it because they have the

14  record of my account.

15             THE COURT:  Mr. Lehman.

16             MR. LEHMAN:  Your Honor, I do have an objection

17  towards relevancy.

18             THE COURT:  Understood.

19  BY MR. CLARK:

20  Q.  You testified earlier that you like your job at Tribeca

21  Bagels.

22  A.  Yes.

23  Q.  And I think -- certainly correct me if I misremembered

24  this -- you said that the Tsadoks opened the doors to this

25  country for you.

1    A.  Yes, because Mr. Hayim had a deli in another location in

2    Manhattan, and that's when I went to work in 1987.

3    Q.  So you were hired by the Tsadoks.

4    A.  In the deli in 1987, the year 1987.

5    Q.  Who hired you to begin to work at Tribeca Bagels?

6    A.  Tito, Tiran.

7    Q.  Just to clarify, Tiran Tsadok is also referred to as Tito;

8    is that correct?

9    A.  I've known him since he was a boy.  I have always called

10   him Tito.

11   Q.  And Tito hired you?

12            THE COURT:  For Tribeca Bagels?

13            MR. CLARK:  For Tribeca Bagels.  My apologies.

14            THE WITNESS:  But because in 1987, he was a baby.

15            THE COURT:  Mr. Lehman, relevance?

16            MR. LEHMAN:  Relevance, and I'm pretty sure the

17   corporation is the one who pays him and hired him.

18            MR. CLARK:  I believe it speaks to biases,

19   specifically the testimony that he made concerning the role of

20   Mr. Tsadok in Tribeca Bagels.

21            MS. SOLARZ:  Which Mr. Tsadok?

22            MR. CLARK:  Tiran.

23            THE COURT:  I will allow it.

24            MR. CLARK:  Thank you.

25   Q.  Just again to get back on track, Mr. Tiran Tsadok hired you

 1   to work at Tribeca Bagels; is that right?

 2   A.  Yes.  Correct.

 3   Q.  If Mr. Tiran Tsadok was unsatisfied with your work at

 4   Tribeca Bagels, he would be allowed to fire you from your

 5   position; correct?

 6   A.  Yes, because he's the owner.  Well --

 7   Q.  And being the owner means he would have the ability to fire

 8   you if he was unsatisfied with your work.  That's correct?

 9   A.  Yes.

10   Q.  And you yourself are an employee at Tribeca Bagels;

11   correct?

12   A.  I'm the manager.  I'm the manager.  I'm completely

13   responsible for the store, and they trust me.

14   Q.  As the manager of the store, you're ultimately responsible

15   to Mr. Tiran Tsadok.

16   A.  Yes.  I am the person responsible completely for the deli.

17   Q.  And you also testified earlier that you determined the pay

18   at Tribeca Bagels; correct?

19   A.  Well, yes.  I set the salaries.  I hire the employees.  I

20   am the one who does the evaluations of their performance.  I'm

21   totally in charge of the deli.  I do not report to Tito about

22   anything about the deli.

23   Q.  Now, you understand that this is a lawsuit where the

24   plaintiff is claiming that he was paid improperly.

25   A.  I understand, but this is not the truth.

1   Q.  You understand that if plaintiff proves his claims,

2   defendants, Mr. Tsadok as well as Tribeca Bagels, would have to

3   pay money potentially.

4           THE COURT:  I'll allow the question.

5           THE WITNESS:  Yeah, but he's not telling the truth.

6           THE COURT:  Understood.

7           Let's move on.

8   BY MR. CLARK:

9   Q.  You still work at Tribeca Bagels; isn't that correct?

10  A.  Yes, I do.

11  Q.  And you'd like to keep your job at Tribeca Bagels?

12  A.  Of course I do.

13  Q.  Were you made any promises in exchange for your testimony

14  here today?

15  A.  No.  Nobody made any promises because I love my job.

16  Q.  Have you had any training on how to pay people under

17  federal law?

18  A.  Well, yeah, I know because I read whatever articles from

19  the labor department I can get.  Besides, I have a lot of

20  experience.  I have 30 years' experience in this kind of

21  business.

