UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

DOMINGO CASTILLO MARCELINO,

Plaintiff,

v.

374 FOOD, INC. d/b/a TRIBECA BAGELS,
TIRAN TSADOK, and HAYIM TSADOK,

Defendants.

------------------------------------------------------X

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: March 27, 2018 |

16 Civ. 6287 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiff Domingo Castillo Marcelino, a former employee of Tribeca Bagels, sued Defendants 374 Food, Inc. (doing business as Tribeca Bagels), Tiran Tsadok, and Hayim Tsadok (with Tiran Tsadok, the "Individual Defendants"),[1] for wage and hour and recordkeeping violations of the Fair Labor Standards Act, 29 U.S.C. §§ 201-219 (the "FLSA"), and the New York Labor Law (the "NYLL"). This Opinion constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52 after a bench trial held on July 19, 2017.

In addition to certain pretrial materials discussed herein, the Court has reviewed the transcript of the trial, the trial exhibits, and the parties' post-trial submissions. It has considered those materials in light of its own recollections of the trial and its perception of the credibility of the witnesses who testified.

---

[1]     For ease of reference, and with no disrespect, the Court will at times distinguish between the two Tsadok defendants by referring to them by their first names.

The Court concludes that Plaintiff has vastly overstated the period of his employment at Tribeca Bagels, to the point of perjuring himself in his testimony to the Court.  However, even the testimony of Defendants' impeachment witnesses suggests that Plaintiff is provisionally entitled to recovery for certain violations of the relevant statutes, in the amount of $8,144, plus prejudgment interest.  The Court refrains from issuing judgment in that amount, however, because it wishes to hear from the parties as to the effect, if any, of Plaintiff's perjury on his entitlement to recovery, and, moreover, on the propriety of sanctions on Plaintiff and/or his counsel pursuant to Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, and the Court's inherent power.

## PROCEDURAL HISTORY

Contrary to other bench trials over which the Court has presided, the instant case presented certain unusual procedural issues that were addressed pretrial.  Accordingly, for completeness, the Court includes a brief procedural history of the case.

Plaintiff filed his Complaint on August 9, 2016.  (Dkt. #1 ("Compl.")).  In it, Plaintiff purported to bring a collective action under the FLSA and a class action under the NYLL.  The crux of Plaintiff's wage and hour violations was contained in his allegations that:

> From approximately September 2, 2015 until on or about April 2016, Plaintiff Castillo worked from approximately 5:00 a.m. until on or about 5:15 p.m. four days a week and from approximately 5:00 a.m. until on or about 5:00 p.m. two days a week (typically 73 hours per week).

> Throughout his employment with defendants, Plaintiff Castillo was paid his wages in cash.
>
> From approximately September 2, 2015 until on or about April 2016, Plaintiff Castillo was paid a fixed salary of $100.00 per day.
>
> Plaintiff Castillo's wages did not vary regardless of how many additional hours he worked in a week.

(Compl. ¶¶ 46-49).  Plaintiff also claimed that Defendants did not keep track of his actual hours worked, and that he had not been provided with rate of pay or wage statements.  (*Id.* at ¶¶ 51-55).  Further, as violative "[g]eneral [e]mployment [p]ractices," Plaintiff alleged that Defendants failed to pay the minimum wage to which he was entitled, overtime wages, and spread-of-hours pay, and, further, that they willfully evaded recordkeeping and notice requirements.  (*Id.* at ¶¶ 57-64).

Defendants filed their answer on January 1, 2017.  (Dkt. #21).  Of note, Defendants denied that Plaintiff was an employee of Tiran and Hayim Tsadok; denied that Plaintiff was employed by Defendants for the entirety of the time period between September 2, 2015, and April 20, 2016; and raised an affirmative defense that the FLSA did not apply because Defendants' annual revenues did not exceed $500,000.  (*Id.*).

An initial pretrial conference was held in the matter on January 4, 2017. (Dkt. #50 (transcript)).  At the beginning of the conference, counsel for Plaintiff disclaimed any intention to proceed as a collective or class action.  (*Id.* at 2-3). The parties then discussed with the Court the possibility of a pretrial resolution.  While counsel for both parties expressed an interest in settlement,

they diverged on the amount of time Plaintiff had been employed at Tribeca Bagels and the overtime hours he had worked, as evidenced by the following colloquy with defense counsel:

> MR. LEHMAN: I think, if it is not going to be a collective action, the main point of contention is going to be how long did the plaintiff work there. My client's position is that he was only there for six weeks, and I think it was pled that he was there for a year.
>
> THE COURT: I have, from the pleadings, perhaps, the note I took down was September 2015 through April 2016.
>
> MR. LEHMAN: Yes, and my client just told me repeatedly that that's not correct.
>
> THE COURT: All right. I'll bite. How can that be? Is it a situation where he just stopped showing up or how does your client know that that's just — he was only there for six weeks?
>
> MR. LEHMAN: Obviously without talking about evidence, my understanding is that he was hired briefly because they had a slight influx, and he was only going to be there for a week. It might have lasted a little bit longer, but it wasn't a long-term job. I don't know why the plaintiff pled that he worked there for so long, but I have had repeated conversations with my client, and he has assured me that it was only, at most, six weeks.
>
> THE COURT: And just for my own edification, he indicated, "he" being the plaintiff in this case, indicated that he worked regularly 12 hours a day and 73 approximately per week. I don't know where your client's business is, although I should, given its proximity to this courthouse, but is it open 12 hours a day?
>
> MR. LEHMAN: I don't know when it's open. My understanding from talking with people there is that, at most, if he worked overtime on any single day would be three hours, so we are looking at three times six, which was at most, we think, 56 hours.

(*Id.* at 3-4; *but see id.* at 5 (Plaintiff's counsel noting that "If there are records that could potentially speak to this date issue, I myself have also consulted with my client, and he insists that he worked around six months there, starting in September.")).[2]  That day, the Court endorsed the case management plan submitted by the parties, and also issued an order referring the case to then-United States Magistrate Judge Andrew J. Peck for a settlement conference. (Dkt. #23-24).

A settlement conference was held before Judge Peck on March 8, 2017. It failed, but was followed by an order referring the case to Judge Peck for general pretrial purposes.  (Dkt. #26).  Three weeks later, after a status conference on March 28, 2017, Judge Peck issued an order referring the matter to the District's mediation program.  (Dkt. #27).  A mediation was scheduled for May 18, 2017, but did not in fact take place.  (Dkt. #31).

Given the failure of several alternative dispute resolution mechanisms, the Court held a pretrial conference on May 26, 2017, to schedule a trial in the matter.  (Dkt. #52 (transcript)).  On June 7, 2017, the Court issued an order scheduling trial for July 19, 2017.  (Dkt. #35).  Counsel for Plaintiff filed a proposed pretrial statement and motion *in limine* on June 21, 2017.  (Dkt. #38-39).  Counsel for Defendants filed their corresponding submissions on June 22, 2017, and June 27, 2017.  (Dkt. #41, 42, 46).

---

[2]     Repeatedly during this litigation, counsel for Plaintiff suggested that Plaintiff worked for six months at Tribeca Bagels, a time frame that struck the Court as irreconcilable with the September-2015-to-April-2016 period charged in the Complaint and argued at trial.

During this time period, defense counsel raised concerns about *ex parte* communications and contemplated a motion for recusal.  The motion was not filed, and the Court addressed the matters at the final pretrial conference on July 5, 2017.  (Transcript of July 5, 2017 Conference at 2-4).  At the same conference, counsel for Defendants confirmed that they would be calling witnesses only for impeachment purposes.  (*Id.* at 8-10).

## FINDINGS OF FACT

A one-day bench trial on Plaintiff's claims was held on July 19, 2017. (Dkt. #54 (trial transcript ("Tr."))).  Spanish-language interpreters were available for any witness who required one.  In keeping with the Court's Individual Rules of Practice in Civil Cases, counsel for Plaintiff submitted a sworn statement containing Plaintiff's direct testimony prior to trial, though the Court ordered Plaintiff to resubmit his affidavit in his native Spanish language with a certified translation.  (*See* Dkt. #43).[3]  Counsel for Defendants presented several impeachment witnesses.  (*See* Dkt. #41 (listing potential witnesses)).

Following the presentation of witness testimony, the Court invited the parties to submit proposed findings of fact and conclusions of law, which they did on September 18, 2017.  (Dkt. #56 (Plaintiff's Proposed Findings of Fact and Conclusions of Law ("Pl. FOF" and "Pl. COL")), 57-58 (Defendants' Proposed Findings of Fact and Conclusions of Law ("Def. FFCL"))).  The Court

---

[3]     To the extent the parties were able to agree to certain facts, they were permitted to stipulate to same.  Plaintiff's portion of the pretrial order contained proposed stipulations of fact (Dkt. #38), but Defendants' portion of the order agreed only with the date the lawsuit was filed (Dkt. #41, 42).

has considered the parties' submissions, but has concluded that it is easier to summarize the testimony at trial and explain the degree to which the Court credits, or discredits, that testimony.

## A.    The Plaintiff's Case

Plaintiff was the first witness called at trial.  (Tr. 5).  After being sworn as a witness, Plaintiff reviewed the Spanish-language version of his declaration (Pl. Ex. 1 ("Declaration")), and confirmed that the statements contained therein were "true to this day" (Tr. 7).  A copy of the certified English translation of his Declaration was also admitted.  (Pl. Ex. 2; Tr. 7-8).

According to Plaintiff's Declaration, he was employed by Tribeca Bagels from September 2, 2015, until April 20, 2016.  (Pl. Ex. 2 at ¶ 3).  Moreover, Plaintiff averred that he knew, and worked with, Tiran and Hayim Tsadok.  (*Id.* at ¶¶ 2, 5, 7-9).  Tiran had been introduced to Plaintiff as "the owner of Tribeca Bagel[s] on several occasions," and Plaintiff recalled Tiran discussing managerial issues, payroll, and finances, as well as giving directions and having input in hiring decisions.  (*Id.* at ¶¶ 5-7).  Hayim was described by Plaintiff as an older gentleman who was known to Plaintiff as "Emo," and who "was present at Tribeca Bagels on a regular basis [to] give [Plaintiff] specific directions and tasks to perform in his capacity as owner of Tribeca Bagels," including instructing Plaintiff on "how to prepare pizza, cut vegetables, and change the oil fryer."  (*Id.* at ¶¶ 8-9).