22  Q.  Are you similarly familiar with the requirements of the

23  New York Labor Law?

24  A.  Yes.

25  Q.  Do you know what spread-of-hours pay?

 1  A.  Do you mean how much you have to pay?

 2  Q.  What is it?

 3          MR. LEHMAN:  Your Honor, I object.  He asked him a

 4  question.

 5          THE WITNESS:  Yes.  I know how much you have to pay

 6  now in the New York state.

 7          THE COURT:  The question, sir is:  There is a concept

 8  in New York state law called spread-of-hours pay.

 9          Is that a term that you have heard of?

10          THE WITNESS:  Yes.  I know how much you have to pay

11  for regular time and how much you have to pay for overtime.

12          MR. CLARK:  I think I have my answer, your Honor.

13          THE COURT:  Yes.

14          MR. CLARK:  No further questions.

15          THE COURT:  Thank you.

16          Redirect.

17          MS. SOLARZ:  I have two quick questions, your Honor.

18          THE COURT:  Yes.

19          MS. SOLARZ:  Thank you.

20  REDIRECT EXAMINATION

21  BY MS. SOLARZ:

22  Q.  Regarding the text messages, have you recently been able to

23  print out your phone bill to refresh your memory about the

24  dates you received those text messages?

25          MR. CLARK:  Objection.  I don't believe that's

1    consistent with his prior testimony.

2              THE COURT:  That's not the issue.  The issue is it

3    could not have been more leading.

4              MS. SOLARZ:  I can rephrase.

5              THE COURT:  You managed to poison the well.  Thanks.

6              Sir, at some point prior to this lawsuit, were you

7    able to print out your phone bill?

8              THE WITNESS:  Yes.

9              THE COURT:  Now you can ask your question.

10   BY MS. SOLARZ:

11   Q.  When was the last time you were able to look at this

12   Craigslist ad that you referred to?

13   A.  I don't remember what was the last time I looked at it.

14   Are you talking about that ad that I placed?

15             THE COURT:  We're talking about the January 31 ad.

16             Are you able to access it now?

17             THE WITNESS:  Yes.  I found it.  Yes, but I don't

18   remember when I did, but I have a copy of it.

19   BY MS. SOLARZ:

20   Q.  So you have a copy of it in your possession?

21   A.  Of what I was looking on January 31, but Domingo called

22   answering that ad, and I told him, right now I just don't have

23   that position any longer.  Excuse me.  When I interviewed him,

24   I told him.  What I have now available is this because Luis

25   Quiroz is sick, and this is what I told him.

 1   BY MS. SOLARZ:

 2   Q.   Thank you.

 3        So when did you last look at what that ad was on

 4   Craigslist?

 5   A.   I think it was when he started the lawsuit because I could

 6   remember very clearly what it was, the ad, about.

 7   Q.   Very good.  Thank you very much.

 8        That will be all, your Honor.

 9   A.   Thank you.

10        (Witness excused)

11        THE COURT:  The next witness, please.

12        THE DEPUTY CLERK:  Please raise your right hand.

13   HAYIM LUNA,

14        called as a witness by the Defense,

15        having been duly sworn, testified as follows:

16        THE DEPUTY CLERK:  Thank you.

17        Please state and spell your name slowly for the

18   record.

19        THE WITNESS:  Hayim Luna, L-u-n-a.

20        THE DEPUTY CLERK:  You may be seated, sir.

21        MR. LEHMAN:  Your Honor, may I be the relief pitcher

22   and close this out?

23        THE COURT:  Yes.

24        MR. LEHMAN:  Thank you.

25        THE COURT:  I just want to make sure whoever begins

 1    finishes.