Plaintiff did not have an official title at Tribeca Bagels, but served as cook and general laborer, with responsibilities that included, among other things,

preparing food.  (Pl. Ex. 2 at ¶¶ 10-12).  Through his Declaration, Plaintiff sought to satisfy the interstate commerce and enterprise requirements of the FLSA by discussing the manner in which his work responsibilities implicated goods transported in interstate commerce, and by recalling sales during a typical shift he worked at Tribeca Bagels.  (*Id.* at ¶¶ 11-12).

No written records of Plaintiff's hours worked were introduced at trial. Plaintiff recounted his work schedule as one of "5:00 a.m. to 5:15 p.m. for four days out of the week and from approximately 5:00 a.m. until 5:50 [p.m.] two days out of the week for a total of six (6) work days in a week."  (Pl. Ex. 2 at ¶ 13).[4]  He recalled being paid $100 per shift, in cash, regardless of the hours worked.  (*Id.* at ¶¶ 14-17).  Plaintiff was not required to keep track of his hours, nor did he recall anyone else keeping track.  (*Id.* at ¶ 18).  He received neither meal nor rest breaks, nor any wage notices or wage statements.  (*Id.* at ¶¶ 19-22).

Plaintiff was then extensively — and very effectively — cross-examined by counsel for Defendants.  (Tr. 8-55).  As to certain topics, Plaintiff's own responses called his direct testimony into doubt.  As to others, Plaintiff's testimony was refuted convincingly by subsequent witnesses at trial.

Plaintiff's difficulties began with the start date of his employment. Plaintiff testified that he walked into Tribeca Bagels on a Monday morning at 8:00 a.m. or 9:00 a.m., asked for employment, and was hired by the manager,

---

[4]    This differed from the allegation in the Complaint.  (*See* Compl. ¶ 46).

"Alberto";[5] indeed, Plaintiff repeatedly testified that he began his tenure at Tribeca Bagels on a Monday. (Tr. 12, 16, 21-22, 56-57). However, according to Plaintiff's Complaint (Compl. ¶ 15), and Declaration (Pl. Ex. 2 at ¶ 3), he began work on Wednesday, September 2, 2015. (Tr. 21-22). And when asked whether it would surprise him to learn that he had in fact first arrived at Tribeca Bagels on a Thursday, Plaintiff twice responded, "No." (*Id.*).

Plaintiff's testimony about the Individual Defendants was equally perplexing, and later discredited in large measure. Plaintiff recalled that Defendant Tiran Tsadok, whom he knew as "Tito," met him on his first day of work, and visited Tribeca Bagels three times per week — Monday, Wednesday, and Friday between 3:00 and 3:30 p.m. — and thus 90 to 100 times during the putative period of Plaintiff's employment. (*See* Tr. 14-15, 22-26). More troubling to the Court was Plaintiff's testimony about Defendant Hayim Tsadok. Plaintiff vividly recalled extensive interactions with "Hayim," who he claimed invited Plaintiff to call him "Emo" on Plaintiff's first day of work and worked alongside Plaintiff in the kitchen. (*Id.* at 26-28; *see also id.* at 28 ("We would talk practically every day. He works with me.")). However, at trial, Plaintiff identified "Hayim" as one of the defense witnesses in the case (*id.* at 10-11), and specifically did not identify Hayim Tsadok, who had flown in from Florida for the trial and had maintained — accurately, it turns out — that he

---

[5]    "Alberto" was identified at trial as Felix Nieto, the manager of Tribeca Bagels. (*See* Tr. 116).

was not involved in the operation of Tribeca Bagels and had never met Plaintiff (*id.* at 41-43).[6]

Separate and apart from the content of his testimony, Plaintiff was not a credible witness. The Court observed Plaintiff throughout his testimony, and was struck by his body language. Plaintiff rarely, if ever, looked up in responding to questions, even questions posed by the Court. Of perhaps greater significance was the fact that Plaintiff spent virtually the entirety of his testimony folding, unfolding, and refolding the Spanish-language version of his Declaration that rested on his lap.

At times, it appeared to the Court that Plaintiff was, in the vernacular, making up answers as he went along. One area involved his apparent employment at a Brazilian restaurant called Rain House. Plaintiff responded in the negative to questions about whether he had ever worked at a restaurant called Rain House or a Brazilian restaurant, and whether he had ever worked at or been to a restaurant where women wore feathers on their heads or dressed in bikinis. (Tr. 32-33). However, when confronted with a picture from Plaintiff's Facebook feed of him dressed "in a cook's outfit with a woman in a bikini with something on her head," Plaintiff suddenly recalled working there "one day, not every time"; he also began restating, inaccurately, counsel's prior

---

[6]     Counsel for Plaintiff wisely did not propose any factual findings concerning Hayim Tsadok. (*See* Dkt. #56 at ¶¶ 3-4, 9-11). The Court imagines that with any degree of diligence — particularly given defense counsel's specific objections in this regard — counsel for Plaintiff could have determined that Hayim Tsadok was not a proper party to this lawsuit and thereby spared him the inconvenience and expense of defending this action and appearing for trial.

questions, in the hope of explaining away his prior answers.  (*Id.* at 33-35).
And though the picture had been posted to Facebook on March 27, 2016 (i.e.,
during his supposed employment at Tribeca Bagels), Plaintiff testified that it
had been taken "[m]aybe one year earlier."  (*Id.* at 35-37).

A second area of wholly implausible testimony concerned the date of
termination of Plaintiff's employment.  Plaintiff recalled it to be April 20, 2016,
the same date recited in his Complaint.  (*Compare* Tr. 43, *with* Dkt. #1 at ¶ 15).
According to Plaintiff, he arrived at work at 5:00 a.m., only to be fired by his
manager for being 30 minutes late.  (Tr. 44).[7]  Unemployed as of approximately
6:00 a.m., Plaintiff made the one-hour trip back to his home in Queens "to
rest," and "stayed at home for that entire day."  (Tr. 45).  Plaintiff was adamant
on this last point, *until* he was confronted with the consent-to-join form that he
had signed in connection with the instant lawsuit, which was also dated
April 20, 2016.  (Tr. 45-47; Def. Ex. B).  Plaintiff suddenly remembered that
later that day, at about "2:00 or 3:00 in the afternoon," he went to see his
attorney, located in midtown Manhattan.  (Tr. 47-50).[8]

Given his prior testimony concerning that day's events, the Court viewed
with skepticism Plaintiff's testimony concerning the newly-recalled visit to his
attorney.  Its doubt then turned to concern:  Plaintiff testified that he had never

---

[7]   Plaintiff later testified that he arrived at 5:30 a.m., which made more sense to his
narrative.  (Tr. 45).

[8]   Plaintiff recalled that he obtained information concerning counsel through an
advertisement in a newspaper that he recalled seeing once, and that he wrote the
telephone number of the firm in a notebook that "may be at home."  (Tr. 48-49).

read the Complaint with which his consent form was affiliated, and had never had it translated into Spanish. (Tr. 51-52). Plaintiff's counsel elected not to conduct redirect examination, so the Court may never know what documents, if any, Plaintiff reviewed before they were filed in this case.

At the end of his cross-examination, Plaintiff was asked whether he had ever stated to another employee that (i) he had left a prior job because he had sued his employer or (ii) he sued people to make a living. (Tr. 54). Plaintiff responded in the negative to both questions, but the damage to his credibility had already been done.

**B.    The Defense Witnesses**

The witnesses whom Defendants called for impeachment purposes were far more credible. The Court discusses their testimony in this section principally as necessary to refute or clarify statements made by Plaintiff in his testimony.

The first defense witness was Bartello Ochoa Rebolledo, who had been employed at Tribeca Bagels for three years at the time of his testimony. (Tr. 65). Ochoa worked from 5:00 p.m. to 5:00 a.m., and would see Plaintiff when he arrived, late, to begin his shift. (*Id.* at 66). According to Ochoa, Plaintiff was employed from February 15, 2016, until March 16, 2016 — approximately one month. (*Id.* at 67). Also telling was Ochoa's recollection of a conversation with Plaintiff in which the latter said "that he had worked in someplace before where he had sued them and in what way they were going to earn a living. That's the only way to do it." (*Id.* at 66; *see also id.* ("I

12

understood that that's what he was planning on doing there or that's what he did before.")).  On cross-examination, counsel for Plaintiff attempted to develop the witness's bias in favor of Defendants, only to be met with the response that "the problem is that it's not true what [Plaintiff] is saying."  (*Id.* at 73).

The defense next called Hayim Tsadok.  Hayim testified that he lived in Florida, and had traveled to New York only to appear for this lawsuit and see family.  (Tr. 75-76).  Hayim occasionally visited Tribeca Bagels, but only for the purpose of seeing his son Tiran.  (*Id.* at 76-77).  Hayim's nickname was "Howie," and not "Emo."  (*Id.* at 77).  And Hayim never met Plaintiff before seeing him in the courtroom at trial.  (*Id.*).

Luis Quiroz — the kitchen employee whom Plaintiff replaced — then testified.  Reviewing a calendar for the months of February and March 2016, Quiroz recalled that from February 13, 2016, until March 18, 2016, he was on leave from Tribeca Bagels in order to have surgery on his elbow.  (Tr. 79-81).[9] Quiroz specifically recalled not seeing Plaintiff after he returned from surgery on March 18.  (*Id.* at 82).

Quiroz also provided information about the Individual Defendants.  He recalled seeing Hayim Tsadok approximately once a year, when he came to visit.  (Tr. 82).  He recalled seeing Tiran Tsadok approximately once a month,

---

[9]     Quiroz also brought medical records with him, substantiating the dates of his surgery and medical treatment.  (Tr. 84-85),  Quiroz spoke generally about returning on March 18, 2016, to full-time duty as a cook at Tribeca Bagels, a position he had held for four years at the time of his testimony.  (*Id.* at. 80).  However, he recalled working for a few hours on a few days in the first half of March "just to do deliveries."  (*Id.* at 81-82).

13

during which visits Tiran would "be at the office for maybe five minutes." (*Id.* at 83).