 2              MR. LEHMAN:  Yes, your Honor.

 3    DIRECT EXAMINATION

 4    BY MR. LEHMAN:

 5    Q.  What is your job at Tribeca Bagels?

 6    A.  Check deliveries and help the cashiers.

 7    Q.  How long have you worked at Tribeca Bagels?

 8    A.  I have one working there since September 2012.

 9    Q.  What are your hours?

10    A.  5:00 a.m. to 5:00 p.m.

11    Q.  Do you know the plaintiff?

12    A.  I know he worked there.  I don't know exactly for how long.

13    Q.  Did you have the same starting time?

14              Let me back up so I'm not leading you.

15              What time did you start work?

16    A.  I'm supposed to start at 5:00, but I always arrive late,

17    maybe 5:30.

18    Q.  Did you ever see Domingo outside of work?

19    A.  During the time he was working there, I saw him in the

20    train.  Usually we were on the same train although not in the

21    same car.

22    Q.  What train do you take?

23    A.  The E.

24    Q.  E or A?

25    A.  E train.

 1   Q.  When was the last time you saw Domingo on the train?

 2   A.  I don't know exactly.  I know that I saw him during the

 3   last week that he worked.  I saw him on Monday or Tuesday.  We

 4   were on the same train, and we were both late.

 5   Q.  Do you know when that was?  December?  January?  November?

 6   What part of the year was it?

 7   A.  I believe it was February, but I'm not sure.

 8   Q.  How often do you see Tiran?

 9        Do you know anyone named Tiran?  Do you know the

10   defendant?

11   A.  Yes.

12   Q.  How often do you see him?

13   A.  He usually comes once a week, but sometimes he comes every

14   two weeks.

15   Q.  Do you ever get any holidays off?

16   A.  Yes.

17   Q.  When?

18   A.  That happens in September.  I don't know the dates, but I

19   know they're Jewish holidays, Rosh Hashana I believe.

20   Q.  Last question:  How long does Tiran stay at the store when

21   you see him?

22   A.  Twenty minutes, fifteen minutes, half an hour, no more.

23        MR. LEHMAN:  No more questions, your Honor.

24        THE COURT:  Thank you.

25        Cross-examination.

 1              MR. CLARK:  No cross for this witness, your Honor.

 2              THE COURT:  Okay of the thank you.

 3              Sir, you may step down.

 4              (Witness excused)

 5              THE COURT:  Tell me, who, please, this witness is.

 6              MS. SOLARZ:  Miguel Camora.

 7              THE COURT:  Mr. Camora, please come forward.

 8   MIGUEL CAMORA,

 9        called as a witness by the Defense,

10        having been duly sworn, testified as follows:

11              Please state and spell your full name.

12              THE WITNESS:  Miguel Camora, M-i-g-u-e-l, last name,

13   C-a-m-o-r-a.

14              Counsel, you may inquire.  Thank you.

15   DIRECT EXAMINATION

16   BY MR. LEHMAN:

17   Q.  Hello.  How long have you worked at Tribeca Bagels?

18   A.  Yes.

19   Q.  How long?

20   A.  About five years.

21   Q.  What hours do you work?

22   A.  5:00 a.m. to 5:00 p.m.

23   Q.  What time do you usually get there?

24   A.  I normally arrive at 4:20/4:40.

25   Q.  Do you know the plaintiff sitting at the plaintiff's table?

H7JYCAST                    Camaras - Direct                    114

```
1   A.  Yes.  I met him at the workplace.

2   Q.  Do you know the hours that he worked?

3   A.  His hours were basically from 5:00 a.m. to 4:00 p.m.

4           THE COURT:  Your hours, sir, were 5:00 a.m. to 5:00

5   p.m.?

6           THE WITNESS:  Yes.

7           THE COURT:  Thank you.

8   BY MR. LEHMAN:

9   Q.  What do you do at Tribeca Bagels?

10  A.  I cook at the grill.

11  Q.  Did you ever make the plaintiff any food?

12  A.  Yes, sir.

13  Q.  When would you make the food for him during the day?  What

14  time?  What time of the day?

15  A.  The hours I'm not sure, but I would make breakfast, maybe

16  bacon and eggs and cheese, and also for lunch I would prepare a

17  sandwich.

18  Q.  Do you know where he would eat this food?

19  A.  He would eat at the kitchen.

20  Q.  Would he be working while eating?

21  A.  No.  Logically, he would take his time to eat.

22  Q.  Do you know the defendant here?

23  A.  Yes.  He is Tito.

24  Q.  How often do you see Tito?

25  A.  Now I may see him once per week maybe for half an hour.
```

1    Q.  Do you know what Tito does when he's at the store?

2    A.  To tell you the truth, I don't know.  He just waves hello.

3    Q.  Do you know the last time you saw the plaintiff?

4    A.  I don't recall the exact day when I saw him last, but he

5    just worked for us.