The next witness was the manager at Tribeca Bagels, Felix Nieto, who had worked there for four years at the time of his testimony. (Tr. 91). Nieto recalled meeting Plaintiff on Thursday, February 11, 2016, and claimed to have received a text message from Plaintiff earlier that morning in response to a Craigslist ad Nieto had placed. (*Id.* at 91-92).[10] Nieto then interviewed Plaintiff and hired him to begin on Monday, February 15, 2016, to work from 5:00 a.m. until 5:00 p.m. — though, Nieto added, Plaintiff was habitually late by 30 to 40 minutes. (*Id.* at 92-93; *see also id.* at 93 (observing that "the work in the kitchen is finished around 3:00 p.m."); *but cf. id.* at 92-93 (referring to a 4:00 p.m. end of shift)). Nieto recalled that Plaintiff took breaks for breakfast and lunch. (*Id.* at 93-94 ("Like every other worker, he stopped to eat.")).

Nieto had a different recollection of the termination of Plaintiff's employment. He testified that Plaintiff's last day was March 15, 2016, which he recalled by looking at telephone records and seeing calls placed by him to Plaintiff that went unanswered. (Tr. 94-95). Plaintiff did not appear for work on March 16 and 17, and when he arrived on March 18, Nieto let him go because Luis Quiroz had returned. (*Id.* at 95).

Nieto was also asked questions regarding the Individual Defendants. He recalled that Tiran Tsadok came to Tribeca Bagels every Wednesday, at which

---

[10]   Nieto recalled the ad as seeking a delivery person. (Tr. 92). By the time Plaintiff replied to the ad, the delivery person had been hired, but a kitchen worker was then needed to replace Quiroz. (*Id.* at 103-04).

14

time he "writes checks normally for the utilities, the rent, and the insurance." (Tr. 96). Nieto disputed, however, that Tiran ever discussed with him "any issue about the workers," such as "work schedules, conditions of employment, [or] method of payment," contending that he (Nieto) was responsible for such matters. (*Id.*; *see also id.* at 91 ("I'm in charge of everything there from purchase orders, inventory, etc."), 97 ("I am responsible on the issues related to the daily operation."), 98 (claiming responsibility "to hire and fire employees," "to supervise and control their working conditions," to "determine[] their rate and how they will be paid and who pays them," to "maintain[] the employment records," and to determine "employees' wages and schedules"), 100 (noting poster in Tribeca Bagels from "the labor department" regarding rates of pay), 106 ("I do not report to [Tiran Tsadok] about anything about the deli."); *but see id.* at 105-06 (conceding that the Tsadok family had hired him in 1987 and that Tiran Tsadok had the power to fire him "because he's the owner")). By contrast, Nieto recalled seeing "Howie" (Hayim Tsadok) only two times in the preceding five years, exclusive of trial. (*Id.* at 97).

Hayim Luna, a delivery worker at Tribeca Bagels for nearly five years, recalled meeting Plaintiff on a subway train "during the last week that [Plaintiff] worked," which Luna believed was in February 2016. (Tr. 111-12). Miguel Camora, a cook at Tribeca Bagels for the same period of time, worked the same shift as Plaintiff, and recalled Plaintiff working "basically from 5:00 a.m. to 4:00 p.m." (*Id.* at 113-14). Camora made both breakfast and lunch for Plaintiff, and recalled Plaintiff taking breaks for both meals. (*Id.* at 114). Both men also

15

spoke to how little time Tiran Tsadok spent at Tribeca Bagels.  (*Id.* at 112, 114-15).

The final impeachment witness was Tiran Tsadok.  Tiran explained that his principal business was real estate management, and that he went to Tribeca Bagels only on Wednesdays because that was the "slowest day for real estate management."  (Tr. 116).  He disclaimed any discussions with Felix Nieto about "how to pay the employees."  (*Id.*).  Tiran also recalled that the first time he met Plaintiff was in the courtroom at a pretrial conference in this case.  (*Id.* at 117-18).[11]

## C.    The Court's Findings

Defendants elected not to put on a case in opposition to Plaintiff's, but rather to call a series of impeachment witnesses.[12]  As a matter of strategy, and as suggested by the preceding two sections, Defendants succeeded in impeaching Plaintiff's credibility.  The Court must determine how properly to consider the evidence supplied by the defense witnesses.  (*See* Tr. 46, 87).  *See generally Estate of Jaquez* v. *Flores*, No. 10 Civ. 2881 (KBF), 2016 WL 1060841, at *9 (S.D.N.Y. Mar. 17, 2016) ("The Court notes that if these statements are offered as impeachment evidence, it does not necessarily follow that they will be admitted.  The Federal Rules of Evidence distinguish between evidence used

---

[11]    Tiran Tsadok also echoed the testimony of other defense witnesses that Tribeca Bagels was closed for the Jewish holidays of Rosh Hashanah and Yom Kippur.  (Tr. 117; *see also id.* at 68, 99-100, 112).

[12]    Plaintiff could have called any of the defense witnesses in his case in chief, but elected not to.

to impeach and substantive evidence.  The rules for substantive evidence are not eradicated by the invocation of the more permissive standards applied to some impeachment evidence.").

Lest there be any doubt, the Court recognizes the difference between impeachment and rebuttal; at this trial, the two concepts had significant overlap.  The Court disbelieved much (indeed, most) of Plaintiff's testimony.  And while it has tried to imagine benign reasons for such demonstrably false statements, such as a lack of sophistication or an innocent failure of recall on Plaintiff's part, the Court remains convinced that on several issues — in particular, the length of time he worked at Tribeca Bagels — Plaintiff perjured himself at trial.

The Court initially considered disregarding *all* of Plaintiff's testimony.  This was, in the Court's estimation, an intellectually honest approach that reflected the degree to which the impeachment witnesses had succeeded in discrediting Plaintiff as a witness.  However, the Court is aware that, in the analogous context of instructing jurors on witness credibility, the "*falsus in uno, falsus in omnibus*" instruction is generally disfavored.  *See United States* v. *Weinstein*, 452 F.2d 704, 713 (2d Cir. 1971) ("The maxim '*Falsus in uno, falsus in omnibus*' has been well said to be itself 'absolutely false as a maxim of life.'" (citation omitted)); 1 Leonard B. Sand *et al.*, MODERN FEDERAL JURY INSTRUCTIONS — CRIMINAL, ¶ 7.01, at Instr. 7-17 (2016) (recommending that the instruction not be given).  In addition, Defendants did not rebut every detail of Plaintiff's testimony — for example, his statements regarding the items sold by

17

Tribeca Bagels on a particular work day — and the Court is left to wonder whether such omissions reflect a recognition that Plaintiff's testimony on these details was accurate or a belief that the impeachment topics selected were sufficient to demonstrate Plaintiff's perfidy.  On reflection, the Court has adopted an approach that is more favorable to Plaintiff, but that will have little effect on the Court's wage and hour analysis:  The Court will credit Plaintiff's testimony, except to the extent that it was rebutted by Defendants' impeachment witnesses.

The Court will issue some general findings of fact here; these findings are derived from the evidence outlined above, and will be expanded upon by the Court as necessary in its conclusions of law.  The Court finds first that Plaintiff was employed as a kitchen worker at Tribeca Bagels from February 15, 2016, until his termination on March 18, 2016.  Based principally on the testimony of Plaintiff and Felix Nieto, the Court finds that Plaintiff worked on 25 days during the work weeks of February 15, February 22, February 29, March 7, and March 14, 2016.  The Court credits Nieto's testimony that Plaintiff was absent from work on March 16 and 17, and on one day during the week of February 22 or February 29.  (Tr. 95).[13]

---

[13]     In addition to recalling Plaintiff's absence during the two days prior to his termination, Nieto also recalled that Plaintiff failed to appear for work on one day, two or three weeks earlier, because Plaintiff "had problems with his living quarters because they were kicking him out." (Tr. 95).  This accords, to a degree, with Plaintiff's testimony that he was out for "over three days" because of an "emergency with [his] living quarters." (*Id.* at 56).  Since Defendants lack more detailed records of Plaintiff's days off, the Court will accept the lower figure offered by Nieto.

The Court further finds that Plaintiff was directly supervised by Felix Nieto, and had no direct interaction with either of the Individual Defendants. And the Court finds that Plaintiff's work week was from Monday to Saturday, and his work day was from 5:00 a.m. until 5:00 p.m., although it will discuss the actual hours Plaintiff worked *infra*.

## CONCLUSIONS OF LAW

Plaintiff pursued seven causes of action at trial:

i.     <u>First Cause of Action</u>:  Violation of the minimum wage provisions of the FLSA.

ii.    <u>Second Cause of Action</u>:  Violation of the overtime provisions of the FLSA.

iii.   <u>Third Cause of Action</u>:  Violation of the New York Minimum Wage Act.

iv.    <u>Fourth Cause of Action</u>:  Violation of the overtime provisions of the NYLL.

v.     <u>Fifth Cause of Action</u>:  Violation of the Spread of Hours Wage Order of the New York Commissioner of Labor.

vi.    <u>Sixth Cause of Action</u>:  Violation of the notice and recordkeeping requirements of the NYLL.

vii.   <u>Seventh Cause of Action</u>:  Violation of the wage statement provisions of the NYLL.

The first five of these causes of action are related:  They all assert that Defendants paid Plaintiff insufficient wages, and the Court will thus consider them in tandem, before addressing Plaintiff's two remaining causes of action individually.