6    Q.  Would you be able to estimate the month you last saw him?

7    A.  I know that he worked for us, but I cannot remember the day

8    of the week or even the month.

9    Q.  Do you know anyone named Hayim?

10   A.  He is Tito's father.

11   Q.  How often do you see Hayim in a year?

12   A.  In five years, I may have seen him twice.

13               MR. LEHMAN:  Thank you.

14               THE COURT:  Cross?

15               MR. CLARK:  No cross of this witness.  Thank you.

16               THE COURT:  Sir, you may step down.

17               (Witness excused)

18               MR. LEHMAN:  This is Tiran, Tito.

19               THE COURT:  Mr. Tsadok, please come forward.

20    TIRAN TSADOK,

21        called as a witness by the Defense,

22        having duly affirmed, testified as follows:

23   DIRECT EXAMINATION

24   BY MR. LEHMAN:

25   Q.  How often do you go to Tribeca Bagels?

 1    A.  I'm there once a week.

 2    Q.  Do you know which day you go?

 3    A.  Wednesdays.

 4    Q.  Is there any particular reason why you go on Wednesdays?

 5    A.  I go on Wednesdays because it's the slowest day for real

 6    estate management, which I do for my father.

 7    Q.  Do you remember the last time you went to the store three

 8    times a week?

 9    A.  No.

10    Q.  Did you ever discuss with Albert how to pay the employees?

11    A.  No.

12    Q.  Do you maintain the plaintiff's employment records?

13              THE COURT:  If I could just have a clarification.

14              The person referred to as Albert -- is that Mr. Nieto?

15              THE WITNESS:  Yes.

16    BY MR. LEHMAN:

17    Q.  Just curious.  Do you have any knowledge as to why they

18    call him Albert?

19    A.  I guess it's a nickname.

20    Q.  How long have you known Albert for?

21    A.  A very long time, since I was a little child.

22    Q.  Have you talked with any of the employees who testified

23    today about their upcoming testimony?

24    A.  No.

25    Q.  That would include did you make any promises to them or

```
 1    threats?

 2    A.   No.

 3    Q.   Do you know what days or holidays for Tribeca Bagels?

 4    A.   What days or holidays?

 5    Q.   When the store is closed?

 6    A.   Rosh Hashana and Yom Kippur.

 7    Q.   Could you repeat that.

 8    A.   We close on Rosh Hashana and Yom Kippur.

 9              THE COURT:  And no other days during the year, sir?

10              THE WITNESS:  No other days.

11    BY MR. LEHMAN:

12    Q.   When was the first time you saw the plaintiff?

13    A.   The first time I saw the plaintiff was a few months ago

14    when we met in this courtroom.

15              MR. LEHMAN:  No further questions, your Honor.

16              THE COURT:  Thank you.

17              Cross-examine?

18              MR. CLARK:  One very brief question.

19              THE COURT:  Of course.

20    CROSS-EXAMINATION

21    BY MR. CLARK:

22    Q.   Good afternoon.

23    A.   Good afternoon.

24    Q.   Just one question.

25              You had said that the first time you met the plaintiff
```

```
 1   was in this courtroom?

 2   A.  Correct.

 3   Q.  This courtroom here today?

 4   A.  In the same courtroom we're in right now.

 5           THE COURT:  What day, sir?  Was it today?

 6           THE WITNESS:  No.  It was a few months ago.  I don't

 7   recall for which --

 8   BY MR. CLARK:

 9   Q.  Was that in front of Judge Failla?

10   A.  I think so.  It could be the other judge that was here.  I

11   don't remember.

12   Q.  But it was in this courtroom today?

13   A.  Yes.

14           MR. CLARK:  No further questions.

15           THE COURT:  No redirect I presume.

16           MR. LEHMAN:  No redirect.

17           THE COURT:  Sir, you may step down.  Thank you very

18   much.

19           THE WITNESS:  Thank you.

20           (Witness excused)

21           MR. LEHMAN:  We rest, your Honor.

22           THE COURT:  My expectation, based on our prior

23   discussions and prior pretrial conferences, is that the parties

24   would like to submit findings of fact and conclusions of law.

25   I wish not to destroy any summer vacations that you may have.
```