**A.    The Court Will Consider Plaintiff's Claims Under the NYLL, But Not the FLSA**

    **1.    Plaintiff Has Not Met His Burden of Demonstrating the Applicability of the FLSA**

        **a.    Applicable Law**

Before addressing the merits of Plaintiff's wage and hour claims, the Court must resolve several antecedent issues concerning the applicable law and the parties who are potentially liable under that law.  "The FLSA and the NYLL both 'guarantee[ ] compensation for all work ... engaged in by [covered] employees."  *Salinas* v. *Starjem Rest. Corp.*, 123 F. Supp. 3d 442, 472 (S.D.N.Y. 2015) (quoting *Kuebel* v. *Black & Decker Inc.,* 643 F.3d 352, 359 (2d Cir. 2011)).  "To establish liability on a claim for underpayment of wages, 'a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work.'"  *Id.* (quoting *Kuebel,* 643 F.3d at 361); *see Tapia* v. *Blch 3rd Ave. LLC*, No. 14 Civ. 8529 (AJN), 2016 WL 4581341, at *4 (S.D.N.Y. Sept. 1, 2016) (observing that under the FLSA and the NYLL, "[p]laintiffs bear the burden of proof to establish all claims and damages by a preponderance of the evidence"); *see generally Gamero* v. *Koodo Sushi Corp.*, 272 F. Supp. 3d 481 (S.D.N.Y. 2017).[14]

---

[14]    In addition to the relevant differences addressed in the text, the FLSA and NYLL also differ in terms of their limitations period.  Under the FLSA, the applicable statute of limitations is two years, although it is extended to three years upon a finding that the FLSA violations by an employer were willful.  29 U.S.C. § 255(a).  The applicable limitations period for NYLL claims is six years.  NYLL § 663(3).  As it happens, neither provision is implicated by this case, because Plaintiff began his employment in February 2016; ended it in March 2016; and filed this lawsuit in August 2016.

An employee is covered by the minimum wage and overtime provisions of the FLSA only if he or she, in any workweek, is: (i) "engaged in commerce or in the production of goods for commerce;" or (ii) "employed in an enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. §§ 206(a), 207(a)(1); *see also Quintero* v. *Anjudiromi Constr. Corp.*, No. 16 Civ. 8781 (RWS), 2018 WL 1027716, at *2 (S.D.N.Y. Feb. 21, 2018). "The two categories are commonly referred to as 'individual' and 'enterprise' coverage, respectively." *Jacobs* v. *N.Y. Foundling Hosp.*, 577 F.3d 93, 96 (2d Cir. 2009). Because the Court understands that Plaintiff is not asserting individual coverage under the FLSA (*see* Pl. COL ¶ 10), the applicability of the FLSA to Plaintiff's employment depends on whether Tribeca Bagels was an "enterprise engaged in commerce or in the production of goods for commerce" during the period of Plaintiff's employment. 29 U.S.C. §§ 206(a), 207(a)(1). On this issue, Plaintiff bears the burden. *Ethelberth* v. *Choice Sec. Co.*, 91 F. Supp. 3d 339, 354 (E.D.N.Y. 2015) (collecting cases).

Under the FLSA, an "enterprise engaged in commerce or in the production of goods for commerce" is an entity that (i) "has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person;" and (ii) "whose annual gross volume of sales made or business done is not less than $500,000[.]" 29 U.S.C. § 203(s)(1)(A)(i-ii).

### b.   Analysis

Plaintiff's enterprise evidence consists of the following paragraphs of his

Declaration:

> My work responsibilities involved handling goods that came from out of state, including but not limited to the frozen packages of dough, dry good deliveries like the napkins and plates, as well as the cleaning supplies that I used regularly for cleaning the premises like soap.
>
> During a typical shift with Tribeca Bagel I would prepare seven (7) steam trays filled with various foods to be sold at the open buffet for upwards of $6.50 [per pound]. Those seven steam trays would be completely sold off to customers by around 5pm. I would also observe that in a typical shift Tribeca Bagels would sell around 40 bagels in the morning for $3.50 a bagel, 30-35 hot sandwiches between 5am and 5pm for $5.50 per sandwich and eight full pizzas divided into 8 slices each that sold for $2.50 a slice. Tribeca also sold in a typical day dozens of sodas, cold drinks, candy bars, coffee, potato chips, miscellaneous snacks, fruit salads, cigars, Advil and other over the counter medicines.

(Pl. Ex. 2 at ¶¶ 11-12).  The Court has reasons to doubt Plaintiff's ability to

speak meaningfully to this issue:  After all, Plaintiff only worked at Tribeca

Bagels for a little over four weeks, and it is difficult to believe that he could

perform his job functions of preparing and setting out food while paying close

attention to sales of other products at other locations in the store.  (See Tr. 58

(testimony of Plaintiff: "They asked me to practically work all the time at the

kitchen."); *see also id.* at 20 (noting door that closed off kitchen)).  However,

Defendants did not specifically rebut this evidence, and the Court will therefore

consider it.

Crediting, as the Court does, the testimony of multiple defense witnesses that Tribeca Bagels was closed at least two days per year for the Jewish holidays of Rosh Hashanah and Yom Kippur, meeting the FLSA threshold in 2016 would require Plaintiff to demonstrate sales revenues of $1,373.63 per day.[15]  Plaintiff's sworn statement, even read generously, does not approach that figure.  According to Plaintiff, during his shift, Tribeca Bagels would sell $140 worth of bagels, $192.50 worth of hot sandwiches, and $160 worth of pizza.  That totals $492.50.  Plaintiff has left the Court to speculate as to the remainder of the FLSA threshold.  For instance, Plaintiff provides no guidance concerning the size or volume of the steam trays, but even assuming a generous estimate of 10 pounds of food in each, that would add only another $455.  That would leave a deficit of approximately $426, and the Court is left on its own to imagine the prices and sales volume of soda and sundries, and the sales at times when Plaintiff was not present.  The Court simply cannot do that.  Plaintiff has not met his burden, and the Court therefore finds that Defendants are not subject to the FLSA.[16]

---

[15]    The Court recognizes that 2016 was a leap year.  For a non-leap year, Plaintiff would have to present evidence suggesting average daily sales of $1,377.41.

[16]    This finding is largely academic:  Even were the Court to find violations of the FLSA, the Court would award damages under the NYLL because the amount of damages recoverable under that statute would be higher.

An employee "may not receive a 'double recovery' of back wages under both the FLSA and [the] NYLL."  *Hernandez* v. *Jrpac Inc.*, No. 14 Civ. 4176 (PAE), 2016 WL 3248493, at *31 (S.D.N.Y. June 9, 2016) (quoting *Gen. Tel. Co. of the Nw.* v. *EEOC*, 446 U.S. 318, 333 (1980)); *accord Hengjin Sun* v. *China 1221, Inc.*, No. 12 Civ. 7135 (RJS), 2016 WL 1587242, at *2 (S.D.N.Y. Apr. 19, 2016) ("The law in this Circuit is clear:  'Obviously, plaintiffs are not entitled to recover twice' under both the FLSA and NYLL 'for the same injury.'" (quoting *Cao* v. *Wu Liang Ye Lexington Rest., Inc.*, No. 08 Civ. 3725 (DC), 2010 WL 4159391, at *2 n.2 (S.D.N.Y. Sept. 30, 2010))).  If "'a plaintiff is entitled to damages under both federal and state wage law,' the Court has discretion to award [that plaintiff]

## 2. The Court Retains Supplemental Jurisdiction over Plaintiff's NYLL Claims

### a. Applicable Law

Under 28 U.S.C. § 1367, in any civil action in which a district court has original jurisdiction, it "shall" also, with limited exceptions, "have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). "A court 'may decline to exercise supplemental jurisdiction,' however, if, among other factors, ... 'the district court has dismissed all claims over which it has original jurisdiction.'" *Kroshnyi* v. *U.S. Pack Courier Servs., Inc.*, 771 F.3d 93, 102 (2d Cir. 2014) (quoting 28 U.S.C. § 1367(c)). Given the Court's disposition of Plaintiff's FLSA claims, it considers now whether it should continue to exercise supplemental jurisdiction over Plaintiff's state-law claims.

Where all of the federal claims in an action have been dismissed, a court must consider whether continuing to exercise supplemental jurisdiction over any remaining state-law claims "serves the interests of economy, convenience, fairness and comity." *Bray* v. *City of New York*, 356 F. Supp. 2d 277, 285 (S.D.N.Y. 2004) (citing *Itar-Tass Russian News Agency* v. *Russian Kurier, Inc.*, 140 F.3d 442, 446-47 (2d Cir. 1998)); *see generally Chapman* v. *Crane Co.*, 694

---

damages under the statute providing the greatest amount of relief." *China 1221*, 2016 WL 1587242, at *2 (quoting *Jiao* v. *Shi Ya Chen*, No. 03 Civ. 165 (DF), 2007 WL 4944767, at *17 (S.D.N.Y. Mar. 30, 2007)); *see Jrpac*, 2016 WL 3248493, at *31 (awarding plaintiffs damages under the NYLL, not the FLSA, because the NYLL's "higher minimum wage" and longer statute of limitations meant that "[p]laintiffs' damages award under the NYLL necessarily ... subsume[d] their award under the FLSA").

F. App'x 825, 828 (2d Cir. 2017) (summary order).  Generally, if a court dismisses before trial all of the claims over which it has original jurisdiction, the balance of these factors will weigh in favor of declining to exercise supplemental jurisdiction over any remaining state-law claims.  *See Kolari* v. *N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ.* v. *Cohill*, 484 U.S. 343, 350 n.7 (1988)).  Conversely, declining to exercise supplemental jurisdiction may disserve the relevant interests "when the dismissal of the federal claim occurs late in the action, after there has been substantial expenditure in time, effort, and money in preparing the dependent claims."  *Motorola Credit Corp.* v. *Uzan*, 388 F.3d 39, 56 (2d Cir. 2004) (internal quotation marks and citation omitted).  For that reason, there is a "particularly strong case for retaining jurisdiction . . . [after a court] has not only spent considerable time dealing with the legal issues and becoming fully conversant with the fact but also has conducted a trial on the merits."  *Id.* (internal quotation marks and citation omitted); *accord Short* v. *Manhattan Apartments, Inc.,* 916 F. Supp. 2d 375, 394 (S.D.N.Y. 2012) (collecting cases).

### b.    Analysis

Applying the factors of judicial economy, convenience, fairness, and comity, this Court concludes that Plaintiff's NYLL claims should not be dismissed on jurisdictional grounds at this late stage of the litigation.  With one exception addressed in the next section of this Opinion, these claims involve a relatively straightforward application of the NYLL's minimum wage, overtime, wage notice, and wage statement provisions, rather than novel or complex

issues of state law that would implicate concerns about comity.  *Cf. Chenensky* v. *N.Y. Life Ins. Co.*, 942 F. Supp. 2d 388, 395 (S.D.N.Y. 2013) ("Here, the relationship between the state and federal claims, the nature of the state law claims, and the pending companion case in state court all favor declining jurisdiction.  No federal claims remain in this case.  And the remaining claims raise novel and complex issues of state law.").  More importantly, given that this Court has already conducted a trial on the merits, the factors of convenience and judicial economy weigh strongly in favor of this Court's continued exercise of supplemental jurisdiction.  Accordingly, this Court will retain jurisdiction over Plaintiff's pendent state-law claims.

## B.   The Court Considers 374 Food Inc., But Not Tiran Tsadok, to Be Plaintiff's Employer Under the NYLL[17]

### 1.   Applicable Law

The FLSA and NYLL statutes are often construed together, particularly when the New York Court of Appeals has not spoken to an issue under the NYLL.  Several years ago, the Second Circuit demurred holding that "the tests for 'employer' status are the same under the FLSA and the NYLL," reasoning

---

[17]   As noted, Plaintiff no longer pursues employer liability against Hayim Tsadok, and judgment will be entered in his favor on all claims.

In cases other than this one, the parties may dispute whether the plaintiff was an "employee" of the defendants.  Such disputes can arise, for instance, in situations where the plaintiff is arguably an "independent contractor," or where the plaintiff is working for multiple employers at the same time.  *See* NYLL § 190(2) ("'Employee' means any person employed for hire by an employer in any employment."); *see generally Hart* v. *Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901 (S.D.N.Y. 2013) (presenting comprehensive analysis for distinguishing employees from independent contractors).  The Court does not understand Defendants here to be contesting that Plaintiff was an employee for the period of time he worked at Tribeca Bagels, but rather which Defendants are properly considered Plaintiff's "employer."

that "this question has not been answered by the New York Court of Appeals."
*Irizarry* v. *Catsimatidis*, 722 F.3d 99, 117 (2d Cir. 2013). The Court of Appeals
still has not addressed this issue, and courts in this District have construed
the employer provisions of each statute *pari passu. See Hernandez* v. *Jrpac
Inc.* (hereinafter, "*Jrpac*"), No. 14 Civ. 4176 (PAE), 2016 WL 3248493, at *22
(S.D.N.Y. June 9, 2016) ("The statutory standard for employer status under the
NYLL is nearly identical to that of the FLSA."); *Inclan* v. *N.Y. Hosp. Grp., Inc.*, 95
F. Supp. 3d 490, 511 (S.D.N.Y. 2015) ("Neither the New York Court of Appeals
nor the Second Circuit has decided whether the tests for 'employer' status are
the same under the FLSA and the NYLL. However, district courts in this
Circuit have consistently interpreted the definition of 'employer' under the New
York Labor Law coextensively with the definition used by the FLSA." (citations
and internal quotation marks omitted)).

Both the FLSA and the NYLL define the term "employer" broadly for
purposes of determining those who bear liability for unpaid wages. *See* 29
U.S.C. § 203(d) (defining "employer" to include "any person acting directly or
indirectly in the interest of an employer in relation to an employee"); NYLL
§§ 2(6) (in definitions to Article 1: Short Title and Definitions: "'Employer'
means the person employing any such mechanic, workingman or  laborer,
whether the owner, proprietor,  agent, superintendent, foreman or other
subordinate."), 190(3) (in definitions to Article 6: Payment of Wages: "'Employer'
includes any person, corporation, limited liability company, or association
employing  any  individual  in  any  occupation, industry, trade,  business or

27

service."), 651(6) (in definitions to Article 19: Minimum Wage Act: "'Employer'
includes any individual, partnership, association, corporation, limited liability
company, business trust, legal representative, or any organized group of
persons acting as employer."). This broad definition, at least with respect to
the FLSA, is in keeping with the remedial purposes of the act. *See Barfield* v.
*N.Y.C. Health & Hosps. Corp.*, 537 F.3d 132, 141 (2d Cir. 2008) (citing
*Nationwide Mut. Ins. Co.* v. *Darden*, 503 U.S. 318, 326 (1992)). From this
breadth, the Second Circuit has reasoned that "the determination of whether
an employer-employee relationship exists for purposes of the FLSA should be
grounded in 'economic reality rather than technical concepts,' determined by
reference not to 'isolated factors, but rather upon the circumstances of the
whole activity.'" *Barfield*, 537 F.3d at 141 (quoting *Goldberg* v. *Whitaker House
Coop., Inc.*, 366 U.S. 28, 33 (1961); *Rutherford Food Corp.* v. *McComb*, 331 U.S.
722, 730 (1947)).

The precise question here concerns the circumstances in which FLSA
liability may be imposed on an individual within a company, where the
company itself is indisputably the plaintiff's employer. A non-exclusive list of
factors (known as the "*Carter* factors," from the case from which they were
derived) that are considered in answering the question include "whether the
alleged employer [i] had the power to hire and fire the employees, [ii] supervised
and controlled employee work schedules or conditions of employment,
[iii] determined the rate and method of payment, and [iv] maintained
employment records." *Barfield,* 537 F.3d at 142 (quoting *Carter* v. *Dutchess*

28

*Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)).  Courts "also consider 'other factors bearing upon the overarching concern of whether the alleged employer possessed the power to control the workers in question.'"  *Yu Y. Ho* v. *Sim Enters., Inc.*, No. 11 Civ. 2855 (PKC), 2014 WL 1998237, at *11 (S.D.N.Y. May 14, 2014) (quoting *Irizarry*, 722 F.3d at 105).

When considering an owner who is not fully involved in the day-to-day operations of the Company, courts are guided by two Second Circuit decisions.[18]  In the first, *Herman* v. *RSR Security Services Ltd.*, 172 F.3d 132 (2d Cir. 1999), the corporate employer was a security service and the putative individual employer was a shareholder and lawyer named Portnoy.  While Portnoy did not supervise the security guards in the performance of their duties, he did involve himself in the day-to-day operations of the business, which was run in part from his law office.  Several senior managers also reported to, and took occasional instruction from, Portnoy.  Portnoy was "viewed by others as having control over RSR"; he "represented himself ... as having such authority"; and he dominated the company in part because his access to bank credit permitted him to "exercise[ ] financial control."  172 F.3d at 136-37.

Reviewing the *Carter* factors, the Second Circuit found Portnoy to be an "employer" for FLSA purposes.  It found the first three factors satisfied, as Portnoy had (i) hired managers (including "individuals who were in charge of

---

[18]     The Court acknowledges as well the helpful analysis provided by Judge Buchwald in *Inclan* v. *New York Hospitality Group, Inc.*, 95 F. Supp. 3d 490, 506-11 (S.D.N.Y. 2015).

the guards"); (ii) occasionally assigned guards to work locations and directed a colleague to revised the company's employment forms; and (iii) had occasionally signed payroll checks and redressed certain unlawful pay practices. *RSR*, 172 F.3d at 140. Of note, the Court emphasized that the existence of an employer-employee relationship "does not require continuous monitoring of employees, looking over their shoulders at all times, or any sort of absolute control of one's employees." *Id.* at 139; *see also id.* ("Control may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA[.]"). It also focused on Portnoy's exercise of general authority in, and his financial control of, RSR. *Id.* at 140.

The Circuit further elaborated on these ideas in *Irizarry* v. *Catsimatidis*, 722 F.3d 99 (2d Cir. 2013), in addressing the degree to which the Chairman, President, and CEO of the Gristedes supermarket chain could be considered an employer for FLSA purposes. 722 F.3d at 103-18. It focused the inquiry of district courts on "two legal questions":

> The first concerns the scope of an individual's authority or "operational control" over a company — at what level of a corporate hierarchy, and in what relationship with plaintiff employees, must an individual possess power in order to be covered by the FLSA? The second inquiry, related but distinct, concerns hypothetical versus actual power: to what extent and with what frequency must an individual actually use the power he or she possesses over employees to be considered an employer?

*Id.* at 106.

As to the first question, the Court found that

30

Evidence that an individual is an owner or officer of a company, or otherwise makes corporate decisions that have nothing to do with an employee's function, is insufficient to demonstrate "employer" status. Instead, to be an "employer," an individual defendant must possess control over a company's actual "operations" in a manner that relates to a plaintiff's employment. It is appropriate, as we implicitly recognized in *RSR*, to require some degree of individual involvement in a company in a manner that affects employment-related factors such as workplace conditions and operations, personnel, or compensation — even if this appears to establish a higher threshold for individual liability than for corporate "employer" status.

***

A person exercises operational control over employees if his or her role within the company, and the decisions it entails, directly affect the nature or conditions of the employees' employment. Although this does not mean that the individual "employer" must be responsible for managing plaintiff employees — or, indeed, that he or she must have directly come into contact with the plaintiffs, their workplaces, or their schedules — the relationship between the individual's operational function and the plaintiffs' employment must be closer in degree than simple but-for causation. Although the answer in any particular case will depend, of course, on the totality of the circumstances, the analyses in the cases discussed above, as well as the responsibilities enumerated in the *Carter* factors, provide guidance for courts determining when an individual's actions rise to this level.

*Id.* at 109-10. And while an individual may be an "employer" by dint of that individual's potential power, even if such power were not always exercised, the Court found that

all of the cases discussed indicate that the manifestation of, or, at the least, a clear delineation of an individual's power over employees is an important and telling factor in the "economic reality" test. Ownership, or a stake in a company, is insufficient to

> establish that an individual is an "employer" without
> some involvement in the company's employment of the
> employees.

*Id.* at 111.

Reviewing the record, the Second Circuit cited Catsimatidis's involvement in "banking," "financial[s]," "real estate," "merchandising," "governmental relations," and "relationships with vendors"; his "exercise of influence in specific stores on multiple occasions"; and his ultimate power "to control Gristede's operations at a high level," in finding him to be an employer for FLSA purposes.  722 F.3d at 112-13; *see also id.* at 116 ("Catsimatidis satisfied two of the *Carter* factors in ways that we particularly emphasized in *RSR*: the hiring of managerial employees and overall financial control of the company.").  The Court recognized, however, "that the facts here make for a close case."  *Id.* at 116 ("We recognize that the facts here make for a close case, but we are guided by the principles behind the liquidated damages provision of the FLSA in resolving the impact of the totality of the circumstances described herein.").

### 2.    Analysis

Defendant 374 Food Inc. qualifies as Plaintiff's employer, though the parties vigorously dispute his period of employment.  The more complicated issue is whether 374 Food's owner, Tiran Tsadok, also qualifies as Plaintiff's employer.  (*See* Def. FFCL 5-6).  In this regard, Plaintiff offered several statements in his Declaration concerning Tiran Tsadok's managerial and operational control of Tribeca Bagels:

> I knew Tiran Tsadok as "Tito" who was introduced to me
> as the owner of Tribeca Bagel[s] on several occasions.  I

> observed and heard Mr. Tsadok discuss the payroll and general finances of Tribeca Bagels with the acting manager Alberto in a regular meeting that the two men held between two to three times a week within the premises at 374 Canal Street. I understood Mr. Tsadok to have hired Alberto and to be in control of the finances.
>
> I received my schedule from Alberto, who I understand to have received direction from Tito.
>
> As an example, Mr. Tsadok was present when I was hired. Alberto asked Mr. Tsadok how much I was going to be paid.

(Pl. Ex. 2 at ¶¶ 5-7). The Court credits very few of these assertions.

Hewing to its earlier policy of accepting that portion of Plaintiff's testimony that was not rebutted by the impeachment witnesses, the Court accepts that Tiran Tsadok was the owner of 347 Food Inc.; that he hired Felix Nieto as his manager; and that he visited the store briefly on Wednesdays while taking a break from his principal job of real estate management. However, the Court does *not* accept that Tiran visited Tribeca Bagels thrice weekly — and certainly does not accept Plaintiff's statement at trial that he observed Tiran and Nieto meet to discuss business issues "approximately 90 to 100 times." (Tr. 25). And it specifically does not believe Plaintiff's account of the conversation between Nieto and Tiran Tsadok that Plaintiff claimed to have heard on his first day of work. (*Id.* at 16, 22). Nor does it believe that Tiran participated in the interview of or decision to hire Plaintiff, or in the setting of Plaintiff's schedule or rate of pay. For his part, Plaintiff presented no evidence of any other involvement by Tiran in the operations of the company. While the FLSA and the NYLL are expansive in their scope, a plaintiff seeking to impose

33

liability under these statutes has some burden to satisfy; Plaintiff has not met his burden here.

Even considering the testimony of the impeachment witnesses, the Court cannot find Tiran Tsadok to be an "employer" under the NYLL. The defense witnesses who were questioned about Tiran's weekly visits to Tribeca Bagels were uniform in recalling the brevity of such visits. (*See, e.g.*, Tr. 83 (testimony of Luis Quiroz: "So he [Tiran] will be at the office for maybe five minutes."), 112 (testimony of Hayim Luna: "Twenty minutes, fifteen minutes, half an hour, no more."), 115 (testimony of Miguel Camora: "Q. Do you know what [Tiran Tsadok] does when he's at the store? A. To tell you the truth, I don't know. He just waves hello."). The only person to be asked about the substance of those visits was Felix Nieto, who recalled that, other than exchanging greetings, Tiran wrote checks for non-employee expenses, including utilities, rent, and insurance. (*Id.* at 96).

By contrast, Nieto made clear that, for the four years preceding the trial, *he* — independent of Tiran — exercised operational control of the business. (*See, e.g.*, Tr. 91 ("I'm in charge of everything there from purchase orders, inventory, etc."), 98 ("For the last four years, I have been doing that."), 106 ("I set the salaries. I hire the employees. I am the one who does the evaluations of their performance. I'm totally in charge of the deli. I do not report to [Tiran] about anything about the deli."); *see also id.* at 98 (explaining his responsibility for hiring and firing employees, scheduling, working conditions, rates of pay, and payroll); *see also id.* at 89 (testimony of Luis Quiroz that Nieto paid him)).

34

It is true that Tiran Tsadok hired Nieto to manage Tribeca Bagels, but Nieto had been working with the Tsadok family for approximately 30 years (*id.* at 105 ("Mr. Hayim [Tsadok] had a deli in another location in Manhattan, and that's when I went to work in 1987.")), and there is no evidence of Tiran's involvement in any hiring decisions thereafter.

On the evidence presented at trial, the Court can conclude that Tiran Tsadok owns Tribeca Bagels, and that he makes sure the lights are kept on. However, Plaintiff has presented insufficient evidence of a "degree of individual involvement [by Tiran] in [Tribeca Bagels] in a manner that affects employment-related factors such as workplace conditions and operations, personnel, or compensation." *Irizarry*, 722 F.3d at 109. The evidence here is considerably less than in *RSR* or *Irizarry*. And as with Plaintiff's FLSA arguments, the Court can speculate as to how Tiran Tsadok *might* "possess control over a company's actual 'operations' in a manner that related to a plaintiff's employment," *id.*, but such speculation cannot take the place of actual evidence. The Court concludes that Plaintiff has not met his burden of proving that Tiran Tsadok was his "employer" under the NYLL.

### C.   Plaintiff Is Provisionally Entitled to Relief on His Third, Fourth, and Fifth Causes of Action[19]

#### 1.   Applicable Law

##### a.   The Burden of Proof in the Absence of Complete Employment Records

Having resolved the issues of applicable law and potentially liable parties, the Court now considers whether Plaintiff has proven wage and hour violations under the FLSA.  As in many cases, Plaintiff's efforts are hampered by the failure of Defendant 347 Food Inc. to keep accurate records, and so the Court addresses the legal ramifications of that failure in this section.[20]

Where an employer's payroll records are inaccurate or incomplete, courts apply a burden-shifting scheme to determine whether an employee has established that he was underpaid, and what damages he suffered.  Here, too, there is an interrelationship in the analyses under the FLSA and the NYLL, and for this reason both are discussed in this section, even though the Court is only considering Plaintiff's claims under the NYLL.

Under the FLSA, "[w]hen an employer fails to maintain accurate and complete records of the hours employees work and the amounts they are paid, the plaintiff-employee need only ... submit 'sufficient evidence from which violations of the [FLSA] and the amount of an award may be reasonably inferred.'"  *Gonzalez* v. *Masters Health Food Serv. Inc.*, No. 14 Civ. 7603 (VEC),

---

[19]   The Court uses the term "provisionally" in the next few sections of this Opinion deliberately, to account for its ultimate directive to the parties to brief the propriety of sanctions in this case.

[20]   In discussing liability under the FLSA in the remainder of this Opinion, the Court uses "Defendant" to refer to Plaintiff's employer, 347 Food, Inc.

2017 WL 3835960, at *16 (S.D.N.Y. July 27, 2017) (quoting *Reich* v. *S. New England Telecomms. Corp.*, 121 F.3d 58, 66 (2d Cir. 1997)).  An employee discharges his burden at this first step "if he ... can prove that [he] 'in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" *Jrpac*, 2016 WL 3248493, at *27 (quoting *Anderson* v. *Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)).  "This burden is 'not high' and may be met 'through estimates based on [the employee's] own recollection.'"  *Id.* (quoting *Kuebel*, 643 F.3d at 362).

If an employee makes this showing, "[t]he burden then shifts to the employer to come forward [i] with evidence of the precise amount of work performed or [ii] with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence."  *Jrpac*, 2016 WL 3248493, at *27 (quoting *Anderson,* 328 U.S. at 687-88).  "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result may be only approximate."  *Gonzalez*, 2017 WL 3835960, at *16 (quoting *Kuebel*, 643 F.3d at 362).

"A similar standard applies to unpaid compensation claims under [the] NYLL."  *Gonzalez*, 2017 WL 3835960, at *16; *see Garcia* v. *JonJon Deli Grocery Corp.*, No. 13 Civ. 8835 (AT), 2015 WL 4940107, at *4 n.8 (S.D.N.Y. Aug. 11, 2015) ("Courts use the same burden-shifting framework to determine liability for unpaid overtime under the NYLL [and the FLSA].").  But under the NYLL, an employer who fails to keep accurate records shoulders a more stringent burden

of proof. "NYLL § 196-a provides that where an employer fails to 'keep adequate records or provide statements of wages to employees as required' by the statute, the employer 'shall bear the burden of proving that the complaining employee was paid wages, benefits and wage supplements.'" *Canelas* v. *World Pizza, Inc.*, No. 14 Civ. 7748 (ER), 2017 WL 1233998, at *9 (S.D.N.Y. Mar. 31, 2017) (quoting NYLL § 196-a(a)).

By its terms, the NYLL — unlike the FLSA — does not permit an employer to discharge this burden by undermining the reasonableness of an employee's evidence that he was underpaid. *Cf. Jrpac*, 2016 WL 3248493, at *27. The NYLL is more demanding: An employer must demonstrate by a preponderance of the evidence that it in fact paid its employees "wages, benefits and supplements." NYLL § 196-a(a). And "[i]f an employer cannot satisfy its burden under the FLSA, it cannot satisfy th[is] 'more demanding burden' of the NYLL." *Canelas*, 2017 WL 1233998, at *9 (quoting *Doo Nam Yang* v. *ACBL Corp.*, 427 F. Supp. 2d 327, 337 n.15 (S.D.N.Y. 2005)).

### b. Minimum Wage, Overtime, and Spread-of-Hours Pay Under the NYLL

At all times relevant to this lawsuit, the minimum wage under the NYLL was $9.00. NYLL § 652(2); N.Y. Comp. Codes R. & Regs. tit. 12 ("12 N.Y.C.R.R.") § 146-1.2. The NYLL also requires employers to pay overtime pay for hours worked in excess of 40 during the work week. *See* 12 N.Y.C.R.R. § 142-2.2 ("An employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and subject to the exemptions of sections 7 and 13 of 29 U.S.C.

38

201 et seq., the Fair Labor Standards Act of 1938, as amended[.]”);[21] *see generally Gamero*, 272 F. Supp. 3d at 499.

An employee may be entitled to a third form of pay, known as “spread-of-hours” pay.  Under New York law, an employee’s “spread of hours is the length of the interval between the beginning and end of an employee’s workday,” and includes “working time plus time off for meals plus intervals off duty.”  12 N.Y.C.R.R. § 142-2.18.  The NYLL requires employers to pay an employee who works a spread of hours in excess of ten, one additional hour at the minimum wage rate.  *Id.* § 142-2.4 (“An employee shall receive one hour’s pay at the basic minimum hourly wage rate, in addition to the minimum wage required in this Part for any day in which: (a) the spread of hours exceeds 10 hours; or (b) there is a split shift; or (c) both situations occur.”).

### c.    Non-Compensable Meal Breaks

“Under both the FLSA and NYLL, ‘all of the time worked during a continuous workday is compensable, save for bona fide meal breaks.’”  *Jrpac*, 2016 WL 3248493, at *27 (quoting *Hart* v. *Rick’s Cabaret Int’l, Inc.*, 60 F. Supp. 3d 447, 476 n.15 (S.D.N.Y. 2014)); *see also Perkins* v. *Bronx Lebanon Hosp. Ctr.*, No. 14 Civ. 1681 (JCF), 2016 WL 6462117, at *3 n.6 (S.D.N.Y. Oct. 31, 2016) (“The NYLL incorporate[s] [the] FLSA[’s] standards for determining whether time worked is compensable time.” (internal quotation marks and citation omitted)); *cf.* 12 N.Y.C.R.R. § 146-3.6 (definition of working time in

---

[21]    Under the FLSA, an employee is entitled to be paid for overtime hours (i.e., hours exceeding 40 per week), at a “rate not less than one and one-half times the regular rate at which [the employee] is employed.”  29 U.S.C. § 207(a)(1).

Hospitality Industry Wage Order to include: "time an employee is required to be available for work at a place ... prescribed by the employer such that the employee is unable to use the time productively for his or her own purpose").[22]

"To qualify as a bona fide meal period, '[t]he employee must be completely relieved from duty for the purposes of eating regular meals. Ordinarily 30 minutes or more is long enough for a bona fide meal period.'" *Salinas*, 123 F. Supp. 3d at 472 (quoting 29 C.F.R. § 785.19(a)). Conversely, an "employee is not relieved if he is required to perform any duties, whether active or inactive, while eating." 29 C.F.R. § 785.19(a). Moreover, "[r]est periods of short duration, running from 5 minutes to about 20 minutes ... are customarily paid for as working time." *Id.* § 785.18; *see also Perkins*, 2016 WL 6462117, at *4 ("The Second Circuit has held that an employee must be 'compensat[ed] for a meal break during which a worker performs activities predominantly for the benefit of the employer.'" (citing *Reich*, 121 F.3d at 64).

### d. Liquidated Damages

Finally, an employee may obtain liquidated damages under the NYLL in certain circumstances, as described in NYLL § 663:

> If any employee is paid by his or her employer less than the wage to which he or she is entitled under the provisions of this article, he or she shall recover in a civil action the amount of any such underpayments, together with costs all reasonable attorney's fees,

---

22    NYLL § 162 specifies the length of meal breaks across various industries. Violations of this provision are enforceable by the New York Department of Labor, but not by affected employees. *See* NYLL § 218. The Court understands Plaintiff here not to be complaining about the absence of formal meal breaks, but rather opposing any deductions from the hours he worked for meal breaks he claims now never to have received.

> prejudgment interest as required under the civil
> practice law and rules, *and unless the employer proves
> a good faith basis to believe that its underpayment of
> wages was in compliance with the law, an additional
> amount as liquidated damages equal to one hundred
> percent of the total of such underpayments found to be
> due.* Any agreement between the employee, and the
> employer to work for less than such wage shall be no
> defense to such action.

NYLL § 663 (emphasis added).

The current version of this provision reflects two significant amendments: one on November 24, 2009, that removed an obligation on the employee's part to prove willfulness as a condition to liquidated damages, and one on April 9, 2011, that authorized liquidated damages in the amount of 100 percent of lost pay, rather than the previous 25 percent. *See generally Gamero*, 272 F. Supp. 3d at 502-03. By removing the element of willfulness, New York has aligned the NYLL "to provide, like the FLSA, that an employee is entitled to liquidated damages except where the employer demonstrates its good faith." *Jrpac*, 2016 WL 3248493, at *34. As a result, "courts have not substantively distinguished the [FLSA's] standard from the current [NYLL] standard of good faith." *Inclan*, 95 F. Supp. 3d at 505; *see Chowdhury* v. *Hamza Express Food Corp.*, 666 F. App'x 59, 61 (2d Cir. 2016) (summary order) ("The legislative history of the 2009 amendment confirms the New York State legislature's intent to 'conform' the NYLL's liquidated damages provision to the FLSA's provision.").

To escape liability for liquidated damages, the employer must show that it acted in good faith, meaning it "took 'active steps to ascertain the dictates of

the FLSA and then act to comply with them.'" *Barfield*, 537 F.3d at 150

(quoting *RSR*, 172 F.3d at 142). In addition, the employer must show that its

good-faith actions were objectively reasonable. *RSR*, 172 F.3d at 142-43. The

Second Circuit has observed that "the employer's burden [is] 'a difficult one,'

emphasizing that 'double damages [are] the norm and single damages the

exception.'" *Barfield*, 537 F.3d at 150 (quoting *RSR*, 172 F.3d at 142).

### 2. Analysis

The Court begins with the burden-shifting scheme implicit in NYLL

claims. When an employer fails to maintain accurate records, a plaintiff must

proffer "sufficient evidence from which violations of the [FLSA and the NYLL]

and the amount of an award may be reasonably inferred." *Gonzalez*, 2017 WL

3835960, at *16 (internal quotation marks and citation omitted). Such is the

case here. Defendant did not maintain accurate records of Plaintiff's hours and

wages, and does not suggest otherwise. And Plaintiff proffered sufficient

evidence from which the Court could infer violations of the NYLL, by submitting

a sworn statement claiming that he was systematically underpaid for the hours

he worked at Tribeca Bagels. The Court — conscious of the fact that an

employee's burden at this first stage "is 'not high,'" *Jrpac*, 2016 WL 3248493,

at *27 (quoting *Kuebel*, 643 F.3d at 362) — concludes that Plaintiff has made

the initial showing that Defendant violated the NYLL.

That shifted to Defendant "the burden of proving that [Plaintiff was] paid

wages, benefits and wage supplements." NYLL § 196-a. Defendant only

partially satisfied these burdens. Accordingly, the Court must "award damages

42

to [Plaintiff], even though the result may be only approximate." *Gonzalez*, 2017 WL 3835960, at *16 (internal quotation mark and citation omitted).

The parties are generally in agreement that, during the period Plaintiff worked at Tribeca Bagels, he worked a six-day workweek for which he received $100, in cash, per shift. The principal dispute was the period of time over which he worked, with Plaintiff averring an eight-month period from September 2015 until April 2016, and repeated defense witnesses testifying to a one-month period from February to March 2016. As explained earlier in this Opinion, the Court credits all of the defense witnesses — or, in the alternative, it disbelieves Plaintiff to the extent he claims a longer time period. In particular, the Court credits the testimony of Luis Quiroz, whose elbow surgery and consequent absence provided the reason for Plaintiff's short-term hiring, and Felix Nieto, who explained the processes by which he hired and fired Plaintiff. And as noted above, the Court finds that Plaintiff worked on 25 days during this period, comprising three weeks of six days worked; one week of five days worked; and one week of two days worked.

A related issue concerns the number of hours Plaintiff worked each day. In his Declaration, Plaintiff states that he worked "from 5:00 a.m. to 5:15 p.m. for four days out of the week and from approximately 5:00 a.m. until 5:50 [p.m.] two days out of the week for a total of six (6) work days in a week." (Pl. Ex. 2 at ¶ 13). The Court understands, from other statements in Plaintiff's Declaration (*see, e.g.*, *id.* at ¶¶ 16-17), that Plaintiff is not claiming that this was his formal schedule, but rather his best estimate of his actual time worked

43

(*see* Tr. 58 (testimony of Plaintiff: "They told me twelve hours.")).  The two defense witnesses who spoke to Plaintiff's formal schedule were somewhat inconsistent:  Felix Nieto referred to it first as 5:00 a.m. to 4:00 p.m. (*id.* at 92), and then as 5:00 a.m. to 5:00 p.m. (*id.* at 93).[23]  Miguel Camora recalled it as 5:00 a.m. to 4:00 p.m.  (*Id.* at 114).

The Court must construe the gaps in Defendant's employment records against Defendant.  For this reason, it finds that Plaintiff's work schedule was 5:00 a.m. to 5:00 p.m.  However, for several reasons, it declines to include the 15- and 50- minute periods that Plaintiff has suggested be added to the end of his shifts.  *First*, several of Plaintiff's co-workers — and his supervisor — recalled him as being habitually late to work on the order of 30 to 40 minutes each day.  (*See, e.g.*, Tr. 66 (Ochoa), 93 (Nieto), 111 (Luna)).  *Second*, the Court credits the testimony of Felix Nieto that, by 3:00 or 3:30 p.m., the steam table that was the bulk of Plaintiff's work was empty.  (*Id.* at 93).  *Finally*, though of less importance to the analysis, the Court has credited the testimony of Nieto and Miguel Camora that Plaintiff took two meal breaks during the day, though it can only speculate as to their length.  (*Id.* at 93-94, 114).  Cognizant of the stringent burden of proof imposed on Defendant by the NYLL in this context, the Court finds that on those days Plaintiff did work, he worked a 12-hour shift.

---

[23]   What may have confused the issue is that the schedule of 5:00 a.m. to 4:00 p.m. was first mentioned as the shift for a delivery worker that was posted on a Craigslist ad.  By the time Plaintiff applied for the position, it had already been filled.

*Minimum Wage:*  Before consideration of overtime pay, the Court considers first whether Plaintiff received a minimum wage.  Plaintiff should have received $9.00 per hour, or $108 per day.  Plaintiff received only $100 per day, and is thus entitled to an additional $8.00 for each of the 25 days he worked, or **$200**.

*Overtime Wages:*  For each of the three weeks in which Plaintiff worked six days, he was entitled to overtime pay of $13.50, rather than $9.00, for 32 of the hours he worked.  Because the Court has already accounted for the $9.00 minimum wage in the preceding paragraph, it concludes that, as overtime compensation, Plaintiff is entitled to an additional **$432**.

For the one week in which Plaintiff worked five days, he was entitled to overtime pay of $13.50 for 20 of the hours he worked.  Here, too, because the Court has already accounted for the $9.00 minimum wage, it concludes that, as overtime compensation, Plaintiff is entitled to an additional **$90**.[24]

*Spread-of-Hours Pay:*  For each work day, Plaintiff's spread of hours exceeded 10 hours.  Thus, Plaintiff is entitled to one hour at the minimum wage rate for each of the 25 days he worked, for a total spread-of-hours pay of **$225.**

*Liquidated Damages:*  Defendant has not satisfied its burden of demonstrating good faith.  The Court therefore finds that Plaintiff is entitled to liquidated damages in the amount of 100 percent of the wages of which he was

---

[24]  The Court does not award overtime compensation for the two days that Plaintiff worked during the week of March 14, 2016.

deprived, which total **$947**.  Accordingly, under the NYLL, Plaintiff is provisionally entitled to liquidated damages in the amount of **$947.**

**D.    Plaintiff Is Provisionally Entitled to Recover Damages on His Sixth Cause of Action**

**1.    Applicable Law**

"New York Labor Law section 195(1) requires employers to provide employees with wage notices within ten business days of the start of employment."  *Kone* v. *Joy Constr. Corp.*, No. 15 Civ. 1328 (LTS), 2016 WL 866349, at *5 (S.D.N.Y. Mar. 3, 2016) (internal quotation marks and citation omitted).  Specifically, the statute mandates that "[e]very employer shall … provide his or her employees, in writing in English and in the language identified by each employee as the primary language of such employee, at the time of hiring, a notice containing" several categories of information, including "the regular pay day designated by the employer" and "the physical address of the employer's main office."  NYLL § 195(1)(a).

Prior to February 27, 2015, "the [Wage Theft Prevention Act ("WTPA"] entitled employees to recover statutory damages for violations of the wage statement requirement of $100 per work week, not to exceed $2,500."  *Baltierra* v. *Advantage Pest Control Co.*, No. 14 Civ. 5917 (AJP), 2015 WL 5474093, at *10 (S.D.N.Y. Sept. 18, 2015) (citation omitted); *accord Cabrera* v. *1560 Chirp Corp.*, No. 15 Civ. 8194 (TPG) (DF), 2017 WL 1289349, at *6 (S.D.N.Y. Mar. 6, 2017), *report and recommendation adopted*, 2017 WL 1314123 (S.D.N.Y. Apr. 6, 2017); *see also* 2010 N.Y. Laws ch. 564 § 7, amending NYLL § 198(1-d).  However, an amendment to the WTPA effective February 27, 2015, permitted

46

employees to recover wage-statement statutory damages of $250 dollars "for each work day that the violations occurred or continue to occur," not to exceed $5,000.  2014 N.Y. Laws ch. 537 § 2, amending NYLL § 198(1-d).

### 2.   Analysis

Plaintiff averred in his Declaration that he received neither wage notices nor wage statements.  (Pl. Ex. 2 at ¶¶ 20-23).  Defendants conceded that Plaintiff received none of the written notices or statements to which he was entitled.  (*See* Tr. 87 (statement of defense counsel: "I will stipulate that the plaintiff did not receive any paperwork."); *id.* at 100 (testimony of Felix Nieto: "Q. Did you ever give him any documents that reflect the hours of work, hourly rate of pay, or overtime?  A. There is nothing in writing. Everything was oral communication.")).  At trial, Nieto testified that at Tribeca Bagels, "[t]here is a poster for the labor department saying how much should be paid, the rate of pay, how much for overtime, etc." (*Id.*).  Plaintiff, however, did not recall seeing "a poster at Tribeca Bagels stating minimum wage," or a "poster or a piece of paper on a wall that stated your legal rights of any sort." (*Id.* at 30).

On this particular issue, the Court sides with Plaintiff.  The poster referred to during trial was not introduced as an exhibit, and the Court cannot tell whether it provided the requisite information in Plaintiff's native Spanish language.  NYLL § 195(1)(a).  In addition, the questioning to Nieto was framed in the present tense, and the Court cannot therefore be sure that the requisite information was posted during the period of Plaintiff's employment.  Plaintiff is therefore provisionally entitled to statutory damages in the amount of $250 per

work day, which, given the Court's finding of 25 work days, results in the statutory maximum award of **$5,000.**

### E.    Plaintiff Is Provisionally Entitled to Recover Damages for His Seventh Cause of Action

#### 1.    Applicable Law

Section 195(3) of the New York Labor Law requires employers to "furnish each employee with a statement with every payment of wages, listing" several details, including the employee's "rate or rates of pay."  NYLL § 195(3). Employers who fail to furnish any sort of wage statement are liable under the statute, as are "employers … [who] fail to comply with all of [Section 195(3)'s] enumerated requirements."  *Severino* v. *436 W. L.L.C.*, No. 13 Civ. 3096 (VSB), 2015 WL 12559893, at *9 (S.D.N.Y. Mar. 19, 2015).  As a result of an amendment to the WTPA effective February 27, 2015, employees are entitled to recover wage-notice statutory damages of $50 dollars "for each work day that the violations occurred or continue to occur," not to exceed $5,000.  2014 N.Y. Laws ch. 537 § 2, amending NYLL § 198(1-b); *see also Cabrera*, 2017 WL 1289349, at *7.

#### 2.    Analysis

Plaintiff stated in his Declaration that he received no wage statements containing the information to which he was entitled under NYLL § 195(3).  (Pl. Ex. 2 at ¶¶ 20-23).  For the reasons discussed in the preceding section, Defendants cannot successfully dispute this assertion.  Accordingly, Plaintiff is provisionally entitled to statutory damages of $50 per day for the 25 days on which he worked, for a total of **$1,250**.

Adding the wage and hour deficiencies, the liquidated damages, and the wage statement and wage notice penalties, Plaintiff is provisionally entitled to recover **$8,144**, exclusive of interest.

## F. Plaintiff Is Provisionally Entitled to Recover Prejudgment Interest on His Unpaid Wages Under the NYLL

### 1. Applicable Law

"Prejudgment interest may be awarded in addition to liquidated damages under [the] NYLL[.]" *Pineda*, 2017 WL 1194242, at *4; *see* NYLL § 198(1-a). "New York law sets the relevant interest rate at nine percent per year." *Ortega* v. *JR Primos 2 Rest. Corp.*, No. 15 Civ. 9183 (JCF), 2017 WL 2634172, at *6 (S.D.N.Y. June 16, 2017) (citing N.Y. C.P.L.R. § 5004). And to determine when prejudgment interest begins to accrue, "[c]ourts applying [the] NYLL in wage and hour cases 'often choose the midpoint of the plaintiff's employment within the limitations period.'" *China 1221*, 2016 WL 1587242, at *6 (quoting *Tackie* v. *Keff Enters. LLC*, No. 14 Civ. 2074 (JPO), 2014 WL 4626229, at *6 (S.D.N.Y. Sept. 16, 2014)).

An NYLL plaintiff may recover prejudgment interest only on his "actual damages … under the NYLL, … not [his] liquidated damages." *Ortega*, 2017 WL 2634172, at *6. "Prejudgment interest is [also] not available for violations of the wage statement or wage notice provisions." *Salustio* v. *106 Columbia Deli Corp.*, 264 F. Supp. 3d 540, 557 (S.D.N.Y. 2017).

49

## 2.    Analysis

Plaintiff is provisionally entitled to recoup prejudgment interest on his unpaid wages under the NYLL.  The Court calculates the midpoint of his employment as March 1, 2016.

## G.    The Parties Are Directed to Submit Supplemental Briefing on the Issue of Sanctions

While the Court may have resolved the question of the damages to which Plaintiff is provisionally entitled, it has left open a more significant question: Given his conduct at trial, is Plaintiff entitled to damages at all?

The Court sees no reason to mince words.  Plaintiff repeatedly testified falsely at trial and, at least with respect to his period of employment, Plaintiff created a timeline out of whole cloth.  Whatever defects in recollection one might attribute to the passage of time, there is plainly a difference between four and one-half weeks and eight months.[25]  The Court finds that Plaintiff committed perjury at trial.  *See United States* v. *Dunnigan*, 507 U.S. 87, 94 (1993) ("A witness testifying under oath or affirmation violates this statute if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." (citing 18 U.S.C. § 1621)).

---

[25]    The Court is also concerned that Plaintiff fabricated interactions with Defendant Hayim Tsadok in order to name him as a defendant in this case.  While it was prudent for Plaintiff and his counsel to cease their litigation efforts against him, that decision should have been made months before trial.  In this regard, the Court is concerned that Plaintiff's counsel may have refused even to consider defense counsel's repeated requests that Plaintiff drop the case against Hayim Tsadok because he lived in Florida and was not involved in the operation of Tribeca Bagels.

And while perjury is something with which a judge — and the perjurer's counsel — should always be concerned, the Court is particularly troubled here because it perceives that the perjury begat the trial.  From the initial pretrial conference, defense counsel indicated that Defendants were willing to settle the matter by paying Plaintiff the wages to which he was entitled for the "at most, six weeks" that Plaintiff was employed at Tribeca Bagels.  (Dkt. #50 at 3-4). The Court understands — to be clear, based only on what it observed while presiding over this case — that the principal reason for trial was the parties' divergence as to the period of employment, a divergence that was engendered by Plaintiff's false statements.  The Court wonders what resources were wasted by Plaintiff's perjury.

## CONCLUSION

The Court wishes to hear from the parties concerning next steps in light of all of the findings contained in this Opinion.  As a result, it ORDERS the parties to submit briefing of no more than 20 pages on the following issues:

1.  May the Court consider Plaintiff's perjury, and any other inappropriate conduct in this litigation, in determining his entitlement to recovery under the NYLL?

2.  Are sanctions against Plaintiff warranted under, among other sources, Federal Rule of Civil Procedure 11 or the Court's inherent power?

3.  Are sanctions against Plaintiff's counsel warranted under, among other sources, Federal Rule of Civil Procedure 11, 28 U.S.C. § 1927, or the Court's inherent power?

Defendants' brief is due **on or before April 30, 2018**.  Plaintiff's responsive brief is due **on or before May 30, 2018**.  No reply brief is requested at this time.

     SO ORDERED.

Dated:     March 27, 2018
             New York, New York

_____

KATHERINE POLK FAILLA
United States District Judge