1       Do you know today the time that you would like to

2   submit them?  Because I'm expecting them to be simultaneous.

3   Would you like to speak with each other about proposing a

4   schedule for their submission?  I'll do whatever works for the

5   parties.

6       MR. LEHMAN:  I'll do whatever works for them.

7       MR. CLARK:  I do have a vacation scheduled, an

8   unusually lengthy one, August 29 to September 8, the first one

9   in a few years.

10       THE COURT:  Sir, would you want to submit your

11   findings of fact before or after your vacation?

12       MR. CLARK:  My preference would be after, if

13   your Honor could indulge me.  Certainly if that's too long for

14   defendants, I would be willing to do it right beforehand.

15   Otherwise, sometime in mid September would be my preference.

16       THE COURT:  September 18?  That works for both

17   parties?

18       MR. CLARK:  That works for the plaintiff.  Thank you.

19       MR. LEHMAN:  Yes, your Honor.

20       THE COURT:  Is there anything else we should be

21   talking about today?

22       MR. CLARK:  Nothing from the plaintiff.

23       MR. LEHMAN:  Nothing from us.

24       THE COURT:  Thank you all for doing this without a

25   break.  I appreciate it.  I know it was a challenge, but I

1    really do thank you for it.  We're adjourned.

2            Counsel, I'm expecting that there will be cites to the

3    record.  So I'm expecting that someone is going to order this

4    transcript at some point.  I'll let you figure out who.

5            (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    DOMINGO CASTILLO MARCELINO

4    Direct By Mr. Mulholland . . . . . . . . . . . . 6
     Cross By Mr. Lehman  . . . . . . . . . . . . . . 8
5    BARTELLO OCHOA REBOLLEDO

6    Direct By Ms. Solarz . . . . . . . . . . . . . .65
     Cross By Mr. Clark . . . . . . . . . . . . . . .68
7    Redirect By Ms. Solarz . . . . . . . . . . . . .73

8    HAYIM TSADOK

9    Direct By Ms. Solarz . . . . . . . . . . . . . .75

10   LUIS QUIROZ

11   Direct By Ms. Solarz . . . . . . . . . . . . . .79
     Cross By Mr. Clark . . . . . . . . . . . . . . .84
12   Redirect By Ms. Solarz . . . . . . . . . . . . .90

13   Felix Nieto

14   Direct By Ms. Solarz . . . . . . . . . . . . . .91
     Cross By Mr. Clark . . . . . . . . . . . . . . 102
15   Redirect By Ms. Solarz . . . . . . . . . . . . 108

16   HAYIM LUNA

17   Direct By Mr. Lehman . . . . . . . . . . . . . 111

18   MIGUEL CAMORA

19   Direct By Mr. Lehman . . . . . . . . . . . . . 113

20   TIRAN TSADOK

21   Direct By Mr. Lehman . . . . . . . . . . . . . 115
     Cross By Mr. Clark . . . . . . . . . . . . . . 117
22

23

24

25

                              PLAINTIFF EXHIBITS

Exhibit No.                                    Received

  1    . . . . . . . . . . . . . . . . . . . . 7

  2    . . . . . . . . . . . . . . . . . . . . 8

  3    . . . . . . . . . . . . . . . . . . . .